No. 25-1477

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

_____

STATE OF RHODE ISLAND, *et al.*,

Plaintiffs-Appellants,

v.

DONALD J. TRUMP, in his official capacity, *et al.*,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Rhode Island

_____

**REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL**

_____

BRETT A. SHUMATE
 *Assistant Attorney General*

SARA MIRON BLOOM
 *Acting United States Attorney*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

MARK R. FREEMAN
GERARD SINZDAK
SIMON G. JEROME
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7209*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-1673*

**INTRODUCTION**

Executive Order 14,238 lawfully directed the three federal agency defendants in this suit to reduce their operations to the maximum extent consistent with law, while ensuring that the agencies perform all statutorily required functions.  Proceeding from the mistaken premise that the APA permits it to superintend the agencies' reorganization, the district court entered a preliminary injunction that suffers from numerous fatal flaws.  As the government explained in its stay motion, the order grants plaintiffs relief far beyond what they have standing to pursue, grants relief the court lacks jurisdiction to provide, and ignores fundamental principles of APA review, including the requirement that a plaintiff challenge discrete, "final" agency actions, not an agency's evolving plan to reorganize itself.

Plaintiffs offer no convincing response to these serious defects.  Consistent with recent decisions of the Supreme Court and Fourth Circuit staying similarly capacious injunctions, this Court should stay the district court's order.  *Department of Education v. California*, 145 S. Ct. 966 (2025); *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025).

**ARGUMENT**

**A.    The Government Is Likely to Succeed on the Merits**

1.  Plaintiffs do not dispute that to obtain relief in federal court, a plaintiff must have a "personal stake" in the lawsuit, *Raines v. Byrd*, 521 U.S. 811, 819 (1997)—that is, a particularized injury, caused by the allegedly unlawful action, which may be

redressed by favorable relief. *Accord* Resp. to Mot. for Stay Pending Appeal 10. It follows that injunctive relief beyond what might remedy a cognizable injury is outside a federal court's power to award. *Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("[A] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

Plaintiffs have proffered only two types of injury: delayed and withheld grant funding, and loss of agency-provided services. Resp. 10, 11. At most, then—putting aside the other insurmountable threshold obstacles to relief, *see infra*—an order tailored to plaintiffs' standing theories might have directed the agencies to disburse funds and to provide certain services.

But the preliminary relief the district court awarded—which prohibits defendants from "implementing" a facially valid Executive Order and directs them to unwind all steps taken in prior compliance with that Order, Add. A2-A3, ¶¶ 1-2—exceeds plaintiffs' theories of harm. The injunction, for example, requires the agencies to reinstate *all* agency employees to their former status, not just those needed to carry out the agencies' mandated functions. Indeed, the injunction's sweeping[1] language might fairly be read to include purely internal tasks, such as analyzing which agency functions are statutorily required and the number of employees required to

---

[1] Contrary to the assertion that the injunction "accepted all the Defendants' suggestions for ensuring that the injunction was narrowly drafted," Resp. 12, the problematic language proposed by plaintiffs survived defendants' objections to its ambiguity. *See* Defs.' Resp. to Pls.' Proposed Order, Dkt. No. 59.

staff those functions.  *See* Exec. Order 14,238, § 2(b).  But neither plaintiffs nor the district court explains how such an analysis would cause loss of funding or services.  To the contrary, the only theory of standing that might justify the district court's broad order—a generic interest in the constitutional operation of government, whose vindication requires judicial supervision of wholesale agency functions—is one the Supreme Court has rejected time and again.  *Raines*, 521 U.S. at 819; *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006).

2.  Defendants' motion explained why plaintiffs' requests for delayed and withheld grant funding belong in the Court of Federal Claims:  because the "source of the rights" on which plaintiffs rely is a set of contracts—their grant agreements with IMLS and MBDA—and because the "type of relief sought" is specific performance, "a quintessential contract remedy."  Mot. for Stay Pending Appeal 13-14 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

The Supreme Court's decision in *Department of Education* confirms the point.  There, the Supreme Court followed similar logic in staying a district-court order enjoining the government from terminating education-related grants.  145 S. Ct. at 968-69.  Plaintiffs dismiss the import of *Department of Education*, saying that it "is not a ruling on the merits" and "did not purport to disturb well-settled law."  Resp. 12.  Those are non-sequiturs.  Merits ruling or not, the outcome reached by the Supreme Court under similar circumstances demands deference from lower courts.  And

3

defendants do not claim that *Department of Education* altered the governing legal framework. Rather, it applied the "well-settled" principle that that "suits based on 'any . . . contract with the United States'" are to be heard by the Court of Federal Claims. *Department of Education*, 145 S. Ct. at 968.

