# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAII; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

Plaintiffs-Appellees,

*(caption continued on inside cover)*

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF FOR DEFENDANTS-APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in their official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in their official capacity as Deputy Under Secretary of Commerce for Minority Business Development; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in their official capacity as Acting Director of the Federal Mediation and Conciliation Service; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the Office of Management and Budget; US OFFICE OF MANAGEMENT AND BUDGET,

Defendants-Appellants,

US INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in their official capacity as Acting Executive Director of the US Interagency Council of Homelessness,

Defendant.

—————————————

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 3

STATEMENT OF THE ISSUE .................................................................. 4

STATEMENT OF THE CASE .................................................................... 4

    A.    Legal and Factual Background .................................................... 4

    B.    Prior Proceedings ...................................................................... 5

SUMMARY OF ARGUMENT .................................................................... 8

STANDARD OF REVIEW ........................................................................ 10

ARGUMENT ............................................................................................ 11

I.    Plaintiffs Are Not Likely to Succeed on the Merits. ........................... 11

    A.    Plaintiffs' claims are not justiciable. ......................................... 12

        1.    Plaintiffs lack standing to challenge "Closure Decisions." ........... 12

        2.    "Closure Decisions" are not final agency actions subject to APA review. ...................................................................... 15

        3.    Plaintiffs lack a constitutional cause of action. ............................. 24

    B.    The district court erred by ordering the reinstatement of grants and personnel. ...................................................... 25

        1.    The district court lacked authority to order payment of grant monies. .................................................................. 25

        2.    The district court lacked authority to order reinstatement of personnel. ............................................................... 34

II.     The Preliminary Injunction Is Vastly Overbroad. ................................................ 43

III.    The Remaining Preliminary Injunction Factors Favor Vacatur. ......................... 45

CONCLUSION ................................................................................................................ 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                  Page(s)

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2024) ..................................................................... 26, 30

*American Fed'n of Gov't Emps. v. Ezell*,
   No. 25-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ..................................... 39

*American Fed'n of Gov't Emps.* v. *OPM*,
   771 F. Supp. 3d 1127 (N.D. Cal. 2025) ......................................................... 39

*American Fed'n of Gov't Emps. v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ........................................................................ 39

*American Foreign Serv. Ass'n v. Trump*,
   768 F. Supp. 3d 6 (D.D.C. 2025) .................................................................... 39

*American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*,
   781 F.3d 571 (1st Cir. 2015) ........................................................................ 11

*American Pub. Health Ass'n v. National Insts. of Health*,
   --- F.4th ----, 2025 WL 2017106 (1st Cir. July 18, 2025).................................. 26, 27

*American Sci. & Eng'g, Inc. v. Califano*,
   571 F.2d 58 (1st Cir. 1978) ........................................................................... 27

*Baker v. Carr*,
   369 U.S. 186 (1962) .................................................................................. 40

*Bennett v. New Jersey*,
   470 U.S. 632 (1985) .................................................................................. 29

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................... 16, 23

*Biden v. Nebraska*,
   600 U.S. 477 (2023) .................................................................................. 44

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984) .................................................................................. 38

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021)................................................................ 26

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ............................................................................... 43

*California v. Texas,*
    593 U.S. 659 (2021) ............................................................................... 36

*Charlesbank Equity Fund II v. Blinds to Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004) ............................................................ 45, 46

*City of New York v. U.S. Dep't of Def.,*
    913 F.3d 423 (4th Cir. 2019)............................................................ 16, 21

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................15, 35, 36

*Columbus Reg'l Hosp. v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021)............................................................... 29

*Community Action of Laramie Cnty., Inc. v. Bowen,*
    866 F.2d 347 (10th Cir. 1989) ................................................................ 32

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ......................................................................... 14, 43

*Dalton v. Specter,*
    511 U.S. 462 (1994) .....................................................................8, 24, 25

*Davis v. FEC,*
    554 U.S. 724 (2008) ............................................................................... 35

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    601 U.S. 42 (2024) ................................................................................. 25

*Department of the Army v. Blue Fox,*
    525 U.S. 255 (1999) ............................................................................... 25

*Department of Educ. v. California:*
    145 S. Ct. 966 (2025) ..................................................................... *passim*
    132 F.4th 92 (1st Cir. 2025)............................................................. 28, 30

iv

*Doe v. Trs. of Bos. Coll.*,
    942 F.3d 527 (1st Cir. 2019) ................................... 11

*Egbert v. Boule*,
    596 U.S. 482 (2022) ............................................... 40

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) ............................... 36, 37, 38, 40

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ..................................12, 15, 35

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ............................ 46

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ........................17, 19

*Gill v. Whitford*,
    585 U.S. 48 (2018) ............................................... 43

*Grosdidier v. Chairman*,
    560 F.3d 495 (D.C. Cir. 2009) .........................37, 38

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) .........................................39, 40

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ............................................. 44

*Harkrader v. Wadley*,
    172 U.S. 148 (1898) ............................................. 40

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ............................. 16

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................. 42

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ............................. 15

*Hispanic Affs. Project v. Acosta*,
    901 F.3d 378 (D.C. Cir. 2018) ...................................................................... 19

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ...................................................................... 46

*In re Sawyer*,
    124 U.S. 200 (1888) ...................................................................... 40

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ...................................................................... 45

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................... 43

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ...................................................... 31, 34, 41, 42

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ...................................................................... 48

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) .............................................. 15, 16, 17, 18

*Maryland v. USDA*,
    No. 25-1338, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ............................ 39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ...................................................................... 26

*McMahon v. New York*,
    606 U.S. ----, 2025 WL 1922626 (July 14, 2025) .................................... 2, 47

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ...................................................................... 27

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................................ 31, 32

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) ...................................................................... 14

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) ........................................................ 19

*National Treasury Emps. Union v. Trump*:
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ...................................... 49
770 F. Supp. 3d 1 (D.D.C. 2025) ........................................................ 39

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................ 45

*Norton v. Southern Utah Wilderness All.,*
542 U.S. 55 (2004) ........................................................ 15, 17, 22, 48

*Nyunt v. Chairman,*
589 F.3d 445 (D.C. Cir. 2009) ........................................................ 37

*OfficeMax, Inc. v. Levesque,*
658 F.3d 94 (1st Cir. 2011) ........................................................ 10

*OPM v. American Fed'n of Gov't Emps.,*
145 S. Ct. 1914 (2025) ........................................................ 36

*Organization for Competitive Mkts. v. USDA,*
912 F.3d 455 (8th Cir. 2018) ........................................................ 22

*Osediacz v. City of Cranston,*
414 F.3d 136 (1st Cir. 2005) ........................................................ 13

*Pepper v. United States,*
562 U.S. 476 (2011) ........................................................ 29

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ........................................................ 48

*Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.,*
313 F. Supp. 3d 62 (D.D.C. 2022) ........................................................ 32

*Raines v. Byrd,*
521 U.S. 811 (1997) ........................................................ 12, 13

*Sampson v. Murray,*
415 U.S. 61 (1974) ........................................................ 39, 40

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ................................................................. 14

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................................. 20

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ................................................ 28

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................. 13

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) .......................................................... 43, 47

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,*
    120 F.4th 59 (2d Cir. 2024) ...................................................... 3

*Sustainability Inst. v. Trump,*
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ......... 29

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................. 12

*Trump v. American Fed'n of Gov't Emps.,*
    606 U.S. ----, 2025 WL 1873449 (July 8, 2025) ................... 2, 20

*Trump v. Boyle,*
    606 U.S. ----, 2025 WL 2056889 (July 23, 2025) ................. 3, 47

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025) ........................................................ 2, 43

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .......................................................... 12, 14

*Vietnam Veterans of Am. v. CIA,*
    811 F.3d 1068 (9th Cir. 2016) ................................................ 22

*Union of Concerned Scientists v. Wheeler,*
    954 F.3d 11 (1st Cir. 2020) ................................................ 30, 41

*United States v. Fausto,*
    484 U.S. 439 (1988) ........................................................36, 37, 38

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................ 41

*Walton v. House of Representatives,*
    265 U.S. 487 (1924) ................................................................ 40

*White v. Berry,*
    171 U.S. 366 (1898) ................................................................ 40

