# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

_____

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAII; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

Plaintiffs-Appellees,

*(caption continued on inside cover)*

_____

On Appeal from the United States District Court
for the District of Rhode Island

_____

## BRIEF FOR DEFENDANTS-APPELLANTS

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in their official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in their official capacity as Deputy Under Secretary of Commerce for Minority Business Development; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in their official capacity as Acting Director of the Federal Mediation and Conciliation Service; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the Office of Management and Budget; US OFFICE OF MANAGEMENT AND BUDGET,

Defendants-Appellants,

US INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in their official capacity as Acting Executive Director of the US Interagency Council of Homelessness,

Defendant.

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF JURISDICTION ........................................................................... 3

STATEMENT OF THE ISSUE ................................................................................. 4

STATEMENT OF THE CASE ................................................................................... 4

    A.    Legal and Factual Background .................................................... 4

    B.    Prior Proceedings ....................................................................... 5

SUMMARY OF ARGUMENT .................................................................................. 8

STANDARD OF REVIEW ....................................................................................... 10

ARGUMENT ............................................................................................................ 11

I.    Plaintiffs Are Not Likely to Succeed on the Merits ................................. 11

    A.    Plaintiffs' claims are not justiciable. ........................................ 12

        1.    Plaintiffs lack standing to challenge "Closure Decisions." ........... 12

        2.    "Closure Decisions" are not final agency actions subject to APA review. ...................................................................... 15

        3.    Plaintiffs lack a constitutional cause of action. ............................. 24

    B.    The district court erred by ordering the reinstatement of grants and personnel. .......................................................................... 25

        1.    The district court lacked authority to order payment of grant monies. .................................................................. 25

        2.    The district court lacked authority to order reinstatement of personnel. ................................................................... 34

II.     The Preliminary Injunction Is Vastly Overbroad. ................................................ 43

III.    The Remaining Preliminary Injunction Factors Favor Vacatur. ......................... 45

CONCLUSION ................................................................................................................. 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**Cases:**                                                                                              **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
   357 F.3d 62 (D.C. Cir. 2024) ................................................................. 26, 30

*American Fed'n of Gov't Emps. v. Ezell*,
   No. 25-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ..................................... 39

*American Fed'n of Gov't Emps.* v. *OPM*,
   771 F. Supp. 3d 1127 (N.D. Cal. 2025) ................................................................. 39

*American Fed'n of Gov't Emps. v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ................................................................. 39

*American Foreign Serv. Ass'n v. Trump*,
   768 F. Supp. 3d 6 (D.D.C. 2025) ................................................................. 39

*American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*,
   781 F.3d 571 (1st Cir. 2015) ................................................................. 11

*American Pub. Health Ass'n v. National Insts. of Health*,
   --- F.4th ----, 2025 WL 2017106 (1st Cir. July 18, 2025) .............................. 26, 27

*American Sci. & Eng'g, Inc. v. Califano*,
   571 F.2d 58 (1st Cir. 1978) ................................................................. 27

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................. 40

*Bennett v. New Jersey*,
   470 U.S. 632 (1985) ................................................................. 29

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................. 16, 23

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ................................................................. 44

*Block v. Community Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................. 38

*Boaz Hous. Auth. v. United States,*
994 F.3d 1359 (Fed. Cir. 2021)..................................................................... 26

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ..................................................................................... 43

*California v. Texas,*
593 U.S. 659 (2021) ..................................................................................... 36

*Charlesbank Equity Fund II v. Blinds to Go, Inc.,*
370 F.3d 151 (1st Cir. 2004) ................................................................... 45, 46

*City of New York v. U.S. Dep't of Def.,*
913 F.3d 423 (4th Cir. 2019)................................................................... 16, 21

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..........................................................................15, 35, 36

*Columbus Reg'l Hosp. v. United States,*
990 F.3d 1330 (Fed. Cir. 2021)..................................................................... 29

*Community Action of Laramie Cnty., Inc. v. Bowen,*
866 F.2d 347 (10th Cir. 1989) ..................................................................... 32

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ..............................................................................14, 43

*Dalton v. Specter,*
511 U.S. 462 (1994) ..........................................................................8, 24, 25

*Davis v. FEC,*
554 U.S. 724 (2008) ..................................................................................... 35

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
601 U.S. 42 (2024) ....................................................................................... 25

*Department of the Army v. Blue Fox,*
525 U.S. 255 (1999) ..................................................................................... 25

*Department of Educ. v. California:*
145 S. Ct. 966 (2025) ........................................................................... *passim*
132 F.4th 92 (1st Cir. 2025)....................................................................28, 30

iv

*Doe v. Trs. of Bos. Coll.*,
    942 F.3d 527 (1st Cir. 2019) ..................................... 11

*Egbert v. Boule*,
    596 U.S. 482 (2022) ............................................... 40

*Elgin v. Department of the Treasury*,
    567 U.S. 1 (2012) ................................... 36, 37, 38, 40

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................... 12, 15, 35

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ................................ 46

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ............................. 17, 19

*Gill v. Whitford*,
    585 U.S. 48 (2018) ............................................... 43

*Grosdidier v. Chairman*,
    560 F.3d 495 (D.C. Cir. 2009) ........................... 37, 38

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) .......................................... 39, 40

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ............................................. 44

*Harkrader v. Wadley*,
    172 U.S. 148 (1898) ............................................. 40

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ................................ 16

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................. 42

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) ................................. 15

v

*Hispanic Affs. Project v. Acosta,*
901 F.3d 378 (D.C. Cir. 2018) ...................................................................... 19

*In re Core Comm'ns, Inc.,*
531 F.3d 849 (D.C. Cir. 2008) ...................................................................... 46

*In re Sawyer,*
124 U.S. 200 (1888) ...................................................................................... 40

*Janvey v. Alguire,*
647 F.3d 585 (5th Cir. 2011) ........................................................................ 45

*Lewis v. Casey,*
518 U.S. 343 (1996) ...................................................................................... 43

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ...................................................................... 31, 34, 41, 42

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) ...................................................................................... 48

*Lujan v. National Wildlife Fed'n,*
497 U.S. 871 (1990) ...................................................................... 15, 16, 17, 18

*Maryland v. USDA,*
No. 25-1338, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) .............................. 39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ...................................................................................... 26

*McMahon v. New York,*
606 U.S. ----, 2025 WL 1922626 (July 14, 2025) ................................... 2, 47

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) ...................................................................... 27

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ................................................................. 31, 32

*Missouri v. Jenkins,*
515 U.S. 70 (1995) ........................................................................................ 14

*New York v. Trump,*
133 F.4th 51 (1st Cir. 2025) ........................................................................ 19

*National Treasury Emps. Union v. Trump*:
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ..................................... 49
770 F. Supp. 3d 1 (D.D.C. 2025) ................................................................. 39

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................ 45

*Norton v. Southern Utah Wilderness All.,*
542 U.S. 55 (2004) ................................................................. 15, 17, 22, 48

*Nyunt v. Chairman,*
589 F.3d 445 (D.C. Cir. 2009) ..................................................................... 37

*OfficeMax, Inc. v. Levesque,*
658 F.3d 94 (1st Cir. 2011) ....................................................................... 10

*OPM v. American Fed'n of Gov't Emps.,*
145 S. Ct. 1914 (2025) ............................................................................. 36

*Organization for Competitive Mkts. v. USDA,*
912 F.3d 455 (8th Cir. 2018) ...................................................................... 22

*Osediacz v. City of Cranston,*
414 F.3d 136 (1st Cir. 2005) ....................................................................... 13

*Pepper v. United States,*
562 U.S. 476 (2011) ................................................................................ 29

*Perez v. Mortgage Bankers Ass'n,*
575 U.S. 92 (2015) ................................................................................. 48

*Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.,*
313 F. Supp. 3d 62 (D.D.C. 2022) ................................................................ 32

*Raines v. Byrd,*
521 U.S. 811 (1997) ............................................................................ 12, 13

*Sampson v. Murray,*
415 U.S. 61 (1974) ............................................................................. 39, 40

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ................................................................ 14

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ................................................................ 20

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985) ................................................ 28

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................ 13

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ........................................................ 43, 47

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.,*
    120 F.4th 59 (2d Cir. 2024) ...................................................... 3

*Sustainability Inst. v. Trump,*
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .......... 29

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................ 12

*Trump v. American Fed'n of Gov't Emps.,*
    606 U.S. ----, 2025 WL 1873449 (July 8, 2025) .................. 2, 20

*Trump v. Boyle,*
    606 U.S. ----, 2025 WL 2056889 (July 23, 2025) ................ 3, 47

*Trump v. CASA, Inc.,*
    145 S. Ct. 2540 (2025) .......................................................... 2, 43

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .......................................................... 12, 14

*Vietnam Veterans of Am. v. CIA,*
    811 F.3d 1068 (9th Cir. 2016) ................................................ 22

*Union of Concerned Scientists v. Wheeler,*
    954 F.3d 11 (1st Cir. 2020) ................................................ 30, 41

*United States v. Fausto,*
    484 U.S. 439 (1988) ....................................................................36, 37, 38

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) .................................................................... 41

*Walton v. House of Representatives,*
    265 U.S. 487 (1924) .................................................................... 40

*White v. Berry,*
    171 U.S. 366 (1898) .................................................................... 40

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................11, 43

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) .................................................................... 24

**U.S. Constitution:**

U.S. Const., art. II, §§ 1 & 3 .................................................................... 20

**Statutes:**

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118–42, 138 Stat. 25 .................................................................... 32

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119–4, 139 Stat. 9 .................................................................... 32

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118–47, 138 Stat. 460 .................................................................... 32

5 U.S.C. § 551 ....................................................................15, 18

5 U.S.C. § 701 ....................................................................30, 41, 42

5 U.S.C. § 702 ....................................................................25, 26, 30, 39

5 U.S.C. § 704 ....................................................................15, 16

5 U.S.C. § 706 ....................................................................15, 16, 22, 36

5 U.S.C. §§ 7101-7135 ................................................................ 36

5 U.S.C. § 7105 ....................................................................... 36

5 U.S.C. § 7123 ....................................................................... 36

5 U.S.C. § 7703 ....................................................................... 36

12 U.S.C. § 5708 ...................................................................... 33

15 U.S.C. § 9502 ...................................................................... 42

15 U.S.C. §§ 9511-9526 .............................................................. 5

15 U.S.C. § 9523 ...................................................................... 33

15 U.S.C. § 9524 ................................................................... 27, 28

15 U.S.C. §§ 9541-9543 .............................................................. 5

15 U.S.C. § 9543 ...................................................................... 33

15 U.S.C. §§ 9552-9553 .............................................................. 5

15 U.S.C. § 9561 ....................................................................... 5

20 U.S.C. § 9103 ....................................................................... 5

20 U.S.C. § 9105 ...................................................................... 42

20 U.S.C. § 9108 ....................................................................... 5

20 U.S.C. § 9141 ....................................................................... 5

20 U.S.C. § 9162 ...................................................................... 33

20 U.S.C. § 9165 ................................................................... 5, 33

20 U.S.C. § 9173 ....................................................................... 5

28 U.S.C. § 1292 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 3

28 U.S.C. § 1361 ........................................................................... 3

28 U.S.C. § 1491 ......................................................................... 26

29 U.S.C. § 172........................................................................... 42

29 U.S.C. § 173............................................................................. 5

**Executive Orders:**

*Commencing the Reduction of the Federal Bureaucracy*
   Exec. Order No. 14,127, 90 Fed. Reg. 10,577 (Feb. 25, 2025) .................................... 4

*Continuing the Reduction of the Federal Bureaucracy*
   Exec. Order No. 14,238, 90 Fed. Reg. 13,043 (Mar. 20, 2025)...........................5, 6, 20

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The district court entered a preliminary injunction that interferes with the Executive Branch's prerogative to manage its own workforce and agency operations. The government respectfully requests that the Court hold oral argument to aid the Court in resolving the important issues presented by this appeal.

## INTRODUCTION

The district court entered a sweeping preliminary injunction directing three federal agencies to unwind past compliance—and to forbear from future compliance—with a facially valid Executive Order requiring those agencies to reduce their operations and workforces "to the maximum extent consistent with applicable law." In particular, the injunction requires the agencies to reinstate grants and personnel that agency leadership consider unnecessary to fulfill the agencies' legally required functions. The result: the district court exceeded the judicial role by installing itself as superintendent over wide-ranging aspects of the agencies' daily operations.

No relief should have been granted whatsoever, because plaintiffs' claims are not justiciable. Plaintiffs contend that each agency acted unlawfully when it decided to comply with the Executive Order. But plaintiffs' use of the label "Closure Decisions" in framing their complaint belies that what they actually challenge is a set of innumerable, subsidiary decisions to determine which agency functions are legally required and to limit agency operations to such functions. As a matter of Article III standing, plaintiffs have no cognizable interest in achieving general oversight of the Executive Branch in the manner they seek. And as a statutory matter, plaintiffs lack a cause of action under the Administrative Procedure Act (APA) to challenge what they call "Closure Decisions," which are not final agency actions. Plaintiffs' attempt to

circumvent the APA's limitations by alleging claims directly under the Constitution, in turn, is squarely foreclosed by Supreme Court precedent.

The district court further erred in the nature and scope of the preliminary relief it awarded. As harm from the "Closure Decisions," plaintiffs claimed they had lost or might conceivably lose grant funds and access to agency-run programs. In addition to generally prohibiting compliance with the Executive Order, the district court specifically ordered that the agencies reinstate both terminated grants and personnel, the latter category on the theory that reductions-in-force might theoretically leave the agencies unable to fulfill their statutory mandates. But the district court lacked jurisdiction to order either of these specified forms of relief. And even if the district court possessed jurisdiction to order such reinstatements, it fatally erred in failing to tailor the scope of its relief to plaintiffs' particular injuries. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2549-62 (2025) (reaffirming traditional equitable limitations on the scope of relief and staying overbroad district-court injunctions "to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue").

Three times in recent weeks, the Supreme Court has put on hold district-court orders that improperly interfere with the Executive Branch's management of its personnel and its grant spending. *See McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626 (July 14, 2025); *Trump v. American Fed'n of Gov't Emps.*, 606 U.S. ----, 2025 WL 1873449 (July 8, 2025); *Department of Educ. v. California*, 145 S. Ct. 966 (2025) (per

2

curiam).  And just last week, the Supreme Court stated that although its interim orders "are not conclusive as to the merits," they nevertheless "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025).  Because the law forecloses plaintiffs' claims here, and because the equities strongly favor removing the improper constraints the district court placed on the Article II officials responsible for running the agencies, this Court should follow the Supreme Court's lead and vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361 to hear their claims, which arise under the APA and the Constitution.  A58, A97-105.[1]  The district court granted plaintiffs' motion for a preliminary injunction on May 6, 2025, A1-49, and entered a preliminary injunction on May 13, 2025, A50-53.  The government filed a timely notice of appeal on May 16, 2025.  A1112-13.  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

---

[1] In June, following the entry of the preliminary injunction and the government's notice of appeal of the same, plaintiffs filed an amended complaint adding a fourth agency as defendant and including factual allegations related to that agency.  A1121-99.  Because plaintiffs' allegations and legal theories concerning the three original agency defendants remain unchanged, and the preliminary injunction "remains in place, unmodified," the government does not understand its appeal to be moot.  *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 77-78 (2d Cir. 2024).  The citations given throughout this brief are to the original complaint.

## STATEMENT OF THE ISSUE

The issue presented is whether the district court erred in entering a preliminary injunction that (1) broadly prohibits the three federal agency defendants from implementing an Executive Order instructing them to reduce their functions and staffing to the minimum level required by law and (2) requires the agencies to reinstate terminated grants and personnel.

## STATEMENT OF THE CASE

### A.     Legal and Factual Background

Shortly after taking office in January, the President issued an Executive Order announcing the "policy of [his] Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people." *Commencing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,217, § 1, 90 Fed. Reg. 10,577, 10,577 (Feb. 25, 2025). Consistent with that policy, the President directed a "reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary" at four federal agencies, so as to "minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation." *Id.* §§ 1-2, 90 Fed. Reg. at 10,577.

The President's reform project extended the following month to seven additional agencies with the promulgation of Executive Order 14,238. In that Order, the President ordered the agencies, which include the Federal Mediation and Conciliation Service (FMCS), the Institute of Museum and Library Services (IMLS),

and the Minority Business Development Agency (MBDA), to eliminate their "non-statutory components and functions … to the maximum extent consistent with applicable law." *Continuing the Reduction of the Federal Bureaucracy*, Exec. Order No. 14,238, § 2(a)(i), (iv), (vii), 90 Fed. Reg. 13,043, 13,043 (Mar. 20, 2025).