Plaintiffs do not dispute that they seek relief that is contractual in nature. Instead, they argue that the "legal rights" they invoke "'exist[ed] prior to and apart from rights created under' grant agreements or any other contract." Resp. 13. Just last week, the Fourth Circuit rejected a materially identical argument when it stayed a preliminary injunction that required the payment of grant monies. *Sustainability Inst.*, 2025 WL 1587100. The panel noted that, like the *Department of Education* plaintiffs, the *Sustainability Institute* plaintiffs disavowed the contractual nature of their claims in favor of an APA framing. *Id.* at *2. "Yet," the Fourth Circuit reasoned, "like the grants in [*Department of Education*], the grants . . . were awarded by federal executive agencies to specific grantees from a generalized fund. While the appropriation statutes authorize the agencies to award grants, it is the operative grant agreements which entitle any particular Plaintiff to receive federal funds." *Sustainability Inst.*, 2025 WL 1587100, at *2. So too here. Plaintiffs have not identified any statute[2] or constitutional provision that requires the government to fund their *specific* grants. Plaintiffs cannot then plausibly demand money from the U.S. Treasury based on the statutes or the

---

[2] As defendants explained, Mot. 11, IMLS voluntarily and fully reinstated grants under the Grants to States program before the preliminary injunction.

Constitution. This Court should follow the Supreme Court's and the Fourth Circuit's lead and reject plaintiffs' attempted end-run around the Tucker Act and the limits on a court's jurisdiction under the APA.

Pivoting, plaintiffs point to their second alleged injury—a loss of agency programming and services—as a reason to avoid the application of the Tucker Act. Resp. 13-14. But the relevant analysis proceeds claim by claim. *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1106-07 (D.C. Cir. 2022). So even if plaintiffs' programming-related claims could proceed in this forum (and, as explained below, they cannot), their grant-related claims may not.

3. In addition to their claims seeking terminated or delayed grant funding, plaintiffs sought and obtained relief against the agency defendants' recent and planned reductions in workforce size. This latter category of claims, which fundamentally concern agency personnel decisions, is precluded by the Civil Service Reform Act. Mot. 15-17.

Defendants acknowledge the apparent contrary conclusion reached by a stay panel of this Court in *Somerville Public Schools v. McMahon*, Nos. 25-1495 & 25-1500, 2025 WL 1576570, at *4 (1st Cir. June 4, 2025).[3] Even so, the Court should not and need not follow *Somerville* for two reasons. First, the *Somerville* panel found material

---

[3] The government has applied to the Supreme Court to stay the district court's injunction in *Somerville* and its companion case. *McMahon v. New York*, No. 24A1203 (U.S. June 6, 2025).

that reductions in force at the Department of Education were "explicitly implemented to shut down an agency." *Id.* (emphasis and alteration omitted). Here, in contrast, although the district court repeatedly used plaintiffs' term "dismantling," it did not find that the President intended to eliminate the agencies entirely. *But see Somerville Pub. Schs.*, 2025 WL 1576570, at *2 n.1. And, indeed, the Executive Order makes clear that the agencies must continue to perform all functions required by law. *See* Exec. Order 14,238, § 2(b).

Second, defendants respectfully disagree with the *Somerville* court's apparent conclusion, repeated by plaintiffs (at 16-17), that honoring CSRA preclusion would leave plaintiffs with no remedy. *See id.* at *4. If "parties . . . will be imminently injured by [an] agency's effective inability to provide them with the services to which they are entitled," *id.*, a court may "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and leave to the agencies the appropriate manner of compliance. Permitting private parties to enmesh themselves in personnel decisions, in contrast, runs directly counter to Congress' intent in promulgating the CSRA.

4.  a.  An APA claim may only proceed where it challenges "circumscribed, discrete agency actio[n]." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). Here, plaintiffs have challenged a "Closure Decision" at each agency—that is, in the district court's telling, a "policy . . . 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining

functions' across the board."  Add. A26.  Simply to recite the district court's label reveals that this "policy" is neither "circumscribed" nor "discrete."

In response, Plaintiffs unconvincingly point to *Somerville* and *New York v. Trump*, 133 F.4th 51 (1st Cir. 2025).  Resp. 19.  But even if a reduction-in-force or funding freeze of the sort at issue in those two cases may be considered a discrete agency action or set thereof, there are many more underlying steps here.  To comply with the Executive Order, an agency must evaluate which functions are statutorily required, assess personnel, funding, and programmatic needs, and take steps to eliminate non-essential personnel.  This is a far cry from a single reduction-in-force or across-the-board pause in funding.  *Somerville Pub. Schs.*, 2025 WL 1576570, at *1.