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).............................................................11, 43

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ................................................................ 24

**U.S. Constitution:**

U.S. Const., art. II, §§ 1 & 3.............................................................. 20

**Statutes:**

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118–42, 138 Stat. 25................................................... 32

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119–4, 139 Stat. 9..................................................... 32

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118–47, 138 Stat. 460................................................. 32

5 U.S.C. § 551..............................................................................15, 18

5 U.S.C. § 701..........................................................................30, 41, 42

5 U.S.C. § 702.....................................................................25, 26, 30, 39

5 U.S.C. § 704..............................................................................15, 16

5 U.S.C. § 706.................................................................15, 16, 22, 36

5 U.S.C. §§ 7101-7135 ................................................................. 36

5 U.S.C. § 7105 ........................................................................... 36

5 U.S.C. § 7123 ........................................................................... 36

5 U.S.C. § 7703 ........................................................................... 36

12 U.S.C. § 5708 ......................................................................... 33

15 U.S.C. § 9502 ......................................................................... 42

15 U.S.C. §§ 9511-9526 ............................................................... 5

15 U.S.C. § 9523 ......................................................................... 33

15 U.S.C. § 9524 ..................................................................... 27, 28

15 U.S.C. §§ 9541-9543 ............................................................... 5

15 U.S.C. § 9543 ......................................................................... 33

15 U.S.C. §§ 9552-9553 ............................................................... 5

15 U.S.C. § 9561 ......................................................................... 5

20 U.S.C. § 9103 ......................................................................... 5

20 U.S.C. § 9105 ......................................................................... 42

20 U.S.C. § 9108 ......................................................................... 5

20 U.S.C. § 9141 ......................................................................... 5

20 U.S.C. § 9162 ......................................................................... 33

20 U.S.C. § 9165 ..................................................................... 5, 33

20 U.S.C. § 9173 ......................................................................... 5

28 U.S.C. § 1292 ................................................................................... 3

28 U.S.C. § 1331 ................................................................................... 3

28 U.S.C. § 1361 ................................................................................... 3

28 U.S.C. § 1491 ................................................................................. 26

29 U.S.C. § 172 .................................................................................. 42

29 U.S.C. § 173 ................................................................................... 5

**Executive Orders:**

*Commencing the Reduction of the Federal Bureaucracy*
   Exec. Order No. 14,127, 90 Fed. Reg. 10,577 (Feb. 25, 2025) .................................... 4

*Continuing the Reduction of the Federal Bureaucracy*
   Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 20, 2025) ........................... 5, 6, 20

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered a preliminary injunction that interferes with the Executive Branch's prerogative to manage its own workforce and agency operations. The government respectfully requests that the Court hold oral argument to aid the Court in resolving the important issues presented by this appeal.

## INTRODUCTION

The district court entered a sweeping preliminary injunction directing three federal agencies to unwind past compliance—and to forbear from future compliance—with a facially valid Executive Order requiring those agencies to reduce their operations and workforces "to the maximum extent consistent with applicable law."  In particular, the injunction requires the agencies to reinstate grants and personnel that agency leadership consider unnecessary to fulfill the agencies' legally required functions.  The result:  the district court exceeded the judicial role by installing itself as superintendent over wide-ranging aspects of the agencies' daily operations.

No relief should have been granted whatsoever, because plaintiffs' claims are not justiciable.  Plaintiffs contend that each agency acted unlawfully when it decided to comply with the Executive Order.  But plaintiffs' use of the label "Closure Decisions" in framing their complaint belies that what they actually challenge is a set of innumerable, subsidiary decisions to determine which agency functions are legally required and to limit agency operations to such functions.  As a matter of Article III standing, plaintiffs have no cognizable interest in achieving general oversight of the Executive Branch in the manner they seek.  And as a statutory matter, plaintiffs lack a cause of action under the Administrative Procedure Act (APA) to challenge what they call "Closure Decisions," which are not final agency actions.  Plaintiffs' attempt to

circumvent the APA's limitations by alleging claims directly under the Constitution, in turn, is squarely foreclosed by Supreme Court precedent.

The district court further erred in the nature and scope of the preliminary relief it awarded. As harm from the "Closure Decisions," plaintiffs claimed they had lost or might conceivably lose grant funds and access to agency-run programs. In addition to generally prohibiting compliance with the Executive Order, the district court specifically ordered that the agencies reinstate both terminated grants and personnel, the latter category on the theory that reductions-in-force might theoretically leave the agencies unable to fulfill their statutory mandates. But the district court lacked jurisdiction to order either of these specified forms of relief. And even if the district court possessed jurisdiction to order such reinstatements, it fatally erred in failing to tailor the scope of its relief to plaintiffs' particular injuries. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2549-62 (2025) (reaffirming traditional equitable limitations on the scope of relief and staying overbroad district-court injunctions "to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue").

Three times in recent weeks, the Supreme Court has put on hold district-court orders that improperly interfere with the Executive Branch's management of its personnel and its grant spending. *See McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626 (July 14, 2025); *Trump v. American Fed'n of Gov't Emps.*, 606 U.S. ----, 2025 WL 1873449 (July 8, 2025); *Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per

curiam).  And just last week, the Supreme Court stated that although its interim orders "are not conclusive as to the merits," they nevertheless "inform how a court should exercise its equitable discretion in like cases."  *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025).  Because the law forecloses plaintiffs' claims here, and because the equities strongly favor removing the improper constraints the district court placed on the Article II officials responsible for running the agencies, this Court should follow the Supreme Court's lead and vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361 to hear their claims, which arise under the APA and the Constitution.  A58, A97-105.[1]  The district court granted plaintiffs' motion for a preliminary injunction on May 6, 2025, A1-49, and entered a preliminary injunction on May 13, 2025, A50-53.  The government filed a timely notice of appeal on May 16, 2025.  A1112-13.  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[1] In June, following the entry of the preliminary injunction and the government's notice of appeal of the same, plaintiffs filed an amended complaint adding a fourth agency as defendant and including factual allegations related to that agency.  A1121-99.  Because plaintiffs' allegations and legal theories concerning the three original agency defendants remain unchanged, and the preliminary injunction "remains in place, unmodified," the government does not understand its appeal to be moot.  *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 77-78 (2d Cir. 2024).  The citations given throughout this brief are to the original complaint.

## STATEMENT OF THE ISSUE

The issue presented is whether the district court erred in entering a preliminary injunction that (1) broadly prohibits the three federal agency defendants from implementing an Executive Order instructing them to reduce their functions and staffing to the minimum level required by law and (2) requires the agencies to reinstate terminated grants and personnel.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

Shortly after taking office in January, the President issued an Executive Order announcing the "policy of [his] Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Commencing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,217, § 1, 90 Fed. Reg. 10,577, 10,577 (Feb. 25, 2025).  Consistent with that policy, the President directed a "reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary" at four federal agencies, so as to "minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." *Id.* §§ 1-2, 90 Fed. Reg. at 10,577.

The President's reform project extended the following month to seven additional agencies with the promulgation of Executive Order 14,238.  In that Order, the President ordered the agencies, which include the Federal Mediation and Conciliation Service (FMCS), the Institute of Museum and Library Services (IMLS),

and the Minority Business Development Agency (MBDA), to eliminate their "non-statutory components and functions … to the maximum extent consistent with applicable law." *Continuing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,238, § 2(a)(i), (iv), (vii), 90 Fed. Reg. 13,043, 13,043 (Mar. 20, 2025).

FMCS helps "parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). IMLS is charged with "ensur[ing] the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." 20 U.S.C. § 9103(c)(1). To that end, IMLS awards grants, conducts research, and offers policy programming. *See id.* §§ 9108(a), 9141, 9165, 9173. And MBDA promotes the growth of minority-owned businesses through similar grantmaking and research functions. *See, e.g.*, 15 U.S.C. §§ 9511-9526, 9541-9543, 9552-9553, 9561.

Shortly after Executive Order 14,238 was promulgated, FMCS, IMLS, and MBDA began to implement it, including by placing staff on administrative leave in anticipation of a reduction-in-force and by terminating a number of grant agreements.