FMCS helps "parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). IMLS is charged with "ensur[ing] the availability of museum, library, and information services adequate to meet the essential information, education, research, economic, cultural, and civic needs of the people of the United States." 20 U.S.C. § 9103(c)(1). To that end, IMLS awards grants, conducts research, and offers policy programming. *See id.* §§ 9108(a), 9141, 9165, 9173. And MBDA promotes the growth of minority-owned businesses through similar grantmaking and research functions. *See, e.g.*, 15 U.S.C. §§ 9511-9526, 9541-9543, 9552-9553, 9561.

Shortly after Executive Order 14,238 was promulgated, FMCS, IMLS, and MBDA began to implement it, including by placing staff on administrative leave in anticipation of a reduction-in-force and by terminating a number of grant agreements.

**B. Prior Proceedings**

**1.** On April 4, 2025, 21 plaintiff States filed this suit. Their complaint centers on alleged "Closure Decisions" at each of the three agencies—that is, in plaintiffs' telling, "a final decision … to implement the [Executive] Order and to gut [the agencies'] operations." A67-68. Plaintiffs allege that, in implementing the Executive

Order, the agencies violated the APA, their statutory obligations, and the Constitution. The same day plaintiffs filed their suit, they moved for a temporary restraining order, which the parties agreed to treat as a motion for a preliminary injunction. Stipulation, Dkt. No. 31.

The district court granted plaintiffs' motion for a preliminary injunction. A1-49. The court concluded that plaintiffs had standing to challenge the agencies' implementation of the Executive Order and deemed plaintiffs' label of "Closure Decisions" to refer to final agency action reviewable under the APA. A21-26. The court also held that inasmuch as the "Closure Decisions" carried the consequences of terminations of grants and personnel, the Tucker Act and the Civil Service Reform Act (CSRA) did not deprive it of jurisdiction to enjoin those consequences under the APA. A14-21. On the merits, the district court concluded that plaintiffs were likely to succeed in demonstrating that the implementation of the Executive Order was unreasoned and contrary to statutory and constitutional law. A26-40.

The injunction prohibits defendants from implementing Section 2 of Executive Order 14,238 (the requirement to eliminate "non-statutory components and functions … to the maximum extent consistent with applicable law") and requires them to "take all necessary steps to reverse any policies, memoranda, directives, or actions issued before this Order that were designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out the directives contained" in the Order. A51-52. The injunction further provides that defendants must "restore all [agency]

employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of [the] Executive Order," "to their status before March 14, 2025."  A52.  And the injunction orders defendants not to "further pause, cancel, or otherwise terminate IMLS or MBDA grants or contracts or fail to disburse funds to recipients in plaintiff States according to such grants or contracts for reasons other than the grantees['] or contractors' non-compliance[] with applicable grant or contract terms."  A52.  Furthermore, defendants must "take immediate steps to resume the processing, disbursement, and payment of already-awarded funding, and to release awarded funds previously withheld or rendered inaccessible due to or in reliance on" the Executive Order, "with respect to recipients in plaintiff States."  A53.

The injunction does not preclude defendants "from taking actions that would improve Agency efficiency or reduce the size or scope" of the agencies "as long as (a) the Agency Defendant provides a reasoned explanation for such action, and (b) the action will not prevent the Agency Defendant from fulfilling any of [its] statutory obligations."  A52.  Moreover, the injunction does not "preclude[] the Agency Defendants from making personnel decisions that are not related to or motivated by" the Executive Order.  A52.

**2.**  The government appealed and sought a stay pending appeal in this Court. That motion remains pending.

## SUMMARY OF ARGUMENT

**I.** Plaintiffs are unlikely to succeed on the merits of their claims.

**A.** To start, plaintiffs' claims are not justiciable. Plaintiffs lack Article III standing to seek general oversight of three agencies' ongoing process of compliance with an Executive Order, because they have no cognizable interest in enforcing what they perceive to be the proper operation of government. Plaintiffs also lack a cause of action under the APA to challenge amorphous "Closure Decisions," which possess neither the discrete characteristics of "agency action" nor the finality that the APA makes necessary preconditions to judicial review. In concluding otherwise, the district court was compelled to examine particular discrete actions that might themselves qualify as agency actions—but such actions cannot be aggregated to circumvent the APA's carefully drawn limitations on suit. Plaintiffs cannot evade those limitations by recasting their claims as constitutional violations of the separation of powers and Take Care Clause. As the district court's analysis shows, each of these purportedly constitutional arguments has at its core a contention that the agencies committed statutory violations. The Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), leaves no doubt that plaintiffs therefore lack a constitutional cause of action.

**B.** Even if plaintiffs could overcome these threshold defects with their case, the district court was not authorized to afford them the particular relief it did in the form of grant and personnel reinstatement.

8

The federal agency defendants may not be sued absent a waiver of sovereign immunity, and the APA's general waiver does not apply where another statute impliedly forbids the relief sought. That is the case here with respect to plaintiffs' requests for grant funding—which are, at their core, contractual and thus required by the Tucker Act to be heard in the Court of Federal Claims, not the District of Rhode Island. Furthermore, the agencies' administration of the grants plaintiffs have identified is committed to their discretion by law and thus unreviewable.

Plaintiffs are on no firmer ground in seeking reinstatement of personnel. Their theory that the agencies might not be able to exercise their statutory functions due to insufficient staffing is precisely the sort of speculative contention federal courts have routinely rejected as insufficient to support standing to seek this particular form of relief. Independently, the existence of a comprehensive statutory framework for judicial challenges to personnel decisions—the CSRA—precludes the district court from exercising jurisdiction under the general federal question statute. That plaintiffs themselves are not capable of bringing claims under the CSRA is a feature, not a bug, of that framework. The district court also lacked authority to order reinstatement because such a remedy was traditionally unavailable at equity, and because the agencies' decisions about how many and which personnel are needed to fulfill statutorily required functions are (like grant funding) committed to their discretion.

**II.** The district court's order to reinstate grants and personnel was also overbroad because the district court did not limit its relief to remedy only irreparable

injury shown by plaintiffs themselves. Instead, the district court recited an illustrative litany of statutes cited by plaintiffs and ordered wholesale restoration of terminated grants and personnel. That the district court limited its grant-specific provision of relief to grants "in plaintiff States" does not solve this problem, for the States lack standing to seek reinstatement of any grant but their own, and the district court conducted no grant-by-grant analysis to determine whether each affected grantee was in fact part of (not merely located within) a plaintiff State.

**III.** The equitable balance strongly favors vacatur. Plaintiffs have not identified any grave and irreparable harm. Improperly withheld grant monies may be recovered via litigation in the Court of Federal Claims, and plaintiffs neither pleaded nor proved the type of irreparable harm that might follow from temporary deprivation of those monies. Additionally, lost access to agency programs cannot qualify as irreparable harm, absent more that plaintiffs have not shown. And any harm shown, in any event, pales in comparison to harm the preliminary injunction visits on the government by interfering with significant swaths of Executive Branch discretion to manage its day-to-day affairs and preventing leadership from implementing the President's directives to streamline federal agencies. The preliminary injunction should be vacated.

## STANDARD OF REVIEW

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011).

Where the district court's analysis is premised on an error of law, the court "has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## ARGUMENT

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Here, plaintiffs have not established "a strong likelihood that they will ultimately prevail on the merits." *American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) (quotation omitted). Nor have they shown irreparable injury to justify an injunction that inflicts outsized harm on the government and the public. *Winter*, 555 U.S. at 24. The district court erred in concluding that plaintiffs satisfied the requirements for interim injunctive relief.

## I. Plaintiffs Are Not Likely to Succeed on the Merits.

Plaintiffs' "Closure-Decision" theory is not cognizable under the APA or the Constitution, and so plaintiffs cannot establish a likelihood of success on the merits. Additional jurisdictional obstacles stand in the way of the specific provisions of the district court's order that require the reinstatement of grants and personnel.

## A. Plaintiffs' claims are not justiciable.

### 1. Plaintiffs lack standing to challenge "Closure Decisions."

Federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches" but to redress concrete injuries to cognizable interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). "By limiting who can sue, the standing requirement implements 'the Framers'' concept of the proper—and properly limited—role of the courts in a democratic society.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quotation omitted). "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is … concrete and particularized,' and that the dispute is 'traditionally thought to be capable of resolution through the judicial process[.]'" *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (first alteration in original) (citation omitted). This requirement serves in part to ensure that disputed legal questions "will be resolved … in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). When "reaching the merits of the dispute would force [the courts] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the "standing inquiry [is] especially rigorous." *Raines*, 521 U.S. at 819-20.

Plaintiffs' principal contention is that the three defendant agencies have decided to "dismantle their operations and cease performance of their functions" in violation of federal law. Mot. for Prelim. Inj., PageID#73, Dkt. No. 3. Putting aside the absence of any credible evidence that the agencies have decided to shutter their operations entirely—indeed, the Executive Order specifically contemplates they will conform their functions to the statutory minimum—plaintiffs' asserted interest in vindicating the proper operation of the Executive Branch is exactly the sort of abstract and generalized grievance that cannot be redressed by a federal court under Article III. *See Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) ("[A] mere interest in seeing the government turn square corners is not the kind of particularized interest that can satisfy the most basic constitutional prerequisite for standing.").

First, a generalized dispute over whether an agency will perform its statutory duties or will have sufficient resources to do so involves no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution through the judicial process." *Raines*, 521 U.S. at 819. Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Quite the contrary, such disputes over the size and scope of the federal government, and the adequacy with which it discharges its duties, have long been left to the "hurly burly" of the political process.

Second, plaintiffs lack a particularized interest in safeguarding the separation of powers, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974). This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 227; *Valley Forge*, 454 U.S. at 482-83.

Third, because plaintiffs assert an injury caused by an alleged blanket abdication by three agencies of their legal responsibilities, the judiciary may not redress that injury, as doing so requires "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (quotation omitted); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

In the district court, plaintiffs sought to justify their standing by pointing to harms in the form of loss of grant funding and agency programs that States allege they benefit from. *See* Reply in Supp. of Mot. for Prelim. Inj. 4, Dkt. No. 44. But those harms are too attenuated from the "Closure Decisions" at which plaintiffs take aim. A "categorical policy to eliminate … 'non-statutory components and functions' and 'reduce the performance of their statutory function[s] and associated personnel'" does not itself affect individual grants and programs, A16; such a policy is at most the framework under which individual termination decisions are made. In other words,

plaintiffs' proffered injuries are not "fairly traceable" to the faintly sketched "Closure Decisions" they identify. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted); *see also Alliance for Hippocratic Med.*, 602 U.S. at 383 ("The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."). Put otherwise, because "standing is not dispensed in gross," *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016) (citation omitted), plaintiffs might have standing to challenge particular actions with respect to grants and programs administered by the three agencies—but they lack any cognizable interest in wholesale administrative reform.

### 2. "Closure Decisions" are not final agency actions subject to APA review.

**a.** Where no other statute applies, § 706(2) of the APA permits judicial review of Executive Branch decisionmaking only where a decision results in "agency action" that is "final." 5 U.S.C. §§ 704, 706(2); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990). This limitation ensures that courts do not engage in "general judicial review of [an agency]'s day-to-day operations." *Lujan*, 497 U.S. at 899. As evidenced by the illustrative list of agency actions the APA provides, an agency action must be "circumscribed" and "discrete." *Norton v. Southern Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 62 (2004) (citing 5 U.S.C. § 551(13)). In contrast, plaintiffs may not level a "broad programmatic attack" against an agency's (much less several agencies')

"continuing (and thus constantly changing) operations," even under a facially discrete label of plaintiffs' own choosing. *Lujan*, 497 U.S. at 890 (holding challenge to "land withdrawal review program" outside the scope of APA review).

Even where the challenged action is sufficiently discrete to qualify as "agency action," it must also be sufficiently "final" to come within the APA's ambit. 5 U.S.C. § 704. "To be considered 'final,' the agency action must" both "mark the 'consummation' of the agency's decisionmaking process" and "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Taken as a whole, the APA's limitations "strike a balance between meaningful judicial review and the needs of effective administration. Review is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (describing 5 U.S.C. § 706(1)).

**b.** *i.* Plaintiffs' challenge to what they call a "Closure Decision" at each agency is quintessentially a "broad programmatic attack," not one directed at reviewable agency action. *See Lujan*, 497 U.S. at 890. Compliance with an Executive Order is not, despite plaintiffs' strained use of the term, reducible to a single "decision." Instead, Executive Order 14,238 required officials at the three (distinct) agencies to begin making various decisions, including which programs (and grants) to retain, the

number of staff necessary to administer programs and grants that continue to operate, and how and when to terminate unnecessary staff. Those decisions, in turn, necessarily follow from a series of internal (and potentially external) deliberations, communications, and analyses—in other words, "a wide variety of activities that comprise the common business of managing government programs." *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (rejecting challenge to Presidential Budget Initiative); *id.* ("Unlike 'circumscribed, discrete agency actions' that are the ordinary subjects of judicial review, the [challenged action] represents the sum of 'many individual actions,' including some 'yet to be taken.'" (citation omitted) (first quoting *SUWA*, 542 U.S. at 62, and then quoting *Lujan*, 497 U.S. at 893)); *see also Lujan*, 497 U.S. at 890.

As a result, plaintiffs cannot claim to have felt "the concrete effects normally required for APA review" from an amorphous "decision" to comply with a presidential directive. *See Lujan*, 497 U.S. at 891. In *Fund for Animals*, the D.C. Circuit rejected an APA challenge to a budget request that proposed changes to the Wild Horse and Burro Program, including a proposal to "round[] up 12,855 animals in its first year." 460 F.3d at 20. The court held that the proposal lacked the "actual or immediately threatened effect" required. *Id.* (quoting *Lujan*, 497 U.S. at 894). Unlike "individual roundups," which "might qualify," a budget request standing alone "did not harm or affect the plaintiffs." *Id.* The same can be said of a "decision" to

downsize agency operations—that plan, without more, has no effect whatsoever on plaintiffs.

In concluding that the "Closure Decisions" were agency actions, the district court credited plaintiffs' assertion that they challenged a "policy that applies the measure 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions' across the board." A22 (quoting Reply in Supp. of Mot. for Prelim. Inj. 14-15).[2] This articulation of plaintiffs' challenge does not cure the problem; it merely substitutes "policy" for "decision" in a sentence that otherwise reaffirms that effectuating the ultimate goal of Executive Order 14,238—the elimination of unnecessary federal bureaucracy—requires countless antecedent agency actions.

*Contra* the district court and plaintiffs, a "Closure Decision" is not the sort of "policy" courts have accepted as constituting agency action. *Lujan* itself, on which the district court relied, merely adverted to the possibility of such an outcome in dictum. 497 U.S. at 890 n.2 ("If there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations, and if that order or regulation is final, and has become

---

[2] In addition to their use of the term "policy," plaintiffs also described the "Closure Decisions" as "rules" or "orders" under the APA. Reply in Supp. of Mot. for Prelim. Inj. 12. Such a description makes little sense—plaintiffs do not (and cannot) identify where any of the three agencies issued the "statement" required of a rule or issued the "disposition" inherent in an order. *See* 5 U.S.C. § 551(4), (6).

ripe for review in the manner we discuss subsequently in text, it can of course be challenged under the APA by a person adversely affected[.]"); *see* A21-22. In *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), the D.C. Circuit applied the logic of that dictum to hold that the plaintiffs had plausibly alleged agency action in the form of a policy "of habitually approving and extending H-2A visas for lengthy periods of time," allegedly in violation of a statute requiring "that H-2A visas be temporary and short-lived." *Id.* at 388. And in *New York v. Trump*, a panel of this Court denied a stay pending appeal of an injunction against a "policy" of "broad, categorical freezes on obligated funds." 133 F.4th 51, 67 (1st Cir. 2025).

Putting aside whether *Hispanic Affairs Project* and *New York* correctly identified reviewable agency action, each court construed the relevant actions to involve defined practices with uniform results—*i.e.*, routine visa extensions and "across-the-board" funding pauses. *Hispanic Affairs Project*, 901 F.3d at 388; *New York*, 133 F.4th at 67. A "Closure Decision" meets neither criterion. Reducing the scope of agency operations to the minimum functions required by law is not a defined practice with respect to a particular group (like visa holders or grantees), it is an ongoing programmatic initiative with potentially varying effects on numerous entities based on which programs and grants the agency modifies. And an initiative to downsize agency operations does not have uniform results (like visa extensions or funding pauses); it represents a plan to take action with future results to be determined down the line. *See Fund for Animals*, 460 F.3d at 20.