b.  By extension, the "Closure Decisions" were not final.  Mot. 11.  Plaintiffs offer no convincing rebuttal to defendants' argument that, by their very nature, the agencies' "decisions" to comply with an Executive Order mark the beginning, not the consummation, of a process.  Mot. 11.  That failure is independently fatal, as a purportedly final action must meet both of *Bennett*'s prongs.  *See Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 955-56 (D.C. Cir. 2019).  Instead, plaintiffs reiterate that they have "lost access to critical programs, grants, and services," meaning that the Closure Decisions have had "legal consequences" for them.  Resp. 20.  If true, those losses stem not from a vaguely defined "Closure Decision," but rather from individual decisions to terminate grants and to reduce workforce size.  *See id.* (describing such individual decisions).  Plaintiffs cannot

circumvent the above-described barriers to review of those individual decisions by instead attacking the agency's operations on a large scale.

c. At its core, plaintiffs' suit is not about what the agencies allegedly did, but what they allegedly failed to do—*i.e.*, provide grant funding and programming. Such a claim should have been evaluated under the APA's stringent, mandamus-like standard of review under 5 U.S.C. § 706(1). Mot. 17-19. In response, Plaintiffs double down on their characterization of their suit as challenging action, not inaction, Resp. 21-22, simply confirming that their suit is an attempted end-run around § 706(1)'s limited avenue for relief.

Under § 706(1), the district's court's analysis does not pass muster. *But see* Resp. 22. Far from carefully delineating "discrete action[s]" that are "legally required," *SUWA*, 542 U.S. at 63, the district court recited a laundry list of statutory provisions and concluded that defendants had likely acted "not in accordance" with them by undertaking undefined "Closure Decisions." Add. A35-A43. And the relief the court granted proves that it overstepped: the court did not identify "specific, unequivocal command[s]," *SUWA*, 542 U.S. at 63, but generically instructed defendants to cease and unwind "implementation" of an Executive Order.

5. In *Dalton v. Specter*, the Supreme Court explained that claims "simply alleging that the President has exceeded his statutory authority[] are not 'constitutional' claims." 511 U.S. 462, 473 (1994). That principle resolves plaintiffs' "constitutional" claims here, which are little more than a repackaging of their statutory claims.

Plaintiffs nevertheless try to circumvent *Dalton*, insisting that defendants must have acted in reliance on the Constitution because no statute authorized the action they took. Resp. 23. This attempted rhetorical move leads precisely to the outcome *Dalton* rejected, where any statutory claim could be converted to a constitutional claim through proper framing. That cannot be right, and plaintiffs make no effort to reconcile their rebuttal with *Dalton*'s logic. Plaintiffs' citations to *Dalton* and *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), are also inapposite. *Dalton* recognized that courts must determine "whether the Constitution authorize[s]" executive action in cases where "no statutory authority was claimed." 511 U.S. at 473. Here, in contrast, defendants have not disclaimed reliance on statutory law. And the cited portion of *Chamber of Commerce* dealt with limitations on judicial review that are not raised here. 74 F.3d at 1332.

### B.    The Remaining Factors Favor a Stay

As defendants explained and documented, the injunction visits two types of harm on them: it requires them to re-employ particular personnel against their will, creating workplace tensions and affecting agency administration, and results in the expenditure of likely unrecoverable funds—both through improper grant payments and associated staff expenditures. Mot. 19-21. The latter harm is exactly what the Supreme Court found sufficient to support emergency relief in *Department of Education*. 145 S. Ct. at 969; *see also Sustainability Inst.*, 2025 WL 1587100, at *2.

Plaintiffs do not engage with defendants' workplace-related harms at all.  Resp. 24-25.  Instead, they surmise that some portion of grant monies paid may be recoverable through "debt collection procedures."  *Id.* 24.  Plaintiffs do not explain, however, why the amounts disbursed might qualify for collection, nor how the government might recoup the costs of collecting that debt, nor why the same facts made no difference to the Supreme Court in *Department of Education.*  Indeed, the government cannot recoup those costs, and so its financial injuries (unlike any harm plaintiffs have pleaded from grants that are later determined to be improperly cancelled or withheld) are actually irremediable.  *But see* Resp. 24.

On the other side of the ledger, plaintiffs would not be irreparably harmed if the injunction were stayed.  Their "hundreds of pages of declarations," Resp. 25, can be reduced to statements that they will not be paid grant funding (a classic remediable harm, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)), and that they may lose access to services and programs they enjoy participating in.  Even accepting these harms as established, they pale in comparison to the administrative disruption and damage to the public fisc the preliminary injunction will continue to cause.

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

SARA MIRON BLOOM
*Acting United States Attorney*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
GERARD SINZDAK
*s/ Simon G. Jerome*
SIMON G. JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1673*
*simon.g.jerome@usdoj.gov*

June 2025

11

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,558 words. The reply also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2025, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Simon G. Jerome*
Simon G. Jerome