**B.    Prior Proceedings**

**1.**  On April 4, 2025, 21 plaintiff States filed this suit. Their complaint centers on alleged "Closure Decisions" at each of the three agencies—that is, in plaintiffs' telling, "a final decision … to implement the [Executive] Order and to gut [the agencies'] operations." A67-68. Plaintiffs allege that, in implementing the Executive

Order, the agencies violated the APA, their statutory obligations, and the Constitution. The same day plaintiffs filed their suit, they moved for a temporary restraining order, which the parties agreed to treat as a motion for a preliminary injunction. Stipulation, Dkt. No. 31.

The district court granted plaintiffs' motion for a preliminary injunction. A1-49. The court concluded that plaintiffs had standing to challenge the agencies' implementation of the Executive Order and deemed plaintiffs' label of "Closure Decisions" to refer to final agency action reviewable under the APA. A21-26. The court also held that inasmuch as the "Closure Decisions" carried the consequences of terminations of grants and personnel, the Tucker Act and the Civil Service Reform Act (CSRA) did not deprive it of jurisdiction to enjoin those consequences under the APA. A14-21. On the merits, the district court concluded that plaintiffs were likely to succeed in demonstrating that the implementation of the Executive Order was unreasoned and contrary to statutory and constitutional law. A26-40.

The injunction prohibits defendants from implementing Section 2 of Executive Order 14,238 (the requirement to eliminate "non-statutory components and functions … to the maximum extent consistent with applicable law") and requires them to "take all necessary steps to reverse any policies, memoranda, directives, or actions issued before this Order that were designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out the directives contained" in the Order. A51-52. The injunction further provides that defendants must "restore all [agency]

employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of [the] Executive Order," "to their status before March 14, 2025." A52. And the injunction orders defendants not to "further pause, cancel, or otherwise terminate IMLS or MBDA grants or contracts or fail to disburse funds to recipients in plaintiff States according to such grants or contracts for reasons other than the grantees['] or contractors' non-compliance[] with applicable grant or contract terms." A52. Furthermore, defendants must "take immediate steps to resume the processing, disbursement, and payment of already-awarded funding, and to release awarded funds previously withheld or rendered inaccessible due to or in reliance on" the Executive Order, "with respect to recipients in plaintiff States." A53.

The injunction does not preclude defendants "from taking actions that would improve Agency efficiency or reduce the size or scope" of the agencies "as long as (a) the Agency Defendant provides a reasoned explanation for such action, and (b) the action will not prevent the Agency Defendant from fulfilling any of [its] statutory obligations." A52. Moreover, the injunction does not "preclude[] the Agency Defendants from making personnel decisions that are not related to or motivated by" the Executive Order. A52.

**2.** The government appealed and sought a stay pending appeal in this Court. That motion remains pending.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs are unlikely to succeed on the merits of their claims.

**A.** To start, plaintiffs' claims are not justiciable. Plaintiffs lack Article III standing to seek general oversight of three agencies' ongoing process of compliance with an Executive Order, because they have no cognizable interest in enforcing what they perceive to be the proper operation of government. Plaintiffs also lack a cause of action under the APA to challenge amorphous "Closure Decisions," which possess neither the discrete characteristics of "agency action" nor the finality that the APA makes necessary preconditions to judicial review. In concluding otherwise, the district court was compelled to examine particular discrete actions that might themselves qualify as agency actions—but such actions cannot be aggregated to circumvent the APA's carefully drawn limitations on suit. Plaintiffs cannot evade those limitations by recasting their claims as constitutional violations of the separation of powers and Take Care Clause. As the district court's analysis shows, each of these purportedly constitutional arguments has at its core a contention that the agencies committed statutory violations. The Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), leaves no doubt that plaintiffs therefore lack a constitutional cause of action.

**B.** Even if plaintiffs could overcome these threshold defects with their case, the district court was not authorized to afford them the particular relief it did in the form of grant and personnel reinstatement.

The federal agency defendants may not be sued absent a waiver of sovereign immunity, and the APA's general waiver does not apply where another statute impliedly forbids the relief sought. That is the case here with respect to plaintiffs' requests for grant funding—which are, at their core, contractual and thus required by the Tucker Act to be heard in the Court of Federal Claims, not the District of Rhode Island. Furthermore, the agencies' administration of the grants plaintiffs have identified is committed to their discretion by law and thus unreviewable.

Plaintiffs are on no firmer ground in seeking reinstatement of personnel. Their theory that the agencies might not be able to exercise their statutory functions due to insufficient staffing is precisely the sort of speculative contention federal courts have routinely rejected as insufficient to support standing to seek this particular form of relief. Independently, the existence of a comprehensive statutory framework for judicial challenges to personnel decisions—the CSRA—precludes the district court from exercising jurisdiction under the general federal question statute. That plaintiffs themselves are not capable of bringing claims under the CSRA is a feature, not a bug, of that framework. The district court also lacked authority to order reinstatement because such a remedy was traditionally unavailable at equity, and because the agencies' decisions about how many and which personnel are needed to fulfill statutorily required functions are (like grant funding) committed to their discretion.

**II.** The district court's order to reinstate grants and personnel was also overbroad because the district court did not limit its relief to remedy only irreparable

injury shown by plaintiffs themselves. Instead, the district court recited an illustrative litany of statutes cited by plaintiffs and ordered wholesale restoration of terminated grants and personnel. That the district court limited its grant-specific provision of relief to grants "in plaintiff States" does not solve this problem, for the States lack standing to seek reinstatement of any grant but their own, and the district court conducted no grant-by-grant analysis to determine whether each affected grantee was in fact part of (not merely located within) a plaintiff State.

**III.** The equitable balance strongly favors vacatur. Plaintiffs have not identified any grave and irreparable harm. Improperly withheld grant monies may be recovered via litigation in the Court of Federal Claims, and plaintiffs neither pleaded nor proved the type of irreparable harm that might follow from temporary deprivation of those monies. Additionally, lost access to agency programs cannot qualify as irreparable harm, absent more that plaintiffs have not shown. And any harm shown, in any event, pales in comparison to harm the preliminary injunction visits on the government by interfering with significant swaths of Executive Branch discretion to manage its day-to-day affairs and preventing leadership from implementing the President's directives to streamline federal agencies. The preliminary injunction should be vacated.

## STANDARD OF REVIEW

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011).

Where the district court's analysis is premised on an error of law, the court "has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, plaintiffs have not established "a strong likelihood that they will ultimately prevail on the merits." *American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) (quotation omitted). Nor have they shown irreparable injury to justify an injunction that inflicts outsized harm on the government and the public. *Winter*, 555 U.S. at 24. The district court erred in concluding that plaintiffs satisfied the requirements for interim injunctive relief.

## I.  Plaintiffs Are Not Likely to Succeed on the Merits.

Plaintiffs' "Closure-Decision" theory is not cognizable under the APA or the Constitution, and so plaintiffs cannot establish a likelihood of success on the merits. Additional jurisdictional obstacles stand in the way of the specific provisions of the district court's order that require the reinstatement of grants and personnel.

### A. Plaintiffs' claims are not justiciable.

#### 1. Plaintiffs lack standing to challenge "Closure Decisions."

Federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches" but to redress concrete injuries to cognizable interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). "By limiting who can sue, the standing requirement implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quotation omitted). "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is … concrete and particularized,' and that the dispute is 'traditionally thought to be capable of resolution through the judicial process[.]'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (first alteration in original) (citation omitted). This requirement serves in part to ensure that disputed legal questions "will be resolved … in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). When "reaching the merits of the dispute would force [the courts] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines*, 521 U.S. at 819-20.

Plaintiffs' principal contention is that the three defendant agencies have decided to "dismantle their operations and cease performance of their functions" in violation of federal law. Mot. for Prelim. Inj., PageID#73, Dkt. No. 3. Putting aside the absence of any credible evidence that the agencies have decided to shutter their operations entirely—indeed, the Executive Order specifically contemplates they will conform their functions to the statutory minimum—plaintiffs' asserted interest in vindicating the proper operation of the Executive Branch is exactly the sort of abstract and generalized grievance that cannot be redressed by a federal court under Article III. *See Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) ("[A] mere interest in seeing the government turn square corners is not the kind of particularized interest that can satisfy the most basic constitutional prerequisite for standing.").