That plaintiffs have not identified reviewable agency action is confirmed by the fact that their legal theories cannot sensibly be analyzed at the level of a "Closure Decision." Consider, for example, Count I of the complaint, which alleges that the agencies acted in an arbitrary and capricious manner by failing to give reasons for their actions and to consider reliance interests. A98. The reason an agency official would "decide" to comply with an Executive Order is self-evident: because such an order is presumptively legitimate direction from the head of the Executive Branch. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3)). No further justification is necessary. An agency likewise cannot reasonably be expected to account for potential reliance interests without determining whose reliance interests will be affected and how. Deciding to comply with an Executive Order is the first step, not the middle or last, in answering those questions.

Similarly, plaintiffs' "Closure-Decision" framing does not lend itself to analysis of whether the agencies took actions in excess of statutory authority. Recall that the Executive Order requires the reduction of agency functions and size "to the maximum extent consistent with applicable law." Exec. Order No. 14,238, § 2(a). It is incoherent to say that by deciding to comply with a directive to take action consistent with law, the agencies have (*ex ante*) violated the law. *Cf. American Fed'n of Gov't Emps.*, 2025 WL 1873449, at *1 (Sotomayor, J., concurring in grant of stay)

(concluding the Supreme Court "ha[d] no occasion to consider whether" reorganization plans required by Executive Order "can and will be carried out consistent with the constraints of law" where the Executive Order itself required the agencies to take action "consistent with applicable law").

Tellingly, the district court departed from plaintiffs' framing in assessing their likelihood of success on the merits, reasoning that the agencies failed to justify letters sent to employees placed on administrative leave, a memorandum announcing a reduced operational scope for one agency, and the termination of individual grants by another agency. A27-29. In effect, the district court appeared to conclude that those individual actions were likely arbitrary and capricious. But it is a non-sequitur then to say that the "Closure Decisions" that supposedly preceded the individual actions cited were themselves arbitrary and capricious. This distinction matters, because plaintiffs face insurmountable threshold obstacles in seeking to challenge the grant and personnel terminations themselves in this forum. *See infra* pp. 25-43. They should not be permitted to evade those obstacles by recasting their theory in broad, programmatic terms. All in all, plaintiffs' request for judicial review of "Closure Decisions" places the district court in the "programmatic oversight" role the APA does not permit it to occupy. *City of New York*, 913 F.3d at 432.

*ii.* That plaintiffs' "Closure-Decision" theory does not allege final agency action, and is thus unreviewable under the APA, is confirmed by the fact that the APA contains a provision permitting a court to "compel agency action unlawfully

withheld or unreasonably delayed." 5 U.S.C. § 706(1). Insofar as plaintiffs challenge an alleged failure to perform required functions, *see* Mot. for Prelim. Inj. 14 ("The remaining five employees working at the MBDA are not capable of carrying out the MBDA's statutorily mandated functions, administering its existing programs, or spending its appropriated funds."); *id.* 9-17 (similar, regarding IMLS); *id.* 16-17 (similar, regarding FMCS), they ought to have brought claims under § 706(1). Their failure to do so matters, because the standard of review under § 706(1) is considerably more stringent than under § 706(2). *SUWA*, 542 U.S. at 63 (observing that through § 706(1) "the APA carried forward the traditional practice prior to its passage," including writs of mandamus); *Organization for Competitive Mkts. v. USDA*, 912 F.3d 455, 462 (8th Cir. 2018) ("Most circuits have adopted the mandamus approach to agency delay issues[.]" (citation omitted)). Had the district court applied the correct standard under § 706(1), it could not possibly have granted relief, both because plaintiffs have not identified any "discrete action[] that [is] unequivocally compelled by statute or regulation," *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1081 (9th Cir. 2016), and because their "Closure-Decision" theory rests largely on allegations of potential *future* failures to take action, not action *already* withheld or delayed. 5 U.S.C. § 706(1); *see* A41-45 (repeatedly crediting claims of harm that could come to pass if the agencies failed to continue programming).

 *iii.* The "decision" to comply with an Executive Order to reduce agency staffing and programming is not "final" within the meaning of the APA, either. The

agencies' ongoing implementation of the Executive Order marks the initiation, not the consummation, of the agency's decision-making process. *Bennett*, 520 U.S. at 177-78. And a plan to take action—even if any subsequent action will have definite effects for the public—does not itself create consequences for would-be plaintiffs. This makes sense, because attempting to review mere plans and ongoing operations under them is a futile task. Directions may be changed, and operational decisions may be reversed. *See, e.g.*, Decl. in Supp. of Mot. for Stay Pending Appeal ¶ 9, Dkt. No. 63-1 (explaining that the IMLS's Grants to States program was fully reinstated before the preliminary injunction).

The district court's conclusion that there existed a final agency action cannot be reconciled with these principles. The court based that conclusion in part on a declaration offered by an IMLS employee in which the employee reported hearing that much of the agency's staff would be placed on leave and its grants, terminated. A23-24. The district court also pointed to similar evidence from MBDA and FMCS. Like the evidence underlying the court's agency-action determination, *see supra* p. 21, this evidence at most would suggest that the agency has taken a series of independently final subsidiary actions. It does not, contrary to the district court's holding, establish that the basis for the exceedingly broad relief plaintiffs received—the generically defined project of complying with an Executive Order—is itself final.

### 3. Plaintiffs lack a constitutional cause of action.

As an alternative to the APA, the district court held that defendants had likely violated the separation of powers and Take Care Clause. A39-40. As defendants explained below, such a holding is squarely foreclosed by *Dalton v. Specter*, 511 U.S. 462 (1994), with which the district court did not even engage. *See* A39-40; Opp'n to Mot. for PI 28-29, Dkt. No. 41 (citing *Dalton*).

*Dalton* teaches that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." 511 U.S. at 472. Rather, the Supreme Court has "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, plaintiffs' asserted constitutional claims are really "statutory one[s]," *Dalton*, 511 U.S. at 474, as they assert simply that the agencies have exceeded their statutory authority. Any statutory claim could be recharacterized as a violation of the "constitutional separation of powers," A40 (quotation omitted), but that is precisely

the sleight of hand rejected in *Dalton*. 511 U.S. at 471-72. The same is true of

plaintiffs' invocation of the Take Care Clause, which is nothing more than an

allegation that defendants have failed to comply with federal statutory law. *See* A39-

40.

**B.     The district court erred by ordering the reinstatement of grants and personnel.**

For the reasons given above, the district court should not have granted any

relief to plaintiffs. When it did, however, it compounded its error by specifically

requiring the agencies to reinstate terminated grants[3] and personnel, categories of

relief it was wholly without power to provide.

**1.     The district court lacked authority to order payment of grant monies.**

**a.** It is well established that "the United States, as sovereign, is generally

immune from suits seeking money damages" absent a waiver of that immunity.

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024).

Although the APA provides a limited waiver of the government's sovereign immunity

for suits "seeking relief other than money damages," *Department of the Army v. Blue Fox,*

*Inc.*, 525 U.S. 255, 260 (1999) (emphasis omitted) (quoting 5 U.S.C. § 702), it does not

---

[3] As the government indicated in a declaration appended to its motion for a stay pending appeal, IMLS voluntarily reinstated grants that were terminated under the agency's Grants to States program before the district court entered its preliminary injunction. *Supra* p. 23. The government does not challenge the injunction insofar as it extends to the Grants to States program.

apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

One example of such an implicit limitation on APA relief involves suits against the United States that sound in contract. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States," 28 U.S.C. § 1491(a)(1), and "impliedly forbids" bringing "contract actions" against "the government in a federal district court" under the APA, *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).[4]

---

[4] The government acknowledges that a panel of the Court issued a decision for publication denying a stay of a preliminary injunction in *American Public Health Association v. National Institutes of Health* (*APHA*), --- F.4th ----, 2025 WL 2017106 (1st Cir. July 18, 2025). The government has sought a stay from the Supreme Court in that case. *National Insts. of Health v. American Pub. Health Ass'n*, No. 25A103 (U.S. July 24, 2025). This Court concluded that the *APHA* plaintiffs' grant-related claims were not barred by the Tucker Act. Here, unlike in *APHA*, the district court's order

*Continued on next page.*

As this Court has long recognized, a plaintiff thus may not maintain an APA suit where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quotation omitted). Other courts of appeals, in determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

Applying the above principles, almost all of plaintiffs' claims fall squarely within the Tucker Act: plaintiffs seek to enforce a contractual agreement with the federal government and obtain the payment of money.[5] The States' grant agreements with IMLS, and the grant agreements between certain entities within the plaintiff States and MBDA, are plainly the "source of the rights upon which" plaintiffs base such claims. *Megapulse*, 672 F.2d at 968. For although plaintiffs point to the agencies'

_____

specifically requires payment of past-due sums. *Id.* at *6 (distinguishing *Department of Education v. California*, 145 S. Ct. 966, 968 (2025)); A53. And here, as in *Department of Education*, the plaintiffs' claims necessarily depend on the terms of their grant agreements—for without those agreements, they would have no colorable entitlement to payment. *APHA*, 2025 WL 2017106, at *8 (citing *Department of Education*, 145 S. Ct. at 966). To the extent the Court disagrees that *APHA* is distinguishable, the government preserves the arguments made in this part for further review.

[5] The only one of plaintiffs' claims that involves any kind of statutory, rather than contractual, obligation to pay money is that related to grants made under 15 U.S.C. § 9524. *See infra* pp. 32-34 (explaining why plaintiffs' challenge to such grants goes to matters committed to agency discretion).

appropriations statutes authorizing grantmaking in general, they do not claim that they are the statutorily mandated beneficiaries of any of the programs described (with the exception of the Grants to States program, which is not at issue in this appeal, *see supra* p. 23 n.3, and MBDA's § 9524 grants, *see supra* p. 27 n.5). *E.g.*, Mot. for Prelim. Inj. 25 (referring to the Native American and Native Hawaiian Library Services Grant Program, the National Leadership Grants for Libraries Program, and the Laura Bush 21st Century Librarian Program); A663 (referring to the Capital Readiness Program and to programs funded under MBDA's Broad Agency Announcement authority). And plaintiffs ultimately "seek[] the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Thus, they can sue to obtain unpaid grant monies under their various contracts only in the Court of Federal Claims.

The Supreme Court recently stayed another district-court order requiring the federal government to make payments based on certain grant agreements, concluding that the government was likely to succeed in showing that the Tucker Act grants the Court of Federal Claims jurisdiction over suits "to order the payment of money." *Department of Educ.*, 145 S. Ct. 966. There, a number of states challenged the Department of Education's termination of various education-related grants, the district court temporarily enjoined the terminations, and this Court denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme Court granted the government's request for relief, reaffirming that "the

28

APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *Department of Educ.*, 145 S. Ct. at 968 (quotation omitted).

That reasoning applies with full force here. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025). As in *Department of Education*, plaintiffs in this case alleged a violation of "a contractual obligation to pay money." 145 S. Ct. at 968 (quotation omitted). The source of plaintiffs' purported rights to payment from IMLS and MBDA are grant agreements, which bear the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that many "federal grant programs" are "much in the nature of a contract" (quotation omitted)); *see also Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) (describing Federal Circuit precedent "treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound"). Plaintiffs sought and obtained a judicial order compelling continued payment of funds under those particular grants. A52-53.

The district court improperly disregarded the import of *Department of Education*. The court first dismissed the case as non-precedential, "considering that the Supreme Court issued the decision on its emergency docket." A15. Precedential or not, "[a] just legal system seeks not only to treat different cases differently but also to treat like cases alike." *Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment). The district court then attempted to distinguish

this case on the basis that "the States' challenges are grounded on whether the Defendants' actions exceeded the bounds of their statutory or constitutional authorities." A16 (emphases omitted). But exactly the same thing was true in *Department of Education*. *See U.S. Dep't of Educ.*, 132 F.4th at 97 ("The States' claims are, at their core, assertions that the Department acted in violation of federal law—not its contracts."). The same result, then, should obtain here.

The district court also found it significant that plaintiffs are seeking equitable relief, not money damages. A17. That characterization elides the fact that plaintiffs seek payment of funds under contractual agreements—a quintessential legal damages award. But even if plaintiffs' requested relief can be characterized as "other than money damages," 5 U.S.C. § 702, they nonetheless fail the APA's separate prohibition on relief that another statute "impliedly forbids." *Id.* As explained, the Tucker Act impliedly forbids a court from relying on the APA's waiver of sovereign immunity to order the government to specifically perform a contract by paying out money. *See Albrecht*, 357 F.3d at 68.

**b.** The district court's order to pay grant funds was improper for an additional, independent reason: because it operates to dictate funding decisions even when those decisions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Such discretionary actions fall outside the APA and are not subject to judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020).

The Supreme Court has expressly held that an agency's decision to discontinue a previously funded program and reallocate those funds to other uses is committed to agency discretion by law. *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993). The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the point of such appropriations "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. In making this allocation, the agency must engage in "a complicated balancing of a number of factors" within "its expertise," including "whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Id.* at 193 (quotation omitted). As long the agency abides by the relevant statutes and by any self-imposed obligations that may arise from regulations or grant instruments, federal law "gives the courts no leave to intrude." *Id.*

Although the Supreme Court in *Lincoln* addressed lump-sum appropriations, its logic extends to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Those decisions—like decisions regarding how best to allocate lump-sum appropriations

across programs—"clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018); *cf. Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget." (quotation omitted)).

Many of the grant programs at issue here fall under that rubric. Each agency is funded at present by a lump-sum appropriation. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, div. A, tit. I, § 1102(a)(2), (8), 139 Stat. 9, 10-11; *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, 138 Stat. 460, 697 (appropriating "[f]or expenses necessary for the Federal Mediation and Conciliation Service ('Service') to carry out the functions vested in it by the Labor-Management Relations Act, 1947[;] for expenses necessary for the Labor Management Cooperation Act of 1978; and for expenses necessary for the Service to carry out the functions vested in it by the Civil Service Reform Act, $53,705,000"); *id.* (appropriating "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act, $294,800,000"); Consolidated Appropriations Act, 2024, Pub. L. No. 118–42, 138 Stat. 25, 123 (appropriating "[f]or necessary expenses of the Minority

Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law, $68,250,000").

And the specific grant programs plaintiffs cite vest each agency's leadership with discretion to determine the appropriate number and size of grants awarded thereunder, to the extent they obligate the agencies to make grants at all. *E.g.*, 20 U.S.C. § 9162(b)(1) ("National leadership grants") ("The Director *may* carry out the activities described in subsection (a) by entering into arrangements, including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education, museums, and other entities *that the Director determines appropriate.* (emphases added)); *id.* § 9165(b) ("Laura Bush 21st Century Librarian Program") ("[T]he [IMLS] Director *may* enter into arrangements, including grants, contracts, cooperative agreements, and other forms of assistance, with libraries, library consortia and associations, institutions of higher education (as defined in section 1001 of this title), and other entities *that the Director determines appropriate*" (emphases added)); 15 U.S.C. §§ 9523-24 (requiring the establishment of an "MBDA Business Center Program" that "offers" particular "services" "in all regions of the United States," and further requiring MBDA to provide minimum funding to any Business Center established, but declining to specify a minimum number of centers, to define "regions of the United States," or to mandate particular grant recipients); 15 U.S.C. § 9543(b)(2) (requiring MBDA to "award grants to eligible institutions," but providing no further criteria to govern the

number or size of such grants); 12 U.S.C. § 5708(e)(2) (transferring funds to MBDA "so that the Agency may use such amounts *in a manner the Agency determines appropriate*" (emphasis added)).

The district court's preliminary injunction applies across the entire range of the grant programs authorized at IMLS and MBDA without accounting for any differences between applicable statutes, regulations, or agreements. Its prohibitions subvert the defendant agencies' ability to consider the optimal distribution of funding to achieve statutory goals "in what [the agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id.* at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)).

## 2. The district court lacked authority to order reinstatement of personnel.

In addition to ordering reinstatement of grants that IMLS and MBDA had terminated, the district court ordered all three defendant agencies to reinstate employees who had been terminated or placed on administrative leave in anticipation of reductions-in-force, on the speculative theory that absent such relief the agencies would be unable to administer grants and programs from which plaintiffs claimed to benefit. This category of relief, too, exceeded the district court's authority in multiple respects.

**a.** A "plaintiff must demonstrate standing for each" form of relief sought, *Davis v. FEC*, 554 U.S. 724, 734 (2008) (quotation omitted), including a showing of injury in fact, *Alliance for Hippocratic Med.*, 602 U.S. at 381. Only "actual or imminent" injuries count. *Id.* Allegations that are "too speculative" or merely assert "possible future injury" do not suffice. *Clapper*, 568 U.S. at 409 (emphasis and quotation omitted).