First, a generalized dispute over whether an agency will perform its statutory duties or will have sufficient resources to do so involves no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S. at 819. Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Quite the contrary, such disputes over the size and scope of the federal government, and the adequacy with which it discharges its duties, have long been left to the "hurly burly" of the political process.

Second, plaintiffs lack a particularized interest in safeguarding the separation of powers, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974). This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 227; *Valley Forge*, 454 U.S. at 482-83.

Third, because plaintiffs assert an injury caused by an alleged blanket abdication by three agencies of their legal responsibilities, the judiciary may not redress that injury, as doing so requires "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (quotation omitted); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

In the district court, plaintiffs sought to justify their standing by pointing to harms in the form of loss of grant funding and agency programs that States allege they benefit from. *See* Reply in Supp. of Mot. for Prelim. Inj. 4, Dkt. No. 44. But those harms are too attenuated from the "Closure Decisions" at which plaintiffs take aim. A "categorical policy to eliminate … 'non-statutory components and functions' and 'reduce the performance of their statutory function[s] and associated personnel'" does not itself affect individual grants and programs, A16; such a policy is at most the framework under which individual termination decisions are made. In other words,

14

plaintiffs' proffered injuries are not "fairly traceable" to the faintly sketched "Closure

Decisions" they identify. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

(quotation omitted); *see also Alliance for Hippocratic Med.*, 602 U.S. at 383 ("The

causation requirement also rules out attenuated links—that is, where the government

action is so far removed from its distant (even if predictable) ripple effects that the

plaintiffs cannot establish Article III standing."). Put otherwise, because "standing is

not dispensed in gross," *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016)

(citation omitted), plaintiffs might have standing to challenge particular actions with

respect to grants and programs administered by the three agencies—but they lack any

cognizable interest in wholesale administrative reform.

> ### 2. "Closure Decisions" are not final agency actions subject to APA review.

**a.** Where no other statute applies, § 706(2) of the APA permits judicial review

of Executive Branch decisionmaking only where a decision results in "agency action"

that is "final." 5 U.S.C. §§ 704, 706(2); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871,

882 (1990). This limitation ensures that courts do not engage in "general judicial

review of [an agency]'s day-to-day operations." *Lujan*, 497 U.S. at 899. As evidenced

by the illustrative list of agency actions the APA provides, an agency action must be

"circumscribed" and "discrete." *Norton v. Southern Utah Wilderness All. (SUWA)*, 542

U.S. 55, 62 (2004) (citing 5 U.S.C. § 551(13)). In contrast, plaintiffs may not level a

"broad programmatic attack" against an agency's (much less several agencies')

"continuing (and thus constantly changing) operations," even under a facially discrete label of plaintiffs' own choosing. *Lujan*, 497 U.S. at 890 (holding challenge to "land withdrawal review program" outside the scope of APA review).

Even where the challenged action is sufficiently discrete to qualify as "agency action," it must also be sufficiently "final" to come within the APA's ambit. 5 U.S.C. § 704. "To be considered 'final,' the agency action must" both "mark the 'consummation' of the agency's decisionmaking process" and "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Taken as a whole, the APA's limitations "strike a balance between meaningful judicial review and the needs of effective administration. Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (describing 5 U.S.C. § 706(1)).

**b. *i.*** Plaintiffs' challenge to what they call a "Closure Decision" at each agency is quintessentially a "broad programmatic attack," not one directed at reviewable agency action. *See Lujan*, 497 U.S. at 890. Compliance with an Executive Order is not, despite plaintiffs' strained use of the term, reducible to a single "decision." Instead, Executive Order 14,238 required officials at the three (distinct) agencies to begin making various decisions, including which programs (and grants) to retain, the

16

number of staff necessary to administer programs and grants that continue to operate, and how and when to terminate unnecessary staff. Those decisions, in turn, necessarily follow from a series of internal (and potentially external) deliberations, communications, and analyses—in other words, "a wide variety of activities that comprise the common business of managing government programs." *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (rejecting challenge to Presidential Budget Initiative); *id.* ("Unlike 'circumscribed, discrete agency actions' that are the ordinary subjects of judicial review, the [challenged action] represents the sum of 'many individual actions,' including some 'yet to be taken.'" (citation omitted) (first quoting *SUWA*, 542 U.S. at 62, and then quoting *Lujan*, 497 U.S. at 893)); *see also Lujan*, 497 U.S. at 890.

As a result, plaintiffs cannot claim to have felt "the concrete effects normally required for APA review" from an amorphous "decision" to comply with a presidential directive. *See Lujan*, 497 U.S. at 891. In *Fund for Animals*, the D.C. Circuit rejected an APA challenge to a budget request that proposed changes to the Wild Horse and Burro Program, including a proposal to "round[] up 12,855 animals in its first year." 460 F.3d at 20. The court held that the proposal lacked the "actual or immediately threatened effect" required. *Id.* (quoting *Lujan*, 497 U.S. at 894). Unlike "individual roundups," which "might qualify," a budget request standing alone "did not harm or affect the plaintiffs." *Id.* The same can be said of a "decision" to

downsize agency operations—that plan, without more, has no effect whatsoever on plaintiffs.

In concluding that the "Closure Decisions" were agency actions, the district court credited plaintiffs' assertion that they challenged a "policy that applies the measure 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions' across the board." A22 (quoting Reply in Supp. of Mot. for Prelim. Inj. 14-15).[2]  This articulation of plaintiffs' challenge does not cure the problem; it merely substitutes "policy" for "decision" in a sentence that otherwise reaffirms that effectuating the ultimate goal of Executive Order 14,238—the elimination of unnecessary federal bureaucracy—requires countless antecedent agency actions.

*Contra* the district court and plaintiffs, a "Closure Decision" is not the sort of "policy" courts have accepted as constituting agency action.  *Lujan* itself, on which the district court relied, merely adverted to the possibility of such an outcome in dictum. 497 U.S. at 890 n.2 ("If there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations, and if that order or regulation is final, and has become

---

[2] In addition to their use of the term "policy," plaintiffs also described the "Closure Decisions" as "rules" or "orders" under the APA.  Reply in Supp. of Mot. for Prelim. Inj. 12.  Such a description makes little sense—plaintiffs do not (and cannot) identify where any of the three agencies issued the "statement" required of a rule or issued the "disposition" inherent in an order.  *See* 5 U.S.C. § 551(4), (6).

ripe for review in the manner we discuss subsequently in text, it can of course be challenged under the APA by a person adversely affected[.]"); *see* A21-22. In *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), the D.C. Circuit applied the logic of that dictum to hold that the plaintiffs had plausibly alleged agency action in the form of a policy "of habitually approving and extending H-2A visas for lengthy periods of time," allegedly in violation of a statute requiring "that H-2A visas be temporary and short-lived." *Id.* at 388. And in *New York v. Trump*, a panel of this Court denied a stay pending appeal of an injunction against a "policy" of "broad, categorical freezes on obligated funds." 133 F.4th 51, 67 (1st Cir. 2025).

Putting aside whether *Hispanic Affairs Project* and *New York* correctly identified reviewable agency action, each court construed the relevant actions to involve defined practices with uniform results—*i.e.*, routine visa extensions and "across-the-board" funding pauses. *Hispanic Affairs Project*, 901 F.3d at 388; *New York*, 133 F.4th at 67. A "Closure Decision" meets neither criterion. Reducing the scope of agency operations to the minimum functions required by law is not a defined practice with respect to a particular group (like visa holders or grantees), it is an ongoing programmatic initiative with potentially varying effects on numerous entities based on which programs and grants the agency modifies. And an initiative to downsize agency operations does not have uniform results (like visa extensions or funding pauses); it represents a plan to take action with future results to be determined down the line. *See Fund for Animals*, 460 F.3d at 20.