Plaintiffs cannot establish non-speculative injury stemming from the agencies' staffing decisions. Recall that plaintiffs' two theories of injury are (1) grant terminations and (2) losses in agency programming. Where plaintiffs alleged that they have suffered actual loss—*i.e.*, termination of grants and programs that has already occurred—they do not claim (nor could they plausibly do so) that those terminations were the result of insufficient staffing. Indeed, plaintiffs' own evidence shows at most that grants and programs were terminated by choice, not inability. A27-28.

The district court instead surmised that actual or planned reductions in force *might* lead to delays or terminations in the future. A31-35. But "might" is nowhere near enough to establish injury in fact. *Alliance for Hippocratic Med.*, 602 U.S. at 383. To be sure, the proportion of staff terminated at each agency tends to support a prediction that the agency's scale and scope, including in programs offered, will be reduced in the future. But that is not news, that is the very intent of the Executive Order. The appropriate and lawful method to challenge an actual (not hypothetical) failure to provide a program that a plaintiff believes the agency is legally obligated to

provide is through a claim under 5 U.S.C. § 706(1), if and when the program is no longer available and any injury to that plaintiff has actually occurred.  Here, the district court improperly accepted plaintiffs' invitation to proceed in reverse, asking whether the agencies intended to terminate staff and whether those terminations might affect grants and programs (some of which might be statutorily required).  The Constitution does not permit such speculation to support a federal suit.  *See California v. Texas*, 593 U.S. 659, 678 (2021) (rejecting a "highly attenuated chain of possibilities"); *OPM v. American Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025) (citing *Clapper*, 568 U.S. 398, and concluding that "allegations of the nine non-profit-organization plaintiffs" were "presently insufficient to support the organizations' standing").

**b.**  Congress has "established a comprehensive system for reviewing personnel action[s] taken against federal employees" that provides the "exclusive means" for that review.  *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation omitted).  The CSRA, which includes the Federal Service Labor-Management Relations Statute (FSLMRS) for federal labor-management relations, 5 U.S.C. §§ 7101-7135, sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service.  *United States v. Fausto*, 484 U.S. 439, 445 (1988).  That scheme permits some, but not all, challenges; it channels those challenges to the Merit Systems Protection Board (MSPB); and it grants exclusive jurisdiction over MSPB appeals to the Federal Circuit.  *See Elgin*, 567 U.S. at 5-6, 5 n.1; 5 U.S.C. § 7703(b)(1); *see also id.* §§ 7105(a)(2), 7123(a)

(setting out similar judicial review scheme for appeals of Federal Labor Relations Authority orders under the FSLMRS). "Federal employees may not circumvent [these statutes'] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir.), *cert. denied*, 558 U.S. 989 (2009). "That principle applies to a 'systemwide challenge' to an agency policy … just as it does to the implementation of such a policy in a particular case." *Nyunt v. Chairman*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Here, the employees themselves have not sued. Instead, the plaintiff States have challenged federal employees' terminations by objecting to the projected consequences of the employees' absence and demanding reinstatement. If tangentially affected parties could challenge the legality of personnel actions and obtain reinstatement of terminated employees without the constraints that apply to the aggrieved employees and the unions that represent them, that would turn the structure of the CSRA "upside down." *Fausto*, 484 U.S. at 449. Beneficiaries of government services—who are, at most, indirectly affected by terminations—should not be able to leapfrog the employees whom the legislative scheme seeks to protect and potentially coopt the remedies that those employees may or may not seek in CSRA proceedings. Allowing separate litigation by collaterally affected parties would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development … of a unitary and

consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449.

The district court acknowledged that the CSRA's regime is "comprehensive," A18 (quoting *Fausto*, 484 U.S. at 455), but nevertheless held (without citing the relevant analysis in *Elgin*) that that statute did not displace the court's jurisdiction here. The court reasoned that the statute's exclusivity applies only to federal employees, as they are the only individuals permitted to bring claims thereunder, and that failing to allow judicial review in this case would foreclose all meaningful review of the States' claims. A19-20. This approach has things precisely backwards. The "exclusion" of the States "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [them] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455; *see, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 347 (1984) (recognizing that where a statute omitted a "provision for participation" by dairy consumers, but allowed participation by dairy producers and handlers, "Congress intended to foreclose consumer participation in the regulatory process" and "intended a similar restriction of judicial review"); *Grosdidier*, 560 F.3d at 497 ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA."). Plaintiffs' exclusion from the CSRA reflects Congress's considered judgment about the limitations of who should be permitted to challenge federal personnel decisions, not a green light to sue in federal district court.

Numerous courts in recent months and years have concluded that similar federal employment suits are precluded. *See, e.g., American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 753, 761 (D.C. Cir. 2019); *American Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 20-25 (D.D.C. 2025); *National Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 7-11 (D.D.C. 2025); *American Fed'n of Gov't Emps. v. Ezell*, No. 25-10276, 2025 WL 470459, at *1-3 (D. Mass. Feb. 12, 2025); *see also Maryland v. USDA*, No. 25-1338, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025) ("The Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims" challenging the "terminat[ion] [of ] thousands of probationary federal employees"). *But see American Fed'n of Gov't Emps.* v. *OPM*, 771 F. Supp. 3d 1127, 1131 (N.D. Cal. 2025) (asserting jurisdiction over challenge to probationary-employee terminations). Plaintiffs' suit is likewise precluded.

**c.** Even if the district court could have exercised jurisdiction over plaintiffs' personnel claims, the preliminary injunction would still be unlawful because reinstatement is not an available remedy under the APA. The APA authorizes a court to grant injunctive relief subject to traditional equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court may grant only those equitable remedies that were "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Reinstatement is not a remedy that was traditionally available at equity. *See Sampson v. Murray*, 415 U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power

… to restrain by injunction the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g., Baker v. Carr*, 369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying removal of a federal officer" reflect "a traditional limit upon equity jurisdiction"); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers[.]" (citations omitted)); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898); *White v. Berry*, 171 U.S. 366, 377 (1898).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence," *Grupo Mexicano*, 527 U.S. at 332. Accordingly, where Congress departs from tradition, it does so expressly. In the CSRA, for example, Congress authorized the MSPB to award "reinstatement," as well as "backpay" to prevailing employees. *Elgin*, 567 U.S. at 6. But of course plaintiffs here seek to avoid the CSRA's comprehensive scheme, and they identify no other statutory basis for ordering employee reinstatement in APA litigation.

Moreover, even to the extent courts can order reinstatement, the Supreme Court has recognized that a grant of preliminary injunctive relief in government personnel cases requires an elevated showing. *Sampson*, 415 U.S. at 84. The Supreme Court emphasized the historical denial of reinstatement power by courts of equity, "the well-established rule that the Government has traditionally been granted the

widest latitude in the dispatch of its own internal affairs, and the traditional unwillingness of courts of equity to enforce contracts for personal service," instructing that a plaintiff in a "Government personnel case[]" must, "at the very least … make a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions." *Id.* at 83-84 (cleaned up). Plaintiffs here made no such showing.

**d.** Courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978) (quotation omitted). Internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524. The district court overrode those principles when it enjoined the agencies' leadership from exercising procedural control over their personnel to ensure that staff are carrying out statutory obligations or otherwise advancing the agency leadership's policies and priorities. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

In determining whether a matter has been committed solely to agency discretion, this Court considers whether "the agency action is of a kind 'traditionally regarded as committed to agency discretion,' or when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Union of Concerned Scientists*, 954 F.3d at 17 (quoting *Lincoln*, 508 U.S. at 191-92). Here, each factor shows that defendants' managerial decisions

41

are committed to agency discretion and that the district court erred in entering injunctive relief intruding on that discretion by requiring the reinstatement of all agency employees placed on leave or terminated per the Executive Order.

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (quoting 5 U.S.C. § 701(a)(2)). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" current projects or would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

Second, plaintiffs can point to no particular statute limiting the agencies' inherent discretion to make independent staffing decisions. To the contrary, insofar as each agency's organic statute refers to personnel, it exudes deference to agency leadership to determine appropriate staffing needs. *See* 20 U.S.C. § 9105(a) ("The [IMLS] Director may … appoint and determine the compensation of such employees as the Director determines to be necessary to carry out the duties of the Institute."); 29 U.S.C. § 172(b) ("The [FMCS] Director is authorized … to appoint such clerical and other personnel as may be necessary for the execution of the functions of the Service … and may … appoint such conciliators and mediators as may be necessary to carry out the functions of the Service."); 15 U.S.C. § 9502(e)(1) ("In addition to the

regional offices that the [MBD] Under Secretary is required to establish under paragraph (2), the Under Secretary shall establish such other offices within the Agency as are necessary to carry out this chapter."). Accordingly, it is in the agencies' discretion to decide how to carry out those statutory directives—including how many or what particular personnel it needs to do so—and the district court lacked authority to order relief usurping the agencies' role in this regard.

## II. The Preliminary Injunction Is Vastly Overbroad.

In the context of any judicial proceeding, the remedy accorded to a plaintiff must be "tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (citing *DaimlerChrysler Corp.*, 547 U.S. at 353); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996). And in the particular context of injunctive relief, a plaintiff must show a likelihood not only of harm, but irreparable harm. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citing *Winter*, 555 U.S. at 20). From the foregoing two principles it follows that a preliminary injunction should be crafted specifically to address the plaintiffs' substantiated claims of actual or imminent irreparable injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). The Supreme Court reaffirmed these principles only weeks ago when it held that federal courts generally lack the authority to issue "universal" injunctions, *i.e.* those that are crafted to afford relief to non-parties. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550 (2025).

43

The district court erroneously entered what is effectively an impermissible universal injunction when it directed the government to reverse *all* steps taken to comply with Executive Order 14,238, whether those steps have any concrete effect on plaintiffs or not. A52. Along the way to that result, the court impermissibly relied on harms alleged to the interests of third parties, not to plaintiffs themselves. In its analysis of irreparable harm, for example, the court cited the declaration of a representative of a nursing union, who stated the termination of FMCS' mediation programs would imperil its relationship with Brown University Health. A45 (citing A995). Neither the union nor Brown University appears to be part of the State of Rhode Island in any way. Nor does a State like Rhode Island have standing to assert the interests of its citizens in a suit against the federal government. *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023). So it is not apparent why any harm to either the union's or the university's interests matters in this suit—and yet, the district court entered sweeping relief that purports to benefit private entities like them.

The district court took a similarly broad-brush approach to its analysis of harm in the grant-termination context, where it failed to differentiate by type of grantee, status of grant funding, and irreparability of harm. Plaintiffs offered evidence related to various grantees—some States themselves, *e.g.*, A755, others seemingly State instrumentalities, *e.g.*, A952-53 (New Jersey State Library). Without analyzing whether the purported instrumentalities had or would in fact suffer harm attributable to the State itself, *see Biden v. Nebraska*, 600 U.S. 477, 490-94 (2023) (conducting a fact-

44

intensive inquiry to answer this question), the district court merely recited the States'

declarations and counted the alleged harms against the government. A32-35.

Similarly, the district court improperly lumped allegations of actual, already-suffered

harm in with speculation about harm that might come in the future, analyzing the

entire body of evidence as one undifferentiated mass. A36-37 (grants alleged to be

terminated already); A37 (expressing doubt that IMLS and MBDA retain sufficient

staff to manage their grant portfolios); *see Charlesbank Equity Fund II v. Blinds to Go, Inc.*,

370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded

on something more than conjecture, surmise, or a party's unsubstantiated fears of

what the future may have in store."). Finally, the district court made no effort to

distinguish harm in general from irreparable harm sufficient to merit preliminary

injunctive relief. Losses of income, as monetary losses, are presumptively recoverable

in litigation and therefore not irreparable. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th

Cir. 2011). Even if monetary losses or delays might sometimes qualify as irreparable,

though, the district court did not endeavor to explore whether those delays would in

fact risk irreparable harm in the contexts plaintiffs identified. A41-45.

### III. The Remaining Preliminary Injunction Factors Favor Vacatur.

Plaintiffs have not established irreparable injury, and any such harm would

plainly be outweighed by the government's and the public's interest, which "merge"

here. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**1.** To begin, plaintiffs' failure to establish irreparable harm is reason alone to vacate the injunction. *See Charlesbank Equity Fund II*, 370 F.3d at 162 (describing irreparable harm as a "necessary threshold showing"). The district court concluded that plaintiffs established irreparable harm because they had lost or could lose access to grant funds or agency programs. A41-45. As described above, without more, alleged monetary losses alone are insufficient. Moreover, loss of access to agency services cannot amount to irreparable harm warranting preliminary relief. Agency-inaction claims (of the sort that should have been brought here) require not just an unreasonable delay, but delay "so egregious as to warrant mandamus." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quotation omitted). Where the applicable legal framework requires such an extraordinary showing to secure any relief, granting a preliminary injunction before any delay in services has materialized—and certainly before any delay has become egregious—would short-circuit the deferential standards under which courts evaluate such claims. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 743 (D.C. Cir. 2017).

**2.** On the other side of the ledger, the district court's injunction inflicts irreparable constitutional harm on the government at every turn. It frustrates the public's interest in having the Executive Branch effectuate the President's policy priorities—including by reducing the federal government's operational footprint—through lawful direction. It inserts the Judicial Branch into the day-to-day, internal operations of a federal agency, impinging on its flexibility to shift resources and make

staffing decisions—tools essential to agency management. It requires payment of monies that may never be recovered. And given the sweeping and intrusive restrictions, it locks the agency into a static operational structure that prevents leadership from determining how best to fulfill the agency's statutory obligations consistent with the President's instructions.

Balancing these harms against those plaintiffs have claimed is a matter of the Court's equitable discretion. *See Starbucks Corp.*, 602 U.S. at 347. Here, that balancing does not take place on a blank slate. In April, the Supreme Court stayed a district-court injunction requiring the Department of Education to disburse grant funds, finding dispositive that the plaintiffs "ha[d] not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed," and further that the plaintiffs "ha[d] the financial wherewithal to keep their programs running." *Department of Education*, 145 S. Ct. at 966. Both statements are true here, too, with respect to the grants the plaintiffs (all of which are States) have identified. As for the reinstatement of personnel, the Supreme Court stayed earlier this month an order requiring the Department of Education to undo a reduction-in-force. *McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626 (July 14, 2025). Both *Department of Education* and *McMahon* "inform how a court should exercise its equitable discretion in like cases" like this one, *Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025), reinforcing the propriety of vacating the preliminary injunction.

These impingements are not meaningfully lessened by the fact that the district court carved out from its injunction "actions that would improve Agency efficiency or reduce the size or scope of the Agency Defendants as long as (a) the Agency Defendant provides a reasoned explanation for such action, and (b) the action will not prevent the Agency Defendant from fulfilling any of [its] statutory obligations." A52. To start, the injunction's imposition of a "reasoned-explanation" requirement for non-final agency action effectively (and impermissibly) mandates procedure in excess of what the APA provides. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 685 (2020) ("We have repeatedly stated that the text of the APA provides the 'maximum procedural requirements' that an agency must follow in order to promulgate a rule." (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 100 (2015))). And even with this exclusion, the injunction still thwarts a legitimate presidential directive by prohibiting compliance with Executive Order 14,238. There is no lawful reason the agencies should be permitted to undertake modernization and efficiency-motivated reforms only when *not* in response to an order from the President to do so—particularly where the injunction's language tracks the Executive Order's itself. In this way, the injunction exposes the government to the risk of contempt proceedings and other sanctions over wide swaths of agency-administration matters. Such judicial supervision over an agency's exercise of lawful discretion is unwarranted and impermissible, but it will continue, potentially for many months, unless the injunction is vacated. *See SUWA*, 542 U.S. at 66-67.

48

As for the grants, month after month, the government is being ordered to pay out millions of dollars on grant agreements it attempted to terminate. The constant flow from the Department of Treasury irreparably harms the public fisc. As in *Department of Education*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. No grantee has "promised to return withdrawn funds should its grant termination be reinstated," *id.* (quotation omitted), nor did the district court impose a bond. If the preliminary injunction is stayed, the agencies will retain the grant money at issue, and the grantees may obtain it as money damages if they are ultimately successful in the appropriate forum. But the opposite is not true. If the grantees continue to receive and spend their grant funding, the government will be left with no meaningful recourse even if it prevails. Exacerbating this error, although the government requested an adequate bond under Federal Rule of Civil Procedure 65(c), the district court instead improperly waived the bond requirement. A47-49; *see National Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam) (explaining that "injunction bonds are generally required").