That plaintiffs have not identified reviewable agency action is confirmed by the fact that their legal theories cannot sensibly be analyzed at the level of a "Closure Decision." Consider, for example, Count I of the complaint, which alleges that the agencies acted in an arbitrary and capricious manner by failing to give reasons for their actions and to consider reliance interests. A98. The reason an agency official would "decide" to comply with an Executive Order is self-evident: because such an order is presumptively legitimate direction from the head of the Executive Branch. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3)). No further justification is necessary. An agency likewise cannot reasonably be expected to account for potential reliance interests without determining whose reliance interests will be affected and how. Deciding to comply with an Executive Order is the first step, not the middle or last, in answering those questions.

Similarly, plaintiffs' "Closure-Decision" framing does not lend itself to analysis of whether the agencies took actions in excess of statutory authority. Recall that the Executive Order requires the reduction of agency functions and size "to the maximum extent consistent with applicable law." Exec. Order No. 14,238, § 2(a). It is incoherent to say that by deciding to comply with a directive to take action consistent with law, the agencies have (*ex ante*) violated the law. *Cf. American Fed'n of Gov't Emps.*, 2025 WL 1873449, at *1 (Sotomayor, J., concurring in grant of stay)

(concluding the Supreme Court "ha[d] no occasion to consider whether" reorganization plans required by Executive Order "can and will be carried out consistent with the constraints of law" where the Executive Order itself required the agencies to take action "consistent with applicable law").

Tellingly, the district court departed from plaintiffs' framing in assessing their likelihood of success on the merits, reasoning that the agencies failed to justify letters sent to employees placed on administrative leave, a memorandum announcing a reduced operational scope for one agency, and the termination of individual grants by another agency. A27-29. In effect, the district court appeared to conclude that those individual actions were likely arbitrary and capricious. But it is a non-sequitur then to say that the "Closure Decisions" that supposedly preceded the individual actions cited were themselves arbitrary and capricious. This distinction matters, because plaintiffs face insurmountable threshold obstacles in seeking to challenge the grant and personnel terminations themselves in this forum. *See infra* pp. 25-43. They should not be permitted to evade those obstacles by recasting their theory in broad, programmatic terms. All in all, plaintiffs' request for judicial review of "Closure Decisions" places the district court in the "programmatic oversight" role the APA does not permit it to occupy. *City of New York*, 913 F.3d at 432.

*ii.* That plaintiffs' "Closure-Decision" theory does not allege final agency action, and is thus unreviewable under the APA, is confirmed by the fact that the APA contains a provision permitting a court to "compel agency action unlawfully

withheld or unreasonably delayed." 5 U.S.C. § 706(1). Insofar as plaintiffs challenge an alleged failure to perform required functions, *see* Mot. for Prelim. Inj. 14 ("The remaining five employees working at the MBDA are not capable of carrying out the MBDA's statutorily mandated functions, administering its existing programs, or spending its appropriated funds."); *id.* 9-17 (similar, regarding IMLS); *id.* 16-17 (similar, regarding FMCS), they ought to have brought claims under § 706(1). Their failure to do so matters, because the standard of review under § 706(1) is considerably more stringent than under § 706(2). *SUWA*, 542 U.S. at 63 (observing that through § 706(1) "the APA carried forward the traditional practice prior to its passage," including writs of mandamus); *Organization for Competitive Mkts. v. USDA*, 912 F.3d 455, 462 (8th Cir. 2018) ("Most circuits have adopted the mandamus approach to agency delay issues[.]" (citation omitted)). Had the district court applied the correct standard under § 706(1), it could not possibly have granted relief, both because plaintiffs have not identified any "discrete action[] that [is] unequivocally compelled by statute or regulation," *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1081 (9th Cir. 2016), and because their "Closure-Decision" theory rests largely on allegations of potential *future* failures to take action, not action *already* withheld or delayed. 5 U.S.C. § 706(1); *see* A41-45 (repeatedly crediting claims of harm that could come to pass if the agencies failed to continue programming).

    *iii.* The "decision" to comply with an Executive Order to reduce agency staffing and programming is not "final" within the meaning of the APA, either. The

agencies' ongoing implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making process. *Bennett*, 520 U.S. at 177-78. And a plan to take action—even if any subsequent action will have definite effects for the public—does not itself create consequences for would-be plaintiffs. This makes sense, because attempting to review mere plans and ongoing operations under them is a futile task. Directions may be changed, and operational decisions may be reversed. *See, e.g.*, Decl. in Supp. of Mot. for Stay Pending Appeal ¶ 9, Dkt. No. 63-1 (explaining that the IMLS's Grants to States program was fully reinstated before the preliminary injunction).

The district court's conclusion that there existed a final agency action cannot be reconciled with these principles. The court based that conclusion in part on a declaration offered by an IMLS employee in which the employee reported hearing that much of the agency's staff would be placed on leave and its grants, terminated. A23-24. The district court also pointed to similar evidence from MBDA and FMCS. Like the evidence underlying the court's agency-action determination, *see supra* p. 21, this evidence at most would suggest that the agency has taken a series of independently final subsidiary actions. It does not, contrary to the district court's holding, establish that the basis for the exceedingly broad relief plaintiffs received— the generically defined project of complying with an Executive Order—is itself final.

### 3.  Plaintiffs lack a constitutional cause of action.

As an alternative to the APA, the district court held that defendants had likely

violated the separation of powers and Take Care Clause.  A39-40.  As defendants

explained below, such a holding is squarely foreclosed by *Dalton v. Specter*, 511 U.S.

462 (1994), with which the district court did not even engage.  *See* A39-40; Opp'n to

Mot. for PI 28-29, Dkt. No. 41 (citing *Dalton*).

*Dalton* teaches that not "every action by the President, or by another executive

official, in excess of his statutory authority is *ipso facto* in violation of the

Constitution."  511 U.S. at 472.  Rather, the Supreme Court has "distinguished

between claims of constitutional violations and claims that an official has acted in

excess of his statutory authority."  *Id.* (collecting cases).  The Constitution is

implicated, for example, if executive officers rely on it as an independent source of

authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if

the officers rely on a statute that itself violates the Constitution.  *See Dalton*, 511 U.S.

at 473 & n.5.  But claims alleging simply that an official has "exceeded his statutory

authority are not 'constitutional' claims" that can be asserted through a direct cause of

action.  *Id.* at 473.

Here, plaintiffs' asserted constitutional claims are really "statutory one[s],"

*Dalton*, 511 U.S. at 474, as they assert simply that the agencies have exceeded their

statutory authority.  Any statutory claim could be recharacterized as a violation of the

"constitutional separation of powers," A40 (quotation omitted), but that is precisely

24

the sleight of hand rejected in *Dalton*. 511 U.S. at 471-72. The same is true of plaintiffs' invocation of the Take Care Clause, which is nothing more than an allegation that defendants have failed to comply with federal statutory law. *See* A39-40.

## B. The district court erred by ordering the reinstatement of grants and personnel.

For the reasons given above, the district court should not have granted any relief to plaintiffs. When it did, however, it compounded its error by specifically requiring the agencies to reinstate terminated grants[3] and personnel, categories of relief it was wholly without power to provide.