In short, this is a case where the merits and the equities point firmly in the same direction—there is no basis for an injunction. The Court should vacate.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

SARA MIRON BLOOM
*Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

*(202) 514-1673*

JULY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,520 words, according to the count of Microsoft Word. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Simon G. Jerome*
Simon G. Jerome

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order on Preliminary Injunction
    (Dkt. No. 57) ........................................................................................................ A1

Preliminary Injunction
    (Dkt. No. 60) ...................................................................................................... A50

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAIʻI; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>)<br>) |
| DONALD J. TRUMP, in his official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in his official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS AND DEVELOPMENT AGENCY; MADIHA D. LATIF, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in his official capacity as Acting Director of the Federal Mediation and Conciliation | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 1:25-cv-128-JJM-LDA

| Service; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the Office of Management and Budget, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Once again, this Court is confronted with a legal challenge by various states, against an Executive Order that attempts to dismantle congressionally sanctioned agencies and ignores congressionally appropriated funds.  Here, the targeted federal agencies support our libraries, museums, minority business enterprises, and the well-respected federal mediation services.  This Executive Order violates the Administrative Procedures Act ("APA") in the arbitrary and capricious way it was carried out.  It also disregards the fundamental constitutional role of each of the branches of our federal government; specifically, it ignores the unshakable principles that Congress makes the law and appropriates funds, and the Executive implements the law Congress enacted and spends the funds Congress appropriated.

Plaintiffs are twenty-one states (the "States") who move for a preliminary injunction,[1] seeking to restrain the Defendants from implementing the President's Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" ("*Reduction* EO"), as it applies to three federal agencies—the Institute of Museum

---

[1] The States initially moved for a temporary restraining order but, upon the parties' stipulation, that motion was converted to one for a preliminary injunction. *See* ECF No. 31; *see also* Text Order, Apr. 10, 2025 (entering the parties' stipulation).

and Library Services ("IMLS"), the Minority Business Development Agency ("MBDA"), and the Federal Mediation and Conciliation Service ("FMCS").  ECF No. 3.  The States assert that the Defendants' efforts to carry out the *Reduction* EO's mandates violate: (1) the APA; (2) Separation of Powers principles; and (3) the Take Care Clause of the United States Constitution.  *Id.* at 2.  The Defendants oppose the motion on various jurisdictional grounds and assert that the States have not satisfied the elements required for entitlement to preliminary relief.  ECF No. 41.  For the reasons stated below, the Court GRANTS the States' motion.

## I.    BACKGROUND

The Court will first provide some exposition on the three congressionally created agencies at the center of this dispute—IMLS, MBDA, and FMCS—before outlining the travel of the case.

### A.  The Agencies

#### 1.  IMLS

In 1996, Congress established IMLS as an agency within the National Foundation on the Arts and Humanities.  20 U.S.C. § 9102.  The agency's mission is to "to advance, support, and empower America's museums, libraries, and related organizations through grantmaking, research, and policy development."  INST. OF MUSEUM AND LIBR. SERVICES, FY 2022-2026 STRATEGIC PLAN 3 (2022), https://www.imls.gov/sites/default/files/2022-02/imls-strategic-plan-2022-2026.pdf.  Per statute, ILMS must have an Office of Museum Services and an Office Library Services.  20 U.S.C. § 9102(b).  IMLS must also "regularly support and conduct, as

appropriate, policy research, data collection, analysis and modeling, evaluation, and dissemination of information to extend and improve the Nation's museum, library, and information services." *Id.* § 9108(a). The agency is also tasked with disbursing and expending appropriated funds and other forms of assistance to support museums and libraries across U.S. states and territories. *Id.* §§ 9121-9165 (libraries), §§ 9171– 9176 (museums). IMLS administers several competitive grant programs each year. *See, e.g.*, *id.* § 9165 (Laura Bush 21st Century Librarian Program); *id.* § 9161 (Native American Library Services Grant Program); *id.* § 9162 (National Leadership Grants for Libraries Program).

### 2. MBDA

In 2021, Congress created MBDA as an agency within the Department of Commerce. 15 U.S.C. § 9502. The agency's purpose is to "promote the growth, global competitiveness, and the inclusion of minority-owned businesses through data, research, evaluation, partnership programs, and federal financial assistance programs." U.S. DEP'T OF COMMERCE, MBDA, FISCAL YEAR 2025 CONGRESSIONAL JUSTIFICATION 16 (2024), https://www.commerce.gov/sites/default/files/2024-03/MBDA-FY2025-Congressional-Budget-Submission.pdf. The Under Secretary of Commerce for Minority Business heads the MBDA. 15 U.S.C. § 9502(b)(1).

The MBDA Business Center Program is a program under the MBDA, *id.* § 9523(a)(1), that creates "a national network of public-private partnerships" to: (1) help minority business enterprises with "accessing capital, contracts, and grants" and "creating and maintaining jobs"; (2) "provide counseling and mentoring to minority

business enterprises"; and (3) "facilitate the growth of minority business enterprises by promoting trade." *Id.* § 9522.   Under the MBDA Business Center Program, the MBDA Under Secretary must "make Federal assistance awards to eligible entities to operate MBDA Business Centers"—which are tasked with providing "technical assistance and business development services, or specialty services, to minority business enterprises." *Id.* § 9523(3).   Tangentially related to the MBDA Business Centers is the MBDA's Office of Business, which is administered by a Director. *Id.* § 9502(d)(2).

### 3. FMCS

FMCS is the oldest of the three agencies, established by Congress in the Taft-Hartley Act of 1947. *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202, 61 Stat. 136.   Congress charged this agency with "assist[ing] parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a).   Thus, the statute instructs FMCS to perform a wide range of functions related to resolving labor disputes, including: (1) conducting grievance mediations as a "last resort and in exceptional cases" to resolve "disputes arising over the application or interpretation of an existing collective-bargaining agreement," *id.* § 173(d), and (2) providing labor mediation and conciliation services "to assist parties to labor disputes affecting commerce to settle such disputes," *see id.* § 173(a)-(c).   FMCS also provides other services to facilitate the resolution of labor such as "appoint[ing] arbitration panels and arbitrators; conduct[ing] skills development and conflict resolution training; and verif[ying] signed union

authorization cards when employers agree to use that method to recognize a union." ECF No. 1 ¶ 124.

### B. Executive Order 14238

On March 14, 2025, the President issued the *Reduction* EO, which directs seven federal agencies—including IMLS, MBDA, and FMCS—to: (1) eliminate their "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and (2) "reduce the performance of their statutory function and associated personnel to the minimum presence and function required by law." Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). The *Reduction* EO instructs the head of each of these agencies to submit, within seven days, a report to the Director of the Office of Management and Budget (OMB) "confirming full compliance with this order and explaining which components or functions of the government entity, if any, are statutorily required and to what extent." *Id.* § 2(b). Further, the *Reduction* EO outlines that, upon review of budget requests these agencies submit, the OMB Director "shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests . . . to the extent they are inconsistent with this order." *Id.* § 2(c).

A day after issuing the *Reduction* EO, the President signed the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025)—in which Congress funded IMLS, MBDA, and FMCS through September 30, 2025 at the same level it funded these agencies in fiscal year 2024. *See* Continuing Appropriations Act § 1101(a)(2), (8). In 2024, Congress appropriated:

(1) $294,800,000 to IMLS "[f]or carrying out the Museum and Library Services Act of 1996 and the National Museum of African American History and Culture Act," Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. 4, 138 Stat. 460; (2) appropriated $53,705,000 to FMCS "to carry out the functions vested in it by the" Taft-Hartley Act, *id.*; and (3) $68,250,000 "[f]or necessary expenses of the Minority Business Development Agency in fostering, promoting, and developing minority business enterprises, as authorized by law." *Id.*, Pub. L. No. 118-42, div. C, tit. 1.

### C. Impact of Executive Order 14238

Since the issuance of the *Reduction* EO, leadership of IMLS, MBDA, and FMCS have taken several actions in furtherance of the EO's mandates. At IMLS, the agency's leadership held an agency-wide town hall in which they informed employees that: (1) they anticipated the agency would be stripped "down to the studs"; (2) employees should anticipate dismissal soon; and (3) a reduction in force ("RIF") plan would likely be implemented soon thereafter. ECF No. 3-40 ¶ 6. A few weeks later, IMLS's Director of Human Resources told staff that the "entirety of IMLS" would be placed on administrative leave and all IMLS grants would be terminated, "with the potential exception of the Grants to States Program." *Id.* ¶ 11.

Additionally, the Director of Human Resources indicated that all but a handful of staff members should expect a RIF in 30 days or less. *Id.* That same day, IMLS emailed state librarians notifying them that "IMLS received word that all staff are going to be placed on administrative leave," and staff accordingly would "not be able

to work or respond to your emails." ECF No. 1-2. IMLS later recalled twelve staff members from administrative leave. ECF No. 3-40 ¶ 15. Prior to the significant reduction in personnel, thirty-five employees were charged with administering IMLS's grant programs. *Id.* ¶ 17. Only four of the twelve employees recalled from administrative leave have grant administering experience, of whom only one administered the Grants to States Program. *Id.* ¶ 20. Further, none of the twelve employees works in IMLS's Office of Research and Evaluation, rendering it essentially defunct. *Id.* ¶ 22. And as of now, IMLS has terminated well over 1,000 grants—with the same boilerplate notice letter stating that the grant was "'no longer consistent with the [agency's] priorities' and that the President's March 14, 2025, executive order 'mandates that the IMLS eliminate all non-statutorily required activities and functions.'" ECF No. 35-3 ¶ 5; *see also* ECF Nos. 35-5 at 10-11, 35-6 at 6-7, 35-8 at 5-20, 35-9 at 4-5 (IMLS grant termination letters that grantees received).

As to MBDA, the agency placed all but five of its employees[2] on paid administrative leave shortly after the *Reduction* EO's issuance. ECF No. 3-41 ¶ 5. And now, those five employees have since been reassigned to positions outside the MBDA. ECF No. 35-4 ¶ 5. MBDA also announced that it was implementing a RIF. ECF No. 1-3. And the agency appears to have since terminated all preexisting MBDA

---

[2] Those remaining employees are the Deputy Under Secretary of Commerce for Minority Business Development, the Chief Operating Officer, the Chief of the Office of Legislative, Education, and Intergovernmental Affairs, a senior advisor, and a budget analyst. *See* ECF No. 3-41 ¶ 5.

grant awards in furtherance of the *Reduction* EO.  *See* ECF No. 45-1 ¶ 4; *see also* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-6 at 2.  The staff terminated include employees responsible for maintaining MBDA's informational clearinghouse, which is central to the agency's statutorily mandated responsibility to collect and share data related to minority enterprise.  ECF No. 3-41 ¶ 13.  Further, the agency has ceased several programs and services, including its Minority Business Advisory Council.  *Id.*

Lastly, FMCS placed almost all of its over 200 employees on administrative leave in the aftermath of the *Reduction* EO's issuance.  ECF No. 3-42 ¶ 4-7.  Now, only about ten to fifteen FMCS employees—all of whom are based in the agency's D.C. headquarters—remain on the job.  *See* ECF No. 3-26 ¶ 17.  And FMCS has started a RIF plan to terminate all but those ten to fifteen remaining employees. ECF No. 3-42 ¶ 7; *see also* Jory Heckman *Federal labor mediation agency cuts staff down to 'skeleton crew'* (Mar. 26, 2025), Fed. News Network, https://federalnewsnetwork.com/workforce/2025/03/federal-labor-mediation-agency-cuts-staff-down-to-skeleton.  Additionally, because the agency has only a fraction of its personnel remaining, it appears that "[n]early all of services [FMCS had] provided—mediation for collective bargaining, grievances, employment disputes, EEOC complaints, and trainings with both unions and management to promote labor peace—are no longer going to be provided."  Heckman, *supra*.

It is these series of actions the Defendants have taken to implement the *Reduction* EO as to IMLS, MBDA, and FMCS, that has prompted the States to seek a preliminary injunction enjoining the Defendants from giving effect to that EO.

## II.    STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022).   "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'"  *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).   In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only."  *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)).   "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## III.    DISCUSSION

### A. Jurisdiction

#### 1.    Standing

The Defendants argue that the States lack standing to seek relief that would prohibit OMB from implementing the *Reduction* EO with respect to the four other agencies that are included in that Order but are not the subject to this lawsuit.  ECF No. 41 at 9.  But the States do not dispute that they cannot seek relief as to those four agencies not included in their Complaint.  ECF No. 44 at 4.  Instead, the States affirm that the claims outlined in their Complaint and preliminary injunction motion encompass the "Defendants' actions as to the IMLS, MBDA, and FMCS."  *Id.*  Thus, while the States' request that the Court enjoin the Defendants from "implementing the Closure Order and the Closure Decisions" can admittedly be read as all encompassing, *see* ECF No. 1 at 53, the States have made it clear that the specific relief they seek is for the Court to enjoin the Defendants from implementing the *Reduction* EO *as to* the IMLS, MBDA, and FMCS.  *See* ECF No. 3 at 2 ("Plaintiff States move for issuance of an order . . . restraining Defendants from implementing actions in accordance with [the *Reduction* EO] *as they relate to the Institute of Museum and Library Services (IMLS), the Minority Business Development Agency (MBDA), and the Federal Mediation and Conciliation Service (FMCS) . . .*") (emphasis added); *see also* Tr. of Prelim. Inj. H'rg. 43, ECF No. 48 (States explaining that "the relief that we're seeking is to enjoin the closure decisions and to enjoin these three

agencies' application and implementation of the Executive Order."). Accordingly, equitable relief against non-parties is not at issue here.

### 2. Ripeness

Next, the Defendants contend that nearly all the States' claims of potential injury from "future delays or failure to receive IMLS, MBDA, and FMCS funds and services" are speculative and thus are not ripe for the Court's review. ECF No. 41 at 11. But the unrefuted record before the Court reveals that the States are relying on more than mere speculation when asserting harms—current or imminent—stemming from the Defendants' efforts to significantly reduce agency services and personnel under the *Reduction* EO. For example, on April 9, 2025, an MBDA employee received a RIF notice from the Office of the Deputy Secretary of Commerce that plainly stated that "[t]he Department is abolishing all positions within MBDA." ECF No. 35-4 at 4. According to that MBDA employee, only five MBDA employees were not placed on administrative leave and have since been reassigned to positions *outside* the MBDA. *See id.* at ¶ 5. It is unclear how it is speculative for the States to precipitate delays in funds and services from the MBDA—and harms flowing therefrom—when the unrebutted record reveals that MBDA's workforce has been reduced to zero. States receiving MBDA funding have stated any pause to such funding will prompt cuts to essential programming. *See, e.g.*, ECF No. 3-11 ¶¶ 13, 20; ECF No. 3-12 ¶¶ 9, 16. Despite many opportunities to do so, the Defendants have presented no evidence suggesting that these MBDA funds and services can still be administered, in a timely fashion or at all, in the absence of MBDA's workforce. And

now, recent developments show that all existing MBDA grants were terminated based, in part, on the *Reduction* EO's mandate for the agency to eliminate all non-statutorily required activities and functions. *See* ECF No. 45-1 ¶ 4; *see also* ECF Nos. 45-2, 45-3, 45-4, 45-5, 45-6, 45-7 (Notice of grant terminations to MBDA grantees in Arizona, Hawai'i, Wisconsin, and Rhode Island).

As to FMCS, the agency announced the cessation of public sector conciliation services as of April 18, 2025, ECF No. 1-4, which are services the States have attested to regularly using and benefiting from. *See, e.g.*, ECF No. 3-39 ¶¶ 7-8; ECF No. 3-26 ¶¶ 13(a), 22-23; ECF No. 3-30 ¶ 10. And as to the IMLS, the agency's headcount was reduced from seventy-seven to twelve employees[3] in the aftermath of the *Reduction* EO's issuance. ECF No. 3-40 ¶¶ 4, 13. An IMLS employee attested, based on their experience, that the twelve remaining employees "will not be able to administer the volume of existing grants and incoming grant applications for the upcoming year [and] [a]s a result . . . no new grants will be awarded, and most existing grants will be terminated." *Id.* ¶ 21. Now, many of the States have attested to being compelled to cut staff and shut down programs due to the grant terminations and missed grant payments in the wake of the agency's apparent implementation of the *Reduction* EO. *See, e.g.*, ECF No. 3-33 ¶¶ 4-10, 20, 22 (Washington); ECF No. 3-3 ¶¶ 16, 22, 23, 31–32 (California); ECF No. 3-4 ¶¶ 17–19, 31 (Connecticut); ECF No. 35-5 ¶¶ 10-12 (Maryland). The States have presented compelling evidence illustrating that the

---

[3] All but twelve IMLS employees were placed on administrative leave. ECF No. 40 ¶ 14.

harms stemming from the dismantling of IMLS, MBDA, and FMCS are already unfolding or are certain to occur, in light the significant reduction in personnel available and competent to administer these agencies' funds and services and the elimination of certain programs that served the States.  Accordingly, the States' claims are sufficiently ripe for the Court's review.