### 1. The district court lacked authority to order payment of grant monies.

**a.** It is well established that "the United States, as sovereign, is generally immune from suits seeking money damages" absent a waiver of that immunity. *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024). Although the APA provides a limited waiver of the government's sovereign immunity for suits "seeking relief other than money damages," *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999) (emphasis omitted) (quoting 5 U.S.C. § 702), it does not

---

[3] As the government indicated in a declaration appended to its motion for a stay pending appeal, IMLS voluntarily reinstated grants that were terminated under the agency's Grants to States program before the district court entered its preliminary injunction. *Supra* p. 23. The government does not challenge the injunction insofar as it extends to the Grants to States program.

apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), and "impliedly forbids" bringing "contract actions" against "the government in a federal district court" under the APA, *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).[4]

---

[4] The government acknowledges that a panel of the Court issued a decision for publication denying a stay of a preliminary injunction in *American Public Health Association v. National Institutes of Health* (*APHA*), --- F.4th ----, 2025 WL 2017106 (1st Cir. July 18, 2025). The government has sought a stay from the Supreme Court in that case. *National Insts. of Health v. American Pub. Health Ass'n*, No. 25A103 (U.S. July 24, 2025). This Court concluded that the *APHA* plaintiffs' grant-related claims were not barred by the Tucker Act. Here, unlike in *APHA*, the district court's order

*Continued on next page.*

As this Court has long recognized, a plaintiff thus may not maintain an APA suit where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quotation omitted). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

Applying the above principles, almost all of plaintiffs' claims fall squarely within the Tucker Act: plaintiffs seek to enforce a contractual agreement with the federal government and obtain the payment of money.[5] The States' grant agreements with IMLS, and the grant agreements between certain entities within the plaintiff States and MBDA, are plainly the "source of the rights upon which" plaintiffs base such claims. *Megapulse*, 672 F.2d at 968. For although plaintiffs point to the agencies'

_____

specifically requires payment of past-due sums. *Id.* at *6 (distinguishing *Department of Education v. California*, 145 S. Ct. 966, 968 (2025)); A53. And here, as in *Department of Education*, the plaintiffs' claims necessarily depend on the terms of their grant agreements—for without those agreements, they would have no colorable entitlement to payment. *APHA*, 2025 WL 2017106, at *8 (citing *Department of Education*, 145 S. Ct. at 966). To the extent the Court disagrees that *APHA* is distinguishable, the government preserves the arguments made in this part for further review.

[5] The only one of plaintiffs' claims that involves any kind of statutory, rather than contractual, obligation to pay money is that related to grants made under 15 U.S.C. § 9524. *See infra* pp. 32-34 (explaining why plaintiffs' challenge to such grants goes to matters committed to agency discretion).

appropriations statutes authorizing grantmaking in general, they do not claim that they are the statutorily mandated beneficiaries of any of the programs described (with the exception of the Grants to States program, which is not at issue in this appeal, *see supra* p. 23 n.3, and MBDA's § 9524 grants, *see supra* p. 27 n.5). *E.g.*, Mot. for Prelim. Inj. 25 (referring to the Native American and Native Hawaiian Library Services Grant Program, the National Leadership Grants for Libraries Program, and the Laura Bush 21st Century Librarian Program); A663 (referring to the Capital Readiness Program and to programs funded under MBDA's Broad Agency Announcement authority). And plaintiffs ultimately "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Thus, they can sue to obtain unpaid grant monies under their various contracts only in the Court of Federal Claims.

The Supreme Court recently stayed another district-court order requiring the federal government to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the Court of Federal Claims jurisdiction over suits "to order the payment of money." *Department of Educ.*, 145 S. Ct. 966. There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and this Court denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for relief, reaffirming that "the

APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *Department of Educ.*, 145 S. Ct. at 968 (quotation omitted).

That reasoning applies with full force here. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025). As in *Department of Education*, plaintiffs in this case alleged a violation of "a contractual obligation to pay money." 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment from IMLS and MBDA are grant agreements, which bear the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that many "federal grant programs" are "much in the nature of a contract" (quotation omitted)); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (describing Federal Circuit precedent "treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). Plaintiffs sought and obtained a judicial order compelling continued payment of funds under those particular grants. A52-53.

The district court improperly disregarded the import of *Department of Education*. The court first dismissed the case as non-precedential, "considering that the Supreme Court issued the decision on its emergency docket." A15. Precedential or not, "[a] just legal system seeks not only to treat different cases differently but also to treat like cases alike." *Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment). The district court then attempted to distinguish

this case on the basis that "the States' challenges are grounded on whether the Defendants' actions exceeded the bounds of their statutory or constitutional authorities." A16 (emphases omitted). But exactly the same thing was true in *Department of Education*. *See U.S. Dep't of Educ.*, 132 F.4th at 97 ("The States' claims are, at their core, assertions that the Department acted in violation of federal law—not its contracts."). The same result, then, should obtain here.

The district court also found it significant that plaintiffs are seeking equitable relief, not money damages. A17. That characterization elides the fact that plaintiffs seek payment of funds under contractual agreements—a quintessential legal damages award. But even if plaintiffs' requested relief can be characterized as "other than money damages," 5 U.S.C. § 702, they nonetheless fail the APA's separate prohibition on relief that another statute "impliedly forbids." *Id.* As explained, the Tucker Act impliedly forbids a court from relying on the APA's waiver of sovereign immunity to order the government to specifically perform a contract by paying out money. *See Albrecht*, 357 F.3d at 68.

**b.** The district court's order to pay grant funds was improper for an additional, independent reason: because it operates to dictate funding decisions even when those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Such discretionary actions fall outside the APA and are not subject to judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020).

The Supreme Court has expressly held that an agency's decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (quotation omitted). As long the agency abides by the relevant statutes and by any self-imposed obligations that may arise from regulations or grant instruments, federal law "gives the courts no leave to intrude." *Id.*

Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Those decisions—like decisions regarding how best to allocate lump-sum appropriations

across programs—"clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *cf. Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotation omitted)).

Many of the grant programs at issue here fall under that rubric. Each agency is funded at present by a lump-sum appropriation. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, div. A, tit. I, § 1102(a)(2), (8), 139 Stat. 9, 10-11; *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 697 (appropriating "[f]or expenses necessary for the Federal Mediation and Conciliation Service ('Service') to carry out the functions vested in it by the Labor-Management Relations Act, 1947[;] for expenses necessary for the Labor Management Cooperation Act of 1978; and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, $53,705,000"); *id.* (appropriating "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act, $294,800,000"); Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 123 (appropriating "[f]or necessary expenses of the Minority

Business Development Agency in fostering, promoting, and developing minority

business enterprises, as authorized by law, $68,250,000").

    And the specific grant programs plaintiffs cite vest each agency's leadership

with discretion to determine the appropriate number and size of grants awarded

thereunder, to the extent they obligate the agencies to make grants at all. *E.g.*, 20

U.S.C. § 9162(b)(1) ("National leadership grants") ("The Director *may* carry out the

activities described in subsection (a) by entering into arrangements, including grants,

contracts, cooperative agreements, and other forms of assistance, with libraries, library

consortia and associations, institutions of higher education, museums, and other

entities *that the Director determines appropriate.* (emphases added)); *id.* § 9165(b) ("Laura

Bush 21st Century Librarian Program") ("[T]he [IMLS] Director *may* enter into

arrangements, including grants, contracts, cooperative agreements, and other forms of

assistance, with libraries, library consortia and associations, institutions of higher

education (as defined in section 1001 of this title), and other entities *that the Director*

*determines appropriate*" (emphases added)); 15 U.S.C. §§ 9523-24 (requiring the

establishment of an "MBDA Business Center Program" that "offers" particular

"services" "in all regions of the United States," and further requiring MBDA to

provide minimum funding to any Business Center established, but declining to specify

a minimum number of centers, to define "regions of the United States," or to

mandate particular grant recipients); 15 U.S.C. § 9543(b)(2) (requiring MBDA to

"award grants to eligible institutions," but providing no further criteria to govern the

number or size of such grants); 12 U.S.C. § 5708(e)(2) (transferring funds to MBDA "so that the Agency may use such amounts *in a manner the Agency determines appropriate*" (emphasis added)).

The district court's preliminary injunction applies across the entire range of the grant programs authorized at IMLS and MBDA without accounting for any differences between applicable statutes, regulations, or agreements. Its prohibitions subvert the defendant agencies' ability to consider the optimal distribution of funding to achieve statutory goals "in what [the agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id.* at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)).

### 2. The district court lacked authority to order reinstatement of personnel.

In addition to ordering reinstatement of grants that IMLS and MBDA had terminated, the district court ordered all three defendant agencies to reinstate employees who had been terminated or placed on administrative leave in anticipation of reductions-in-force, on the speculative theory that absent such relief the agencies would be unable to administer grants and programs from which plaintiffs claimed to benefit. This category of relief, too, exceeded the district court's authority in multiple respects.

**a.** A "plaintiff must demonstrate standing for each" form of relief sought, *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotation omitted), including a showing of injury in fact, *Alliance for Hippocratic Med.*, 602 U.S. at 381. Only "actual or imminent" injuries count. *Id.* Allegations that are "too speculative" or merely assert "possible future injury" do not suffice. *Clapper*, 568 U.S. at 409 (emphasis and quotation omitted).