### 3.    Subject Matter Jurisdiction

#### a.  The Tucker Act

Next, the Defendants argue that the Court lacks jurisdiction over the States' APA claims related to the Defendants grant terminations because, under the Tucker Act, Congress vested the Court of Claims with exclusive jurisdiction over such claims. ECF No. 41 at 14.  The Court disagrees.  The Tucker Act "provides jurisdiction and waiver of immunity in the Claims Court so long as the action: 1) is against the United States; 2) seeks relief over $10,000; and 3) is founded upon the Constitution, federal statute, executive regulation or governmental contract."  *Vill. W. Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 138 (D.R.I. 2009) (citing 28 U.S.C. § 1491(a)).  To support the contention that the States' challenges to the grant terminations are claims sounding in contract, the Defendants rely primarily on the Supreme Court's ruling on an emergency stay application in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam).

In *California,* the Supreme Court stayed a district court's temporary restraining order that enjoined the Government from terminating education-related grants after finding that the Government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."  *Id.*

at 968.  The Supreme Court highlighted that the APA's sovereign immunity waiver does not apply to claims seeking "money damages," *id.* (citing 5 U.S.C. § 702), then explained that the APA's immunity waiver "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered . . ." *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  The Supreme Court highlighted that the "Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

But *California* does not render this Court an improper forum for the States' claims under the APA.  To start, *California*'s precedential value is limited, considering that the Supreme Court issued the decision on its emergency docket, in the context of an application for a stay pending appeal, and based on "barebones briefing, no argument, and scarce time for reflection."  145 S. Ct. at 969 (Kagan, J., dissenting); *see also Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ("The principal dissent's catchy but worn-out rhetoric about the 'shadow docket' is similarly off target.  The stay will allow this Court to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do not have to decide the merits on the emergency docket.  To reiterate: The Court's stay order is not a decision on the merits.").

Further, the *California* stay order does not displace governing law that guides the Court's approach to discerning whether the States' claims are essentially contract

claims in order to direct jurisdiction to the Court of Claims. "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). The Court first addresses the States' source of rights; here the States bring claims under the APA and the United States Constitution. *See* ECF No. 1 at 44-52. As the Defendants recognize, the States are not "challeng[ing] specific grant terminations [or] specific payments they claim to be entitled to." ECF No. 41 at 21. Rather, the States' suit challenges each agency's actions implementing a categorical policy to eliminate their "non-statutory components and functions" and "reduce the performance of their statutory function and associated personnel" under the *Reduction* EO. *See* Exec. Order No. 14238 § 2(a), 90 Fed. Reg. 13043 (Mar. 14, 2025). True, some of the harms the States allege because of these decisions include the termination of certain grant agreements. But nowhere are the parties quibbling over whether the States subject to those grant terminations breached the terms or conditions of the underlying agreements as to transform this action into one sounding in contract. Rather, the States' challenges are grounded on whether the Defendants' actions exceeded the bounds of their *statutory* or *constitutional* authorities.

The Court now turns to the relief the States seek. The Court of Claims' exclusive jurisdiction under the Tucker Act does not arise "merely because [a plaintiff] hints at some interest in a monetary reward from the federal government

or because success on the merits may obligate the United States to pay the complainant." *Crowley Gov't Servs., Inc.*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)).  Indeed, the Supreme Court reaffirmed, in *California*, that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 145 S. Ct. at 968 (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988)).  The States seek equitable relief to enjoin the Defendants' actions implementing the *Reduction* EO—not specific performance of any grant agreements. True, the scope of the relief the States seek implicates enjoining the unlawful terminations of their grants.  But such relief "is not a claim for money damages," precluded under the APA—even though "it is a claim that would require the payment of money by the federal government." *Bowen*, 487 U.S. at 894.  That is because money damages are a remedy at law that "provide relief that substitutes for that which ought to have been done." *Id.* at 910.  Whereas specific relief does not constitute a "substitute remed[y] at all, but attempt[s] to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (citations omitted).  Here, the States "seek access to funds they are presently entitled to, 'rather than money in compensation for the losses, whatever they may be, that [Plaintiffs] will suffer or ha[ve] suffered by virtue of the withholding of those funds.'" *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412, at *10 (D.D.C. Apr. 16, 2025) (quoting *Bowen*, 487 U.S. at 895).

Accordingly, because the States' challenges are based on alleged statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act.  *Crowley*, 38 F.4th at 1106.

### b.  The Civil Service Reform Act

Next, the Defendants assert that the Court lacks jurisdiction to consider the States' challenges to the placement of IMLS, MBDA, and FMCS personnel on administrative leave because, under the Civil Service Reform Act ("CSRA"), "Congress made the Office of Special Counsel [OSC], the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") the exclusive means for federal employees . . . and other interested parties to raise challenges to final, non-discrimination-related employment actions, even when those disputes involve constitutional claims."  ECF No. 41 at 19-20 (citations omitted).  The Defendants urge that "the APA does not permit litigants to forestall properly applicable channeling regimes that Congress established."  *Id.* at 20.

There is no dispute that the CSRA "established a comprehensive system for reviewing personnel action taken against federal employees."  *United States v. Fausto*, 484 U.S. 439, 455 (1988).  But to determine whether the CSRA's statutory review scheme precludes district court jurisdiction, the Court must consider whether: (1) "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction," and (2) "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'"  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207,

212 (1994)).  As to the second prong, the Court must presume that Congress does not intend to limit jurisdiction "if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'"  *Id.* (quoting *Thunder Basin*, 510 U.S. at 212-213).

The Court does not observe any jurisdiction bar within the CSRA's statutory scheme that would apply to the States; the scheme, at most, contemplates the availability of judicial review of *federal employees'* disputes over employment decisions.  Specifically, the CSRA's "comprehensive and exclusive" statutory scheme "protects covered *federal employees* against a broad range of personnel practices, and ... supplies a variety of causes of action and remedies to employees when their rights under the statute are violated."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (emphasis added).  Thus, "[a] *federal employee* generally may not pursue alternative routes of judicial review, such as by filing a civil action in district court under the APA."  *Rodriguez v. United States*, 852 F.3d 67, 82 (1st Cir. 2017) (emphasis added).  Here, none of the plaintiffs are federal employees so the Court need not review whether their claims fall under the ambit of the CSRA.

As to the second prong, a finding of CSRA preclusion would foreclose all meaningful judicial review over the States' claims because they cannot bring their claims under CSRA's statutory scheme.  Further, the States' challenges to the Defendants actions to implement the *Reduction* EO are plainly outside the MSPB's expertise.  While the States' challenges implicate the Defendants' decisions to

terminate or place employees on leave, such challenges are not the run of the mill challenges to adverse employment actions with which the MSPB may be familiar. Instead, the States' claims raise constitutional and statutory challenges to various agencies' decisions effectuating "the termination of agency functions, the failure to carry out statutory duties, [and] the refusal to expend appropriations." ECF No. 44 at 11. The MSPB and OSC do not have the jurisdiction to review the congressional appropriation issues raised here. *See Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *11 n.22 (D.D.C. Apr. 22, 2025)[4] ("*Widakuswara II*") ("the MSPB and OSC have no jurisdiction to review the cancellation of congressional appropriations."). And the States' remaining APA and constitutional claims—under separation of powers principles and the Take Care Clause—"raise[s] standard questions of administrative and constitutional law, detached from any issues related to federal employment." *Id.* (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 194 (2023)) (internal quotation marks omitted). Thus, the States' claims fall outside the "competence and expertise" of the administrative bodies that handle employee grievance arising under the CSRA.

Lastly, for similar reasons, the States' claims are "wholly collateral" to CSRA's review provisions because they invoke constitutional and administrative questions

---

[4] The D.C. Circuit administratively stayed the preliminary injunction issued in *Widakuswara II* as to only the part of the order to restore grants but specified that "[t]he purpose of this administrative stay is to give the court sufficient opportunity to consider the emergency motions for stay pending appeal and should not be construed in any way as a ruling on the merits of those motions." *Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. May 1, 2024).

about the propriety of the agencies' actions to curtail their respective statutory and discretionary functions—i.e., claims that do not necessarily relate to CSRA's focus on the review of federal employee grievances. Accordingly, the CSRA statutory scheme does not reflect Congress's intent to preclude the Court's jurisdiction to review the States' claims here.

### B. Likelihood of Success on the Merits

#### 1. APA Claims

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The States assert that the Defendants' implementation of the *Reduction* EO violates the APA because such actions are arbitrary and capricious and contrary to law. Before reaching the merits, the Court must first address the Defendants' contentions that the States' claims cannot be subject to judicial review under the APA because the agency actions at issue are neither discrete nor final.

#### a. "Programmatic" Challenges

The Defendants contend that the States do not challenge "discrete agency action," "but rather a collection of grant terminations, personnel actions, and programmatic activities." ECF No. 41 at 20-21. In making such arguments, the Defendants analogize the States' challenges as the type of "programmatic challenge" that the Supreme Court dispelled in *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 (1990). *See* ECF No. 41 at 20-22. In *Lujan*, the "programmatic challenge" that the Supreme Court dispelled "was an attempt to seek 'wholesale' 'programmatic

improvements' 'by court decree' by 'couch[ing]' '[the Bureau of Land Management's] land withdrawal review program' as an 'unlawful agency action.'" *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).  But the Supreme Court recognized in *Lujan* that "if there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations . . . it can of course be challenged under the APA."  497 U.S. at 890 n.2.  Here, the States' claims are closer to the latter type of APA challenge; the States have underscored that they are challenging the Agency Defendant's adoption of a discrete, categorical policy that applies the measure "of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions" across the board.  *See* ECF No. 44 at 14-15.  Accordingly, the States' APA challenges are of the type deemed proper under *Lujan*.

### b.  Final Agency Action

Now, the Court must address whether there was "final agency action" to permit judicial review under the APA.  5 U.S.C. § 704.  "[A]gency action includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id.* § 551(13).  "Agency action" is not an "all-encompassing" term that authorizes the Court to "exercise 'judicial review [over] everything done by an administrative agency.'"  *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)).  Still, the term has a broad sweep—covering "comprehensively every manner

in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citing *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)). Relevantly, "[t]he term 'action' encompasses an agency's 'policy or routine practice.'" *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 895326, at *13 (D. Md. Mar. 24, 2025) (quoting *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018)). An agency action is final if: (1) it marks the "'consummation' of the agency's decisionmaking process," and (2) the action determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177 (1997)). The Court is to apply the "finality" requirement in a "flexible" and "pragmatic" fashion. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149-151 (1967). For the purposes of this analysis, it is crucial to lay out the actions that occurred at IMLS, MBDA, and FMCS close to the *Reduction* EO's issuance.

At IMLS, an employee described that the agency's leadership held a town hall during which they informed staff that IMLS "would look 'very different' following the President's [*Reduction*] executive order and that it might be stripped 'down to the studs.'" ECF No. 3-40 ¶ 6. Then on March 31, each office head within IMLS "met separately with their staff to inform them that the entirety of IMLS would be placed on admin[istrative] leave and that all grants would be terminated, with a potential exception of the Grants to States Program." *Id.* ¶ 11. That same day all but twelve of IMLS's staff of seventy-seven were placed on administrative leave. *Id.* ¶¶ 4, 13. Over a week later, IMLS terminated over 1,000 grants—and each termination notice

stated that the grant was "'no longer consistent with the agencies' priorities' and that the President's March 14, 2025, executive order 'mandates that the IMLS eliminate all non-statutorily required activities and functions.'" ECF No. 35-3 ¶ 5; *see also* ECF Nos. 35-5 at 10-11, 35-6 at 6-7, 35-8 at 5-20, 35-9 at 4-5 (notices of grant termination from IMLS to grantees in Maryland, New Jersey, Washington, and Wisconsin citing the *Reduction* EO and stating that the grant terminations were based, in part, on "the President's March 14, 2025 executive order [that] mandates that the IMLS eliminate all non-statutorily required activities and functions.").

At MBDA, a RIF notice to one of its employees revealed the plan to "eliminate the non-statutory components and functions of MBDA"—that appeared to include "abolishing all positions within MBDA." ECF No. 35-4 at 4. And that appears to have occurred, because all MBDA employees have either been placed on administrative leave with a slated termination date of May 9, 2025, or have been reassigned to positions outside the MBDA. *Id.* ¶¶ 5–6. A declaration from an MBDA employee also reveals that Nate Cavanaugh—an individual purporting to act under the authority of Acting MBDA Undersecretary Keith Sonderling—sent out notices informing MBDA grant recipients that their grants were being terminated effective April 17, 2025. ECF No. 45-1 ¶ 4. That employee has conveyed that "all preexisting MBDA grants were terminated pursuant to such notices." *Id.* The States have provided copies of such notice of grant terminations from the MBDA, all which include boilerplate language explaining that the grants were being terminated, in part based on the "the President's March 14, 2025 executive order [that] mandates

that the MBDA eliminate all non-statutorily required activities and functions.".  *See* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2.

Lastly, at the FMCS, staff has been cut from 207 to fifteen.  ECF No. 3-42 ¶¶ 4-7.  A letter from the Director of Human Resources indicates that the RIF implemented was "taken in accordance with President Donald Trump's . . . Executive Order 14238 [*Reduction* EO] of March 14, 2025."  *Id.* at 5.  Further, FMCS circulated an internal memorandum citing the *Reduction* EO as among the "updated guidance" the agency received to implement a plan to perform "only statutory mandated functions."  ECF No. 1-4 at 2.  And that memorandum also outlined "operational adjustments" to take effect immediately, stating that the agency: (1) will not accept new public sector and grievance mediation, and (2) should not schedule new in-person education, advocacy, and outreach meetings.  *Id.* at 2-3.

What the unrefuted evidence reveals is that, to comply with the *Reduction* EO, IMLS, MBDA, and FMCS each adopted a policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum—thereby taking an "agency action."  *Bessent*, 2025 WL 895326, at *13.  And each of those agencies "consummat[ed] [their] decisionmaking process" upon adopting such policies as there is no evidence that these decisions to eliminate non-statutorily required activities and functions are "tentative or interlocutory." *Bennett*, 520 U.S. at 178.  Rather, as surmised above, the IMLS, MBDA, and FMCS made it explicitly clear in various memoranda, grant termination letters, and other documents that they were terminating grants, staff, and programs pursuant to their

effort to "eliminate all non-statutorily required activities." Further, "legal consequences" flow from these decisions, as: (1) the States and other grant recipients no longer have access to previously award funds because of grant terminations and withheld or delayed disbursements; (2) the personnel necessary for these agencies to feasibly administer grant awards and payments to the States have been removed, en masse, and (3) FMCS, in particular, has stopped providing public sector services to the States. Accordingly, the Court finds that IMLS, MBDA, and FMCS have taken final agency actions subject to the Court's review.

### c. Arbitrary and Capricious

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious . . . ." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if it is not reasonable and reasonably explained." *Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024) (citing *FCC v. Prometheus Radio Project*, 556 U.S. 502, 513 (2021)). While the scope of review under this standard is "narrow" and the Court may not "substitute its judgment for that of the agency," the agency must still articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281

286 (1974)).  But "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

Here, there is an absence of *any* reasonable explanation from IMLS, MBDA, and FMCS.  The *Reduction* EO—with which these agencies sought to comply through their challenged policies—stated that the "non-statutory components and functions" of IMLS, MBDA, and FMCS shall be "eliminated to the maximum extent consistent with applicable law."  90 Fed. Reg. 13043 (Mar. 14, 2025).  But the Defendants have not shown that any analysis was conducted to determine which "components and functions" of IMLS, MBDA, and FMCS are statutorily required, and which are not.