Plaintiffs cannot establish non-speculative injury stemming from the agencies' staffing decisions. Recall that plaintiffs' two theories of injury are (1) grant terminations and (2) losses in agency programming. Where plaintiffs alleged that they have suffered actual loss—*i.e.*, termination of grants and programs that has already occurred—they do not claim (nor could they plausibly do so) that those terminations were the result of insufficient staffing. Indeed, plaintiffs' own evidence shows at most that grants and programs were terminated by choice, not inability. A27-28.

The district court instead surmised that actual or planned reductions in force *might* lead to delays or terminations in the future. A31-35. But "might" is nowhere near enough to establish injury in fact. *Alliance for Hippocratic Med.*, 602 U.S. at 383. To be sure, the proportion of staff terminated at each agency tends to support a prediction that the agency's scale and scope, including in programs offered, will be reduced in the future. But that is not news, that is the very intent of the Executive Order. The appropriate and lawful method to challenge an actual (not hypothetical) failure to provide a program that a plaintiff believes the agency is legally obligated to

provide is through a claim under 5 U.S.C. § 706(1), if and when the program is no longer available and any injury to that plaintiff has actually occurred. Here, the district court improperly accepted plaintiffs' invitation to proceed in reverse, asking whether the agencies intended to terminate staff and whether those terminations might affect grants and programs (some of which might be statutorily required). The Constitution does not permit such speculation to support a federal suit. *See California v. Texas*, 593 U.S. 659, 678 (2021) (rejecting a "highly attenuated chain of possibilities"); *OPM v. American Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025) (citing *Clapper*, 568 U.S. 398, and concluding that "allegations of the nine non-profit-organization plaintiffs" were "presently insufficient to support the organizations' standing").

**b.** Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for that review. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation omitted). The CSRA, which includes the Federal Service Labor-Management Relations Statute (FSLMRS) for federal labor-management relations, 5 U.S.C. §§ 7101-7135, sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service. *United States v. Fausto*, 484 U.S. 439, 445 (1988). That scheme permits some, but not all, challenges; it channels those challenges to the Merit Systems Protection Board (MSPB); and it grants exclusive jurisdiction over MSPB appeals to the Federal Circuit. *See Elgin*, 567 U.S. at 5-6, 5 n.1; 5 U.S.C. § 7703(b)(1); *see also id.* §§ 7105(a)(2), 7123(a)

36

(setting out similar judicial review scheme for appeals of Federal Labor Relations Authority orders under the FSLMRS). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir.), *cert. denied*, 558 U.S. 989 (2009). "That principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Here, the employees themselves have not sued. Instead, the plaintiff States have challenged federal employees' terminations by objecting to the projected consequences of the employees' absence and demanding reinstatement. If tangentially affected parties could challenge the legality of personnel actions and obtain reinstatement of terminated employees without the constraints that apply to the aggrieved employees and the unions that represent them, that would turn the structure of the CSRA "upside down." *Fausto*, 484 U.S. at 449. Beneficiaries of government services—who are, at most, indirectly affected by terminations—should not be able to leapfrog the employees whom the legislative scheme seeks to protect and potentially coopt the remedies that those employees may or may not seek in CSRA proceedings. Allowing separate litigation by collaterally affected parties would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development … of a unitary and

consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449.

The district court acknowledged that the CSRA's regime is "comprehensive," A18 (quoting *Fausto*, 484 U.S. at 455), but nevertheless held (without citing the relevant analysis in *Elgin*) that that statute did not displace the court's jurisdiction here. The court reasoned that the statute's exclusivity applies only to federal employees, as they are the only individuals permitted to bring claims thereunder, and that failing to allow judicial review in this case would foreclose all meaningful review of the States' claims. A19-20. This approach has things precisely backwards. The "exclusion" of the States "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [them] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455; *see, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347 (1984) (recognizing that where a statute omitted a "provision for participation" by dairy consumers, but allowed participation by dairy producers and handlers, "Congress intended to foreclose consumer participation in the regulatory process" and "intended a similar restriction of judicial review"); *Grosdidier*, 560 F.3d at 497 ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA."). Plaintiffs' exclusion from the CSRA reflects Congress's considered judgment about the limitations of who should be permitted to challenge federal personnel decisions, not a green light to sue in federal district court.

Numerous courts in recent months and years have concluded that similar federal employment suits are precluded. *See, e.g., American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 753, 761 (D.C. Cir. 2019); *American Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20-25 (D.D.C. 2025); *National Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 7-11 (D.D.C. 2025); *American Fed'n of Gov't Emps. v. Ezell*, No. 25-10276, 2025 WL 470459, at *1-3 (D. Mass. Feb. 12, 2025); *see also Maryland v. USDA*, No. 25-1338, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims" challenging the "terminat[ion] [of ] thousands of probationary federal employees"). *But see American Fed'n of Gov't Emps.* v. *OPM*, 771 F. Supp. 3d 1127, 1131 (N.D. Cal. 2025) (asserting jurisdiction over challenge to probationary-employee terminations). Plaintiffs' suit is likewise precluded.

**c.** Even if the district court could have exercised jurisdiction over plaintiffs' personnel claims, the preliminary injunction would still be unlawful because reinstatement is not an available remedy under the APA. The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement is not a remedy that was traditionally available at equity. *See Sampson v. Murray*, 415 U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power

39

… to restrain by injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g., Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers[.]" (citations omitted)); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898); *White v. Berry*, 171 U.S. 366, 377 (1898).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Accordingly, where Congress departs from tradition, it does so expressly. In the CSRA, for example, Congress authorized the MSPB to award "reinstatement," as well as "backpay" to prevailing employees. *Elgin*, 567 U.S. at 6. But of course plaintiffs here seek to avoid the CSRA's comprehensive scheme, and they identify no other statutory basis for ordering employee reinstatement in APA litigation.

Moreover, even to the extent courts can order reinstatement, the Supreme Court has recognized that a grant of preliminary injunctive relief in government personnel cases requires an elevated showing. *Sampson*, 415 U.S. at 84. The Supreme Court emphasized the historical denial of reinstatement power by courts of equity, "the well-established rule that the Government has traditionally been granted the

widest latitude in the dispatch of its own internal affairs, and the traditional unwillingness of courts of equity to enforce contracts for personal service," instructing that a plaintiff in a "Government personnel case[]" must, "at the very least … make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions." *Id.* at 83-84 (cleaned up). Plaintiffs here made no such showing.

**d.** Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978) (quotation omitted). Internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524. The district court overrode those principles when it enjoined the agencies' leadership from exercising procedural control over their personnel to ensure that staff are carrying out statutory obligations or otherwise advancing the agency leadership's policies and priorities. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

In determining whether a matter has been committed solely to agency discretion, this Court considers whether "the agency action is of a kind 'traditionally regarded as committed to agency discretion,' or when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Union of Concerned Scientists*, 954 F.3d at 17 (quoting *Lincoln*, 508 U.S. at 191-92). Here, each factor shows that defendants' managerial decisions

41

are committed to agency discretion and that the district court erred in entering injunctive relief intruding on that discretion by requiring the reinstatement of all agency employees placed on leave or terminated per the Executive Order.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (quoting 5 U.S.C. § 701(a)(2)). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" current projects or would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, plaintiffs can point to no particular statute limiting the agencies' inherent discretion to make independent staffing decisions. To the contrary, insofar as each agency's organic statute refers to personnel, it exudes deference to agency leadership to determine appropriate staffing needs. *See* 20 U.S.C. § 9105(a) ("The [IMLS] Director may … appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute."); 29 U.S.C. § 172(b) ("The [FMCS] Director is authorized … to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service … and may … appoint such conciliators and mediators as may be necessary to carry out the functions of the Service."); 15 U.S.C. § 9502(e)(1) ("In addition to the

regional offices that the [MBD] Under Secretary is required to establish under paragraph (2), the Under Secretary shall establish such other offices within the Agency as are necessary to carry out this chapter."). Accordingly, it is in the agencies' discretion to decide how to carry out those statutory directives—including how many or what particular personnel it needs to do so—and the district court lacked authority to order relief usurping the agencies' role in this regard.