For instance, in its letter apprising employees of their placement on administrative leave, IMLS merely indicated that "this action . . . is taken to facilitate the work and operations of the agency."  ECF No. 1-1 at 2; *see also* ECF No. 3-40 at 4.  And both MBDA and FMCS explained that the implementation of a RIF was being done in accordance with the *Reduction* EO—shortly before most of their employees were placed on administrative leave.  *See* ECF No. 3-42 at 4-5; ECF No. 1-3 at 2. Further, in its memorandum announcing the cessation of its core programs, FMCS stated it was "required to perform only statutorily mandated functions" because of the mandates in the *Reduction* EO and other executive orders and guidance.  *See* ECF No. 1-4 at 2.  And, as the States point out, MBDA has not publicly acknowledged or even explained the removal of *all* its staff and the abrupt dismantling of its core programs.  *See* ECF No. 3-41 ¶ 13 (indicating that MBDA has: (1) taken down grant

solicitations for its Rural Business Center Program and Women Entrepreneurship Program, (2) eliminated its Minority Business Center Advisory Council, and (3) placed all staff responsible for its informational clearinghouse—"a statutorily mandated activity to collect and share data on minority business enterprises"—on administrative leave.).

IMLS has also offered no further explanation for the termination of thousands of its grants other than stating that the grants are "no longer consistent with the agency's priorities" and citing the *Reduction* EO's mandate to "eliminate all non-statutorily required activities and functions." *See* ECF Nos. 35-5 at 11; 35-6 at 7; 35-8 at 5-20; 35-9 at 5. And grant termination letters from MBDA provided the same anemic explanations, using nearly the same language that was used in the boilerplate IMLS grant termination letters. *See* ECF Nos. 45-2 at 4; 45-3 at 6, 7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2 ("MBDA has determined that your grant is unfortunately no longer consistent with the agency's priorities . . . [and] the President's [*Reduction* EO] mandates that the MBDA eliminate all non-statutorily required activities and functions . . . Therefore, the MBDA hereby terminates your grant in its entirety . . .").

Recall that "[t]he APA requires a rational connection between the facts, the agency's rationale, and the ultimate decision." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025). Thus, conclusory statements do not "reasonably" explain agency action. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)) ("[T]o this end, conclusory statements

will not do; an 'agency's statement must be one of *reasoning*.'").  Here, the "rational connections" are absent, as IMLS's, MBDA's, and FMCS's justifications for eliminating programs, terminating grants, and implementing large-scale employee RIFs have been couched in mere conclusory statements—most of which merely defer to the *Reduction* EO.  There is no explanation about why the targeted programs or grants fell within the ambit of "non-statutory" functions or components.  Such conclusory explanations, "devoid of data or any independent explanation, [are] grossly insufficient and fall[] far short of reasoned analysis."  *Widakuswara v. Lake*, No. 25-CV-2390 (JPO), 2025 WL 945869, at *5 (S.D.N.Y. Mar. 28, 2025) (*"Widakuswara I"*).

Additionally, ILMS, MBDA, and FMCS have failed to indicate that they considered any of the significant reliance interests of their program beneficiaries or grantees such as libraries, museums, business centers, contractors, labor unions, states, and local governments.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citations omitted) ("When an agency changes course, as [IMLS, MBDA, FMCS] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.").  The States have presented compelling evidence that they rely on timely and continuous disbursements to continue operating several important programs and services.  *See, e.g.*, ECF No. 3-24 ¶¶ 18, 22 (New Mexico explaining that delay in disbursement of IMLS grant funds will prompt the delay, suspension, or reduction of interlibrary loan services); ECF

No. 3-3 ¶ 27 (California State Librarian noting that "If we do not receive such disbursements/reimbursements [from IMLS], it will stop statewide and local public library programs immediately and before they can be completed, contracted services will be denied payment. Much-needed library services to Californians will cease. Money for the salary and benefits for a significant portion of the California State Library's staff (34 positions) would be unavailable, and layoffs would ensue."); ECF No. 3-10 ¶ 16 ("Any pause in funding would delay completion of client projects, resulting in clients losing access to capital and contracting opportunities, prevent new clients from accessing these services and resources, and may lead to loss of jobs. Delay would also eliminate our ability to fill key staff positions currently open, and would therefore terminate the ability to restore vital business activity by the Hawaiʻi MBDA Business Center.").

Further, the States have supplied evidence underscoring how much they have depended on FMCS to provide mediation and conciliation services to solve non-federal public sector disputes and to prevent "prolonged labor disputes that could disrupt the provision of essential state services." ECF No. 3-30 ¶¶11-13 (noting prolonged labor disputes pose risks to state services such as child welfare); *see also* ECF No. 3-32 ¶ 13 ("If FMCS ceased to function in a meaningful way . . . Rhode Island would suffer from prolonged labor disputes that could disrupt transportation, healthcare, and other critical services throughout the State."); ECF No. 3-26 ¶ 8.b n.1 (School District in Illinois required to seek emergency mediation services "after the Parties had spent five (5) months working with an FMCS mediator whose services suddenly ceased to

be available" after the issuance of the *Reduction* EO); *id.* ¶¶ 18, 22 (explaining that FMCS mediators are "exceedingly competent and well-trained"; New Mexico will "not be able to replace those services in the near or medium term").  These examples show the significant reliance interests that IMLS, MBDA, and FMCS appeared not to consider when hastily adopting the mandates in the *Reduction* EO.  "In light of the serious reliance interests at stake, [IMLS, MBDA, and FMCS'] conclusory statements do not suffice to explain [their] decision[s]."  *Encino Motorcars*, 579 U.S. at 224.

Accordingly, because IMLS, MBDA, and FMCS have not provided a rational connection between the sweeping actions they have taken and the vague, conclusory justifications they have provided, the Court finds that the States have established a strong likelihood of success on their arbitrary and capricious claims.  *Ohio*, 603 U.S. at 292.  Further, the Court finds that the States have illustrated a strong likelihood of success on their claims that IMLS, MBDA, and FMCS acted arbitrarily and capriciously in failing to consider reliance interests.  *Regents*, 591 U.S. at 30; *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations omitted) ("Sudden and unexplained change, . . . or change that does not take account of legitimate reliance . . . may be 'arbitrary, capricious [or] an abuse of discretion.'"

### d.  Contrary to Law

IMLS, MBDA, and FMCS also likely violated the APA, as their actions were "not in accordance with law."  5 U.S.C. 706(2)(A).

### i.  Actions Inconsistent with the Agencies' Mandatory Statutory Duties

"Under Article II of the Constitution and relevant Supreme Court precedents the President [and subordinate executive agencies] must follow statutory *mandates*." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). The Executive may *not* "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* Thus, "absent a lack of funds or a claim of unconstitutionality that has not been rejected by final Court order, the Executive must abide by statutory mandates and prohibitions." *Id.* Here, the States have presented compelling evidence illustrating that IMLS, MBDA, and FMCS are flouting their statutory mandates in implementing the directives outlined in the *Reduction* EO.

Starting with IMLS, Congress directed the agency to conduct regular research and data collection to "extend and improve the Nation's museum, library, and information services." 20 U.S.C. § 9108(a). Congress also tasked the agency with administering the Grants to States Program, *see id.* § 9141, which involves: (1) reviewing state plans from fifty-nine states and territories, *id.* §§ 9122(3), (5), 9134(e)(1); (2) notifying jurisdictions of noncompliant plans and providing "technical assistance" to help bring such plans into compliance, *id.* § 9134(e)(3)(A), (C); (3) paying the "Federal share of the activities" described in approved state plans, *id.* § 9133(a), and monitoring state expenditures, *id.* § 9133(c). Further, Congress charged IMLS with administering grant programs relating to the National Museum of African American History and Culture, 20 U.S.C. § 80r-5(b), and the National Museum of the American Latino, *id.* § 80u(f)(2). Congress also instructed IMLS to administer several competitive grant programs each year. *Id.* § 9165(a)(1)-(3) (Laura

Bush 21st Century Librarian Program); *id.* § 9161 (Native American Library Services Grant Program); *id.* § 9162 (National leadership grants for libraries program).

Before the large-scale RIF at the agency, IMLS carried out its responsibilities with seventy-seven employees—with thirty-five employees assigned mainly to administer the agency's grants programs. ECF No. 3-40 ¶¶ 17-18. Nothing suggests that the twelve employees expected to be brought back from administrative leave will be able to fulfill IMLS's wide-ranging statutory responsibilities. *Id.* ¶ 21. First, none of the returning twelve employees work in the IMLS's Office of Research and Evaluation—which is the office primarily responsible for conducting the regular research and data collection that the statute requires IMLS to perform. *Id.* ¶ 22. Thus, with that office essentially defunct, there is no evidence that the agency will be able to perform its statutorily required regular research and data collection. *See* 20 U.S.C. § 9108. Nor is there any indication that the twelve employees will be able to consider the large volume of new grant applications and administer any existing grants—especially because most of those twelve employees do not have experience with administering grants. ECF No. 3-40 ¶¶ 20-21.

Regarding MBDA, Congress directed that the agency "shall" provide federal assistance awards and technical assistance to MBDA Business Centers, 15 U.S.C. § 9523(a)(3), and outlined the criteria the agency must use when awarding grants, *id.* § 9524. Congress also required MBDA to (1) "collect and analyze data" relating to minority business enterprises, *id.* § 9513(a)(1)(A); (2) conduct economic "research, studies, and surveys," *id.* § 9513(a)(1)(B)(i); and (3) "provide outreach, educational

services, and technical assistance" in at least five languages, *id.* § 9513(A)(1)(C). Congress also instructed MBDA to establish a "regional office . . . for each of the regions of the United States," *id.* § 9502(e)(2)(A) and provided a list of duties those offices must perform, including outreach, cooperation with relevant private and government entities, and information-gathering, *id.* § 9502(e)(2)(B).

    But as of now, no employees appear to be currently working at MBDA. *See* ECF No. 35-3 ¶¶ 4-5. Thus, there is no one who can: (1) staff the "regional office for each of regions of the country" that MBDA is statutory required to have, *see* 15 U.S.C. § 9502(e)(2)(A); (2) monitor MBDA's existing grants for compliance—if any still exist; or (3) timely award new grants, all of which used to be facilitated by a team of forty employees. *See* ECF No. 3-41 ¶¶ 10-12. MBDA has ceased performing many of its statutory duties, including: (1) posting new grant solicitations; (2) performing data collecting and sharing on minority business enterprises, and (3) undertaking required communications with MBDA centers. *Id.* ¶ 13; ECF No. 3-12 ¶ 17.

    Lastly, as to FMCS, Congress outlined that it is "the duty of the Service, in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." 29 U.S.C. § 173(a). Further, Congress directed FMCS to "make its conciliation and mediation services available in the settlement of" grievance disputes arising "arising over the application or interpretation of an existing collective-bargaining agreement." *Id.* § 173(d). Yet FMCS has ceased its grievance mediation services as of March 14, 2025. *See* ECF

No. 1-4 at 2 ("No new [Grievance Mediation ("GM")] cases will be accepted.  As of March 14, all GM cases should be complete.").  Further, with its substantial reduction of personnel from about 200 to fifteen, *see* ECF No. 3-42 ¶¶ 4-7, nothing suggests that FMCS' remaining employees can continue to perform its statutory duties, *see* ECF No. 3-14 ¶ 11.

### ii.    Violations of Each Agency's Appropriations Statute

The Constitution's Appropriation Clause, U.S. Const. art. I, § 9, cl. 7, grants "Congress 'exclusive power' over federal spending." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (quoting *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)).  Without such exclusive power, "the [E]xecutive would possess an unbounded power over the public purse of the nation[ ] and might apply all its monied resources at his pleasure." *U.S. Dep't of the Navy*, 665 F.3d at 1347 (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213–14 (1833)).

By making laws, Congress has expressly restricted the Executive Branch from taking control of its appropriation powers.  One such body of law is the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681 et seq., ("ICA") which details the procedures the Executive must follow if it wishes to impound appropriated funds.  For the permanent rescission of appropriated funds, Congress outlined that if the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or . . .

should be rescinded for fiscal policy of other reasons," the President must "transmit to both Houses of Congress a special message" that specifies the amount, effect, reasons, and other information relating to the proposed rescission. 2 U.S.C. § 683(a). The act also requires the funds proposed for rescission "be made available for obligation" unless, within forty-five days, Congress rescinds the appropriation. *Id.* § 683(b). And if the President wishes to defer appropriated funds, the ICA also outlines that process, which also involves sending a special message to Congress. *Id.* §§ 684(a), 682(1). Accordingly, while "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program . . . the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty*, 725 F.3d at 261 n.1; *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Congress appropriated funds to IMLS, MBDA, and FMCS at the same levels as the previous fiscal years. But the records show that these agencies are rescinding or deferring appropriated funds and do not plan to spend them. For instance, it appears that all—or nearly all—preexisting grants that IMLS and MBDA administer have been terminated, *see* ECF Nos. 45-1 ¶ 4; 35-3 ¶ 5, to carry out the *Reduction* EO and other of the President's undefined policy goals. *See* ECF Nos. 45-2 at 4; 45-3 at 6,

7; 45-4 at 2; 45-5 at 2; 45-6 at 2; 45-7 at 2 ("MBDA has determined that your grant is unfortunately no longer consistent with the agency's priorities . . . MBDA is repurposing its funding allocations . . . in furtherance of the President's agenda. Independently and secondly, the President's [*Reduction* EO] mandates that the MBDA eliminate all non-statutorily required activities and functions . . . Therefore, the MBDA hereby terminates your grant in its entirety . . ."); *see also* ECF Nos. 35-5 at 10-11; 35-6 at 6-7; 35-8 at 5-20; 35-9 at 4-5 (same).  As explained above, nothing suggests that the "skeleton" crew remaining at IMLS—which has only a small portion of personnel experienced with grant administration—will be able to administer disbursements of the millions of dollars in grant funds they are budgeted to award. *See* IMLS, FISCAL YEAR 2024 APPROPRIATIONS REQUEST TO THE UNITED STATES CONGRESS 4-6, (Mar. 2023), https://www.imls.gov/sites/default/files/2023-03/fy24cj.pdf (allocating over $250 million for grants and $20 million for administrative expenses).  Nor is it clear how a crew of *zero* will be able to administer any of the grant funds MBDA is budgeted to award.  *See* MBDA, FISCAL YEAR 2024 CONGRESSIONAL JUSTIFICATION (Mar. 2023), https://www.commerce.gov/sites/default/files/2023-04/MBDA-FY2024-Congressional-Budget-Submission.pdf.

As for FMCS, only fifteen employees remain and they must perform the work that over 200 employees previously performed.  Thus, such a small group of personnel will expend only a fraction of what it would have otherwise spent to perform to its conciliation, arbitration, and mediation services with its previous staffing level.  *See*

FMCS, Fiscal Year 2024 Congressional Budget Submission, at 23 (Mar. 13, 2023), https://www.fmcs.gov/wp-content/uploads/2023/03/2024-Congressional-Budget.pdf ($42.3 million out of $55 million budget request allocated to mediations, training, outreach, and workshops).

As the States point out, the *Reduction* EO orders OMB to "reject funding requests" for IMLS, MBDA, and FMCS "to the extent they are inconsistent" with the mandate for these agencies to "eliminate non-statutory components and functions" and "reduce the performance of their statutory functions and associated personnel." 90 Fed. Reg. 13043 (Mar. 14, 2025). Thus, the *Reduction* EO practically proscribes these agencies from increasing expenditures elsewhere to make up for these cuts in spending, considering its mandate to reduce these agencies' functions and activities to the bare minimum. But Congress made clear that it wanted to appropriate funds to IMLS, MBDA, and FMCS so they may operate at the same level as the previous fiscal year. And the Executive does not have the "unilateral authority to refuse to spend the funds." *In re Aiken Cnty*, 725 F.3d at 261 n.1. Thus, if the Executive does wish to rescind or defer funds appropriated to an agency, they are in luck, as the ICA sets forth clear procedures to facilitate that process under congressional oversight. 2 U.S.C. §§ 681–688. But that process was not facilitated here. Rather, IMLS, MBDA, and FMCS took actions that essentially directed the rescission of funds to fulfill the President's policy—with congressional authorization glaringly absent.

The Court therefore finds that the States are likely to succeed in establishing that IMLS, MBDA, and FMCS violated the APA by acting "not in accordance" with

their respective statutory mandates and congressional appropriations acts when effectively absconding their statutory mandates by terminating core services and grant programs.

### 2.  Separation of Powers and Take Care Clause Claims

Under the Constitution, the President is required "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, "across the entire Executive Branch— including 'independent' agencies." *Eng. v. Trump*, 279 F. Supp. 3d 307, 327 (D.D.C. 2018) (citing *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 496–97 (2010)). "And because federal agencies are 'creatures of statute,' and 'the Take Care Clause cannot be used to bypass agencies' limited status as creatures of statute, [they] possess only the authority that Congress has provided them.'" *Widakuswara II*, 2025 WL 1166400, at *15 (quoting *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024)).