## II. The Preliminary Injunction Is Vastly Overbroad.

In the context of any judicial proceeding, the remedy accorded to a plaintiff must be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citing *DaimlerChrysler Corp.*, 547 U.S. at 353); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996). And in the particular context of injunctive relief, a plaintiff must show a likelihood not only of harm, but irreparable harm. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citing *Winter*, 555 U.S. at 20). From the foregoing two principles it follows that a preliminary injunction should be crafted specifically to address the plaintiffs' substantiated claims of actual or imminent irreparable injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). The Supreme Court reaffirmed these principles only weeks ago when it held that federal courts generally lack the authority to issue "universal" injunctions, *i.e.* those that are crafted to afford relief to non-parties. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550 (2025).

43

The district court erroneously entered what is effectively an impermissible universal injunction when it directed the government to reverse *all* steps taken to comply with Executive Order 14,238, whether those steps have any concrete effect on plaintiffs or not. A52. Along the way to that result, the court impermissibly relied on harms alleged to the interests of third parties, not to plaintiffs themselves. In its analysis of irreparable harm, for example, the court cited the declaration of a representative of a nursing union, who stated the termination of FMCS' mediation programs would imperil its relationship with Brown University Health. A45 (citing A995). Neither the union nor Brown University appears to be part of the State of Rhode Island in any way. Nor does a State like Rhode Island have standing to assert the interests of its citizens in a suit against the federal government. *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023). So it is not apparent why any harm to either the union's or the university's interests matters in this suit—and yet, the district court entered sweeping relief that purports to benefit private entities like them.

The district court took a similarly broad-brush approach to its analysis of harm in the grant-termination context, where it failed to differentiate by type of grantee, status of grant funding, and irreparability of harm. Plaintiffs offered evidence related to various grantees—some States themselves, *e.g.*, A755, others seemingly State instrumentalities, *e.g.*, A952-53 (New Jersey State Library). Without analyzing whether the purported instrumentalities had or would in fact suffer harm attributable to the State itself, *see Biden v. Nebraska*, 600 U.S. 477, 490-94 (2023) (conducting a fact-

intensive inquiry to answer this question), the district court merely recited the States'

declarations and counted the alleged harms against the government. A32-35.

Similarly, the district court improperly lumped allegations of actual, already-suffered

harm in with speculation about harm that might come in the future, analyzing the

entire body of evidence as one undifferentiated mass. A36-37 (grants alleged to be

terminated already); A37 (expressing doubt that IMLS and MBDA retain sufficient

staff to manage their grant portfolios); *see Charlesbank Equity Fund II v. Blinds to Go, Inc.*,

370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded

on something more than conjecture, surmise, or a party's unsubstantiated fears of

what the future may have in store."). Finally, the district court made no effort to

distinguish harm in general from irreparable harm sufficient to merit preliminary

injunctive relief. Losses of income, as monetary losses, are presumptively recoverable

in litigation and therefore not irreparable. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th

Cir. 2011). Even if monetary losses or delays might sometimes qualify as irreparable,

though, the district court did not endeavor to explore whether those delays would in

fact risk irreparable harm in the contexts plaintiffs identified. A41-45.

## III.   The Remaining Preliminary Injunction Factors Favor Vacatur.

Plaintiffs have not established irreparable injury, and any such harm would

plainly be outweighed by the government's and the public's interest, which "merge"

here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**1.** To begin, plaintiffs' failure to establish irreparable harm is reason alone to vacate the injunction. *See Charlesbank Equity Fund II*, 370 F.3d at 162 (describing irreparable harm as a "necessary threshold showing"). The district court concluded that plaintiffs established irreparable harm because they had lost or could lose access to grant funds or agency programs. A41-45. As described above, without more, alleged monetary losses alone are insufficient. Moreover, loss of access to agency services cannot amount to irreparable harm warranting preliminary relief. Agency-inaction claims (of the sort that should have been brought here) require not just an unreasonable delay, but delay "so egregious as to warrant mandamus." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quotation omitted). Where the applicable legal framework requires such an extraordinary showing to secure any relief, granting a preliminary injunction before any delay in services has materialized—and certainly before any delay has become egregious—would short-circuit the deferential standards under which courts evaluate such claims. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017).

**2.** On the other side of the ledger, the district court's injunction inflicts irreparable constitutional harm on the government at every turn. It frustrates the public's interest in having the Executive Branch effectuate the President's policy priorities—including by reducing the federal government's operational footprint—through lawful direction. It inserts the Judicial Branch into the day-to-day, internal operations of a federal agency, impinging on its flexibility to shift resources and make

46

staffing decisions—tools essential to agency management. It requires payment of monies that may never be recovered. And given the sweeping and intrusive restrictions, it locks the agency into a static operational structure that prevents leadership from determining how best to fulfill the agency's statutory obligations consistent with the President's instructions.

Balancing these harms against those plaintiffs have claimed is a matter of the Court's equitable discretion. *See Starbucks Corp.*, 602 U.S. at 347. Here, that balancing does not take place on a blank slate. In April, the Supreme Court stayed a district-court injunction requiring the Department of Education to disburse grant funds, finding dispositive that the plaintiffs "ha[d] not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed," and further that the plaintiffs "ha[d] the financial wherewithal to keep their programs running." *Department of Education*, 145 S. Ct. at 966. Both statements are true here, too, with respect to the grants the plaintiffs (all of which are States) have identified. As for the reinstatement of personnel, the Supreme Court stayed earlier this month an order requiring the Department of Education to undo a reduction-in-force. *McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626 (July 14, 2025). Both *Department of Education* and *McMahon* "inform how a court should exercise its equitable discretion in like cases" like this one, *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025), reinforcing the propriety of vacating the preliminary injunction.

These impingements are not meaningfully lessened by the fact that the district court carved out from its injunction "actions that would improve Agency efficiency or reduce the size or scope of the Agency Defendants as long as (a) the Agency Defendant provides a reasoned explanation for such action, and (b) the action will not prevent the Agency Defendant from fulfilling any of [its] statutory obligations." A52. To start, the injunction's imposition of a "reasoned-explanation" requirement for non-final agency action effectively (and impermissibly) mandates procedure in excess of what the APA provides. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) ("We have repeatedly stated that the text of the APA provides the 'maximum procedural requirements' that an agency must follow in order to promulgate a rule." (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 100 (2015))). And even with this exclusion, the injunction still thwarts a legitimate presidential directive by prohibiting compliance with Executive Order 14,238. There is no lawful reason the agencies should be permitted to undertake modernization and efficiency-motivated reforms only when *not* in response to an order from the President to do so—particularly where the injunction's language tracks the Executive Order's itself. In this way, the injunction exposes the government to the risk of contempt proceedings and other sanctions over wide swaths of agency-administration matters. Such judicial supervision over an agency's exercise of lawful discretion is unwarranted and impermissible, but it will continue, potentially for many months, unless the injunction is vacated. *See SUWA*, 542 U.S. at 66-67.

48

As for the grants, month after month, the government is being ordered to pay out millions of dollars on grant agreements it attempted to terminate. The constant flow from the Department of Treasury irreparably harms the public fisc. As in *Department of Education*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. No grantee has "promised to return withdrawn funds should its grant termination be reinstated," *id.* (quotation omitted), nor did the district court impose a bond. If the preliminary injunction is stayed, the agencies will retain the grant money at issue, and the grantees may obtain it as money damages if they are ultimately successful in the appropriate forum. But the opposite is not true. If the grantees continue to receive and spend their grant funding, the government will be left with no meaningful recourse even if it prevails. Exacerbating this error, although the government requested an adequate bond under Federal Rule of Civil Procedure 65(c), the district court instead improperly waived the bond requirement. A47-49; *see National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam) (explaining that "injunction bonds are generally required").

In short, this is a case where the merits and the equities point firmly in the same direction—there is no basis for an injunction. The Court should vacate.

# CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*

  *(202) 514-1673*

JULY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,520 words, according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Simon G. Jerome*
Simon G. Jerome