Here, IMLS, MBDA, and FMCS were created by Congress via statutes that granted each a comprehensive set of statutory responsibilities.  *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (establishing IMLS); and Minority Business Development Act of 2021, Infrastructure Investment and Jobs Act, Pub. L. 117-58, div. K (Nov. 15, 2021) (authorizing MBDA). And Congress, a mere day after the *Reduction* EO's issuance, passed a statute that appropriated funds to these three agencies.  *See* Continuing Appropriations Act § 1101(a)(2), (8).   But Defendants' acts "[w]ithholding congressionally appropriated

funds, and effectively shuttering a congressionally created agency simply cannot be construed as following through on [the] constitutional mandate [of the Take Care Clause]." *Widakuswara II*, 2025 WL 1166400, at *15.

Intertwined with the Take Care Clause claim, the States assert that the Defendants' actions "violate[] the constitutional separation of powers." ECF No. 3 at 33. Article I of the Constitution grants to the legislative branch, the exclusive power to make law, U.S. Const. art. I, § 1, and the power of the purse, *id.* § 8, cl. 1. As for the Executive, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). By issuing the *Reduction* EO—which effectively directs withholding the funds that Congress recently statutorily appropriated to IMLS, MBDA, and FMCS, resulting in the cessation of several of their programs, *see supra*—the Executive is usurping Congress's: (1) power of the purse, by disregarding congressional appropriations; and (2) vested legislative authority to create and abolish federal agencies. *See Widakuswara I*, 2025 WL 945869, at *7 (finding that the Executive usurped Congress's power of the purse and "legislative supremacy" in violation of the Constitution's implicit separation of powers principles when "withholding funds statutorily appropriated to full administer" a federal agency).

Thus, the States have established a likelihood of success on their claims that the Defendants violated the Take Care Clause and constitutional separation of powers.

### C. Irreparable Harm

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987)). There are "relevant guideposts" to guide that discretion—"the plaintiff's showing must possess some substance" and "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (citations omitted). The Court finds that the States have demonstrated irreparable and continuing harm from the Defendants' de facto dismantling of IMLS, MBDA, and FMCS.

The States have presented a plethora of declarations illustrating the myriad of harms arising from the undoing of IMLS. The New Jersey Library "issued stop work orders" and will not be able to work on project developing tools to teach informational literacy to K-12 students due to terminated IMLS grant funding. ECF No. 35-6 ¶¶ 7-8. The New York State Library described that a delay in funding from IMLS will cause it to "immediately . . . halt services and implement a hiring freeze." ECF No. 3-27 ¶ 29, 42. And the loss of data from IMLS's Public Library Survey would "represent the loss of decades of information that is critical for community development and planning." *Id.* ¶ 35. The California State Library will have to "stop statewide and local public library programs immediately and before they can be completed," "deny payments for contracted services, and initiate layoffs if it does not receive IMLS

disbursements and reimbursements."  ECF No. 3-3 ¶ 10, 32.  Loss of IMLS funding will also diminish or halt the California State Library's programs "targeted to seniors, veterans and English learners" and services to the "blind and visually impaired."  *Id.* ¶ 31.  Maryland's state-operated Banneker-Douglass-Tubman Museum delayed portions of an archaeological project because of the uncertainty surrounding IMLS funding.  ECF No. 3-13 ¶¶ 9, 14.

For Maryland's Entrepreneurial Development and Assistance Center, the delay or loss in MBDA funding will halt: (1) "essential programs" such as "entrepreneurship education" and "one-on-one business guidance," and (2) "access to resources like the content library for continued learning."  ECF No. 3-16 ¶ 12. Baltimore MBDA Advance Manufacturing Center—which provides comprehensive technical assistance to help minority manufacturing businesses adopt innovative technologies and business methodologies—will suffer "immediate service impacts" related to such technical assistance if there is a pause in MBDS funding.  ECF No. 3-12 ¶¶ 9, 16.

University of Wisconsin System Office of Business & Entrepreneurship will have to "cancel any upcoming training and accelerator services for participants already enrolled and expecting these services" due to termination of MBDA grant award.  ECF Nos. 3-37 ¶ 23; 45-2 at 4.  The University of Hawai'i Maui College— which receives MBDA funding to provide entrepreneurship training to students—will have to eliminate "training courses, coaching and mentoring support services, and curriculum development" and will lose "three grant program staff" due to the

termination of their MBDA grant.  ECF Nos. 3-11 ¶¶ 13, 20; 45-4 at 2.  Arizona's MBDA Business Center will close due to the termination of their MBDA grant and therefore will no longer provide pertinent services to Arizona businesses that aided in access to capital, access to markers, and market research.  ECF No. 45-3 ¶¶ 1, 4.  Further, the Center will have to terminate ten employees and release twenty contractors without notice.  *Id.* ¶ 5.

As to the FMCS, the Defendants do not dispute that the agency has completely stopped their public sector services.   And it is undisputed that the States often rely on FMCS for their conciliation and mediation services to resolve public sector labor disputes.  Such services are not easily replicable.  To start, the use of FMCS's services is embedded in some states' laws, *see, e.g.*, ECF No. 3-26 ¶ 6 (New Mexico), and forty-two states have collective bargaining agreements with specific provisions that either allow or mandate the use of FMCS's services "in labor-management relations."  *See* ECF No. 3-39 ¶¶ 7-8.  And States opt to request FMCS's assistance because it is a well reputed, trustworthy, experienced neutral entity that is fluent in providing services that are "critical for resolving labor disputes" and "promot[ing] confidence in the decision-makers and the dispute resolution process."  ECF No. 3-14 ¶ 10; *see* ECF No. 3-26 ¶¶ 18, 22 (describing FMCS mediators as "exceedingly competent and well-trained" and noting that New Mexico will not be able to replace FMCS's services "in the near or medium term").  FMCS's mediation services have been critical in averting prolonged labor disputes which posed significant disruption to essential services such as transportation, healthcare, and child welfare.  *See* ECF Nos. 3-30 ¶¶ 11-13; 3-32

¶ 13.   And the record shows that circumscribing FMCS significantly reducing personnel and ceasing their core public sector and grievance programs has set the stage for ongoing and imminent harms.

For example, the New Mexico Public Employee Labor Relations Board had eight pending cases at the time the *Reduction* EO was issued in which the parties "hoped to obtain FMCS mediation services" due to the lack of other services that not only could provide mediation for free or a reduced fee but also supply the specialized substantive knowledge on labor relations that FMCS mediators possessed.   ECF No. 3-26 ¶¶ 21-22.   Additionally, the Associated Federation of State County and Municipal Employees, AFL-CIO ("AFSCME")—a private and public sector union that uses FMCS for handling grievances concerning the States' public employees— attested to having multiple pending mediations in which the parties were using FMCS services.   *See* ECF No. 3-39 ¶¶ 9, 20-22.   But the abrupt layoff of FMCS personnel due to the *Reduction* EO, prompted "the immediate cessation of all FMCS assistance in the mediation of labor management dispute in the public and private sector." *Id.* ¶ 23.   Now, AFSCME unions representing public sector employees in the States must "find and utilize other more costly and time expansive method to resolve disputes," and labor disputes that are "more likely to result in work disruptions" with this discernable path to mediation now gone.   *Id.*

In Illinois, a school district spent five months working with an FMCS mediator for a negotiation impasse in a labor dispute until those mediation services abruptly stopped after the issuance of the *Reduction* EO.   ECF No. 3-26 ¶ 8.b n.1.   Now, the

affected union has issued an intent to strike if the labor dispute is not resolved by early April, *id.*, and it is unclear whether such disputes have been resolved. In Rhode Island, the United Nurses & Allied Professionals (UNAP) and Brown University Health was assigned a FMCS mediator after the parties reached a negotiation impasse relating to new collective bargaining agreements for about 2,5000 healthcare workers employed at the state's only Level One Trauma Center—Rhode Island Hospital. ECF No. 44-2 ¶¶ 8-10. That assigned mediator appeared at the first session, but before the session began the mediator informed the parties that he was no longer able to mediate the parties' negotiation because he was placed on administrative leave under the *Reduction* EO. *Id.* ¶ 11. The UNAP collective bargaining agreement with Brown University Health has now expired and the loss of FMCS's mediation services has "dramatically increased the risk of an imminent work stoppage—with life-and-death consequences—at the busiest medical center in the region." *Id.* ¶ 15.

These are just a few key examples of how the implementation of the *Reduction* EO at IMLS, MBDA, and FMCS has disrupted numerous critical state library and museum services and programs, impeded the resolution of time-sensitive labor disputes involving State entities, and curtailed broad-ranging training, consultation, and technical assistance services and programs that facilitate the growth of minority business enterprises. Accordingly, the Court finds that the States have established a likelihood of success on their claims of irreparable harm arising from the Defendants' actions here.

### D. Balance of the Equities and Public Interest

The final two preliminary injunction factors—balance of the equities and public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). When weighing these factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief ... pay[ing] particular regard for the public consequences" that would result from granting the emergency relief sought. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks and citations omitted). Here, the two factors weigh strongly in favor of equitable relief.

The States have set forth a plethora of injuries that would arise if the Court does not grant injunctive relief. *See supra* Section III.C. On the flip side, the Defendants assert that granting the injunctive relief the States request would "effectively disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities." ECF No. 41 at 37. They also assert harm from disbursing funds that "may not be retrievable afterwards." *Id.* As the Court explained, the Defendants' implementation of the *Reduction* EO has effectively usurped Congress's lawmaking and spending authority—without constitutional or statutory authority permitting them to do so. And there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Thus, the Court finds that "there is no competing harm to the government with the issuance

of preliminary relief that orders compliance with governing statutes and the Constitution." *Widakuswara II*, 2025 WL 1166400, at *17. In fact, the "substantial" public interest lies "'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Thus, the Court finds that these final two factors weigh in favor of granting a preliminary injunction.

### E. Bond

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But that rule "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *24 (D.R.I. Apr. 15, 2025) (citations omitted). Generally, "[a] bond 'is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action.'" *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, No. 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)).

Here, the Defendants request that the Court impose a bond against the States that is "commensurate with the scope of any such order." ECF No. 41 at 37. The

Defendants assert that the States are seeking "the disbursement of grant funds" and thus the Court should order them to post a bond equal to the size of "any payment that the Court orders on a preliminary basis" because without such a bond, "there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that the Defendants were 'wrongfully enjoined.'" *Id.* But requiring the States to pay a bond equal to the grant disbursements at issue would impose a significant financial barrier to their ability to raise these challenges to the Defendants unlawful decisions withholding these grant disbursements. The States have attested that they would need to cut or terminate critical services and lay off staff because of such a loss of federal funding. *See*, *supra* Section III.C. Thus, requiring them to pay a bond in an amount equal to that loss of federal funding—via withheld grant disbursements—would impose the same imminent harm that this preliminary injunction aims to avoid and thus, would deny the States' right to judicial review here. *Nat'l Council of Nonprofits*, No. 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).

Nor has the Government shown that it would be unable to recover any funds disbursed because of the injunctive relief entered here. Such a claim is dubious considering that "the Government has various legal mechanisms to recoup these kinds of funds." *California*, 145 S. Ct. at 974 (Jackson, J., dissenting); *see, e.g.*, 2 C.F.R. § 200.346; *see also* 2 C.F.R. § 3187.2 (indicating that "the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal

Awards set forth in 2 CFR part 200 shall apply to awards from funds appropriated to [IMLS].").  Accordingly, the Court declines to impose a bond against the States.

## IV.    PRELIMINARY INJUNCTION[5]

For all these reasons, the Court finds based on the record evidence before it that a preliminary injunction is appropriate and necessary.  The States shall prepare and submit to the Court a preliminary injunction form order, after consultation with the Defendants.

Additionally, because of the finding of likelihood of success by the States and the large-scale irreparable harm that would occur without the preliminary injunction, the Court DENIES the Defendants' request to stay this Order for seven days.  *See* ECF No. 41 at 38.


IT IS SO ORDERED.


/s/ John J. McConnell, Jr.
John J. McConnell, Jr.
Chief Judge
United States District Court

May 6, 2025

---

[5] This Order binds Defendants' officers, agents, employees, attorneys, and other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B). Fed. R. Civ. P. 65(d)(2).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF RHODE ISLAND; STATE
OF NEW YORK; STATE OF HAWAI'I;
STATE OF ARIZONA; STATE OF
CALIFORNIA; STATE OF
COLORADO; STATE OF
CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF
THE STATE OF MICHIGAN; STATE
OF MINNESOTA; STATE OF
NEVADA; STATE OF NEW JERSEY;
STATE OF NEW MEXICO; STATE OF
OREGON; STATE OF VERMONT;
STATE OF WASHINGTON; STATE
OF WISCONSIN;

     Plaintiffs,

     v.

DONALD J. TRUMP, in his official
capacity as President of the United
States; INSTITUTE OF MUSEUM
AND LIBRARY SERVICES; KEITH E.
SONDERLING, in his official capacity
as Acting Director of the Institute of
Museum and Library Services;
MINORITY BUSINESS AND
DEVELOPMENT AGENCY; MADIHA
D. LATIF, in her official capacity as
Deputy Under Secretary of Commerce
for Minority Business Development;
HOWARD LUTNICK, in his official
capacity as Secretary of Commerce;
FEDERAL MEDIATION AND
CONCILIATION SERVICE;
GREGORY GOLDSTEIN, in his official
capacity as Acting Director of the
Federal Mediation and Conciliation

C.A. No. 1:25-cv-00128-JJM-LDA

A50

Service; OFFICE OF MANAGEMENT     )
AND BUDGET; RUSSELL T.            )
VOUGHT, in his official capacity as  )
Director of the Office of Management  )
and Budget;                       )
                                  )
     Defendants.            )
                                  )
                                  )

## PRELIMINARY INJUNCTION

For the reasons contained in this Court's Memorandum and Order (ECF No. 57), it is hereby ORDERED that a PRELIMINARY INJUNCTION is entered. Agency Defendants, their officers, agents, employees, and attorneys, and any other persons who are in active concert or participation with Defendants or their officers, agents, employees, or attorneys,[1] are hereby ordered as follows:

1. The Defendants Institute of Museum and Library Services ("IMLS"), Keith E. Sonderling, Minority Business and Development Agency ("MBDA"), Madiha D. Latif, Howard Lutnick, Federal Mediation and Conciliation Service ("FMCS"); Gregory Goldstein, Office of Management and Budget, Russell T. Vought (collectively "Agency Defendants") are enjoined from implementing Section 2 of the Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" as to IMLS, MBDA, and FMCS.

---

[1] This Order binds Defendants' officers, agents, employees, attorneys, and other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B). Fed. R. Civ. P. 65(d)(2). Individual defendants are enjoined in their official capacities only.

2. The Agency Defendants must promptly take all necessary steps to reverse any policies, memoranda, directives, or actions issued before this Order that were designed or intended, in whole or in part, to implement, give effect to, comply with, or carry out the directives contained in Executive Order 14238 with respect to IMLS, MBDA, or FMCS.

3. The Agency Defendants shall not take any further actions to eliminate IMLS, MBDA, and FMCS pursuant to Executive Order 14238. Nothing in this Order shall be construed to preclude the Agency Defendants from taking actions that would improve Agency efficiency or reduce the size or scope of the Agency Defendants as long as (a) the Agency Defendant provides a reasoned explanation for such action, and (b) the action will not prevent the Agency Defendant from fulfilling any of their statutory obligations.

4. The Agency Defendants shall take all necessary steps to restore all IMLS, MBDA, and FMCS employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of Executive Order 14238, to their status before March 14, 2025. Nothing in this Order precludes the Agency Defendants from making personnel decisions that are not related to or motivated by Executive Order 14238.

5. The Agency Defendants shall not further pause, cancel, or otherwise terminate IMLS or MBDA grants or contracts or fail to disburse funds to

recipients in plaintiff States according to such grants or contracts for reasons other than the grantees or contractors' non-compliances with applicable grant or contract terms.

6. The Agency Defendants shall take immediate steps to resume the processing, disbursement, and payment of already-awarded funding, and to release awarded funds previously withheld or rendered inaccessible due to or in reliance on Section 2 of the Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy" with respect to recipients in plaintiff States.

7. The Agency Defendants shall, within 7 days of the date of this Order, file with the Court a status report that confirms Defendants' full compliance with this Order, or to the extent that full compliance was not practicable in that 7 day period, why full compliance is not practicable, and that details the actions Defendants have taken to comply with the Order.

IT IS SO ORDERED.

John J. McConnell, Jr.
Chief Judge
United States District Court

May 13, 2025