# 25-1477

# United States Court of Appeals for the First Circuit

STATE OF RHODE ISLAND, STATE OF NEW YORK, STATE OF HAWAII,
STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT,
STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF MICHIGAN,
STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY,
STATE OF NEW MEXICO, STATE OF OREGON, STATE OF VERMONT,
STATE OF WASHINGTON, STATE OF WISCONSIN, STATE OF ARIZONA,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in the official capacity as President of the United States,

*Defendants-Appellants,*

*(Caption continues inside front cover)*

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF FOR PLAINTIFFS-APPELLEES

PETER F. NERONHA
 *Attorney General of Rhode Island*
150 South Main Street
Providence, Rhode Island 02903

ANNE E. LOPEZ
 *Attorney General of Hawai'i*
425 Queen Street
Honolulu, Hawai'i 96813

LETITIA JAMES
 *Attorney General of New York*
28 Liberty Street
New York, New York 10005
(212) 416-6184

*(Additional counsel listed on signature pages.)*    Dated: August 27, 2025

*(Caption continues from front cover.)*

INSTITUTE OF MUSEUM AND LIBRARY SERVICES, KEITH E. SONDERLING, in the official capacity as Acting Director of the Institute of Museum and Library Services, MINORITY BUSINESS DEVELOPMENT AGENCY, MADIHA D. LATIF, in the official capacity as Deputy Under Secretary of Commerce for Minority Business Development, FEDERAL MEDIATION AND CONCILIATION SERVICE, GREGORY GOLDSTEIN, in the official capacity as Acting Director of the Federal Mediation and Conciliation Service, HOWARD LUTNICK, in the official capacity as Secretary of Commerce, RUSSELL THURLOW VOUGHT, in the official capacity as Director of the Office of Management and Budget, US OFFICE OF MANAGEMENT AND BUDGET,

*Defendants-Appellants*,

US INTERAGENCY COUNCIL ON HOMELESSNESS, KENNETH JACKSON, in the official capacity as Acting Executive Director of the US Interagency Council of Homelessness,

*Defendants*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................iii

INTRODUCTION ............................................................................... 1

ISSUES PRESENTED ......................................................................... 5

STATEMENT OF THE CASE ............................................................... 5

    A.   Congress Establishes the Three Agencies at Issue ................. 5

    B.   The Executive Order Directing the Dismantling of the Three Agencies and Its Implementation ................................. 9

    C.   This Lawsuit ................................................................. 12

STANDARD OF REVIEW.................................................................. 15

SUMMARY OF ARGUMENT ............................................................. 16

ARGUMENT ................................................................................... 19

I.     THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER PLAINTIFFS' CLAIMS. ................................................... 19

    A.   Plaintiffs Have Demonstrated Article III Standing............... 19

    B.   The Tucker Act Does Not Divest the District Court of Jurisdiction. ............................................................... 24

    C.   The Civil Service Reform Act Does Not Bar the District Court from Ordering Reinstatement of Agency Personnel................................................................... 30

**Page**

II.    THE DISTRICT COURT CORRECTLY FOUND THAT
PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
CLAIMS. ................................................................................ 36

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their
Administrative Procedure Act Claims.................................. 36

        1.    Plaintiffs challenge final agency action. ...................... 37

        2.    Plaintiffs' claims are not subject to review as claims
seeking to compel unlawfully withheld or
unreasonably delayed actions. ...................................... 42

        3.    Plaintiffs do not challenge action committed to
agency discretion by law............................................... 44

    B.    Plaintiffs Are Likely to Succeed on the Merits of Their
Constitutional Claims........................................................... 47

III.    THE DISTRICT COURT PROPERLY EXERCISED ITS
DISCRETION IN BALANCING THE EQUITIES AND CRAFTING A
TAILORED REMEDY. ............................................................. 52

    A.    Plaintiffs Demonstrated Irreparable Harm. ........................ 52

    B.    The Balance of Equities and Public Interest Weigh
Strongly in Plaintiffs' Favor. ............................................... 54

    C.    The Preliminary Injunction Is Appropriately Tailored.......... 58

CONCLUSION ........................................................................ 64

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Albrecht v. Committee on Emp. Benefits of Fed. Rsrv. Emp.*
  *Benefits Sys.,*
  357 F.3d 62 (D.C. Cir. 2004) ................................................................ 29

*American Fed'n of Gov't Emps. v. Trump,*
  139 F.4th 1020 (9th Cir. 2025) .............................................. 32, 35, 49

*American Fed'n of Gov't Emps. v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ........................................................... 34

*American Fed'n of Gov't Emps. v. Trump,*
  No. 25-cv-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025)............ 51

*Axon Enter., Inc. v. Federal Trade Comm'n,*
  598 U.S. 175 (2023)........................................................................ 30-33

*Baker v. Carr,*
  369 U.S. 186 (1962)............................................................................. 62

*Bell v. Hood,*
  327 U.S. 678 (1946)............................................................................. 49

*Bennett v. Spear,*
  520 U.S. 154 (1997)............................................................................. 38

*Biden v. Nebraska,*
  600 U.S. 477 (2023).................................................................... 19, 64

*Boaz Hous. Auth. v. United States,*
  994 F.3d 1359 (Fed. Cir. 2021) .......................................................... 29

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988).................................................................... 24, 28

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.,*
  622 F.3d 36 (1st Cir. 2010) ................................................................ 59

iii

**Cases**                                                                  **Page(s)**

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ................................................................ 27

*Carr v. Saul*,
593 U.S. 83 (2021) .............................................................................. 32

*Chamber of Com. of the U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................ 50-51

*Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*,
801 F.2d 430 (D.C. Cir. 1986) ............................................................ 39

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................ 19

*Clinton v. City of N.Y.*,
524 U.S. 417 (1998) ............................................................................ 47

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) .......................................................... 29

*Comcast of Me./N.H., Inc. v. Mills*,
988 F.3d 607 (1st Cir. 2021) .............................................................. 15

*Community Action of Laramie Cnty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) ............................................................ 45

*Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
137 F.4th 932 (9th Cir. 2025) ...................................................... 32, 56

*Connectu LLC v. Zuckerberg*,
522 F.3d 82 (1st Cir. 2008) ................................................................ 42

*Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ............................................................................ 37

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) .......................................................... 27

**Cases**                  **Page(s)**

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ................................................................ 23

*Dalton v. Specter*,
 511 U.S. 462 (1994) ............................................................ 49-50

*Department of Com. v. New York*,
 588 U.S. 752 (2019) ........................................................... 44-45

*Department of Educ. v. California*,
 145 S. Ct. 966 (2025) ............................................................ 28

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
 591 U.S. 1 (2020) .................................................................. 36

*Does 1-6 v. Mills*,
 16 F.4th 20 (1st Cir. 2021) ...................................................... 54

*Elgin v. Department of Treasury*,
 567 U.S. 1 (2012) .................................................................. 33

*Emigrant Residential, LLC v. Pinti*,
 134 F.4th 626 (1st Cir. 2025) .............................................. 42, 62

*FCC v. Prometheus Radio Project*,
 592 U.S. 414 (2021) ............................................................... 36

*Flyers Rts. Educ. Fund, Inc. v. Federal Aviation Admin.*,
 864 F.3d 738 (D.C. Cir. 2017) .................................................. 53

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010) ......................................................... 30, 49

*Friedman v. Federal Aviation Admin.*,
 841 F.3d 537 (D.C. Cir. 2016) .................................................. 37

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
 460 F.3d 13 (D.C. Cir. 2006) ................................................... 40

**Cases**                                                      **Page(s)**

*Gately v. Massachusetts,*
  2 F.3d 1221 (1st Cir. 1993) ................................................................. 64

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
  560 F.3d 495 (D.C. Cir. 2009) ........................................................... 33

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ............................................................................ 62

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ............................................................................ 46

*Hispanic Affs. Project v. Acosta,*
  901 F.3d 378 (D.C. Cir. 2018) ........................................................... 41

*In re Aiken Cnty.,*
  725 F.3d 255 (D.C. Cir. 2013) ........................................................... 48

*In re Core Commc'ns, Inc.,*
  531 F.3d 849 (D.C. Cir. 2008) ........................................................... 53

*In re Sawyer,*
  124 U.S. 200 (1888) ............................................................................ 62

*K-Mart Corp. v. Oriental Plaza, Inc.,*
  875 F.2d 907 (1st Cir. 1989) .............................................................. 52

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................... 54

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ............................................................................ 45

*Little Sisters of the Poor Saints Peter & Paul Home v.
  Pennsylvania,*
  591 U.S. 657 (2020) ............................................................................ 55

*Lubow v. U.S. Dep't of State,*
  783 F.3d 877 (D.C. Cir. 2015) ........................................................... 41

**Cases**                                                                    **Page(s)**

*Lucas v. American Fed'n of Gov't Emps. (AFGE),*
  No. 23-7051, 2025 WL 2371197 (D.C. Cir. Aug. 15, 2025) ............... 31

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) ....................................................... 40-41

*Maryland v. U.S. Dep't of Agric.,*
  No. 25-1338, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ................... 34

*Match-E-Be-Nash-She-Wish Band of Pottawatomi*
  *Indians v. Patchak,*
  567 U.S. 209 (2012) ......................................................... 24

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ............................................. 27

*Mercado-Salinas v. Bart Enters. Int'l, Ltd.,*
  671 F.3d 12 (1st Cir. 2011) ............................................... 15

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) ............................................. 45

*Missouri v. Jenkins,*
  515 U.S. 70 (1995) ......................................................... 23

*N.A.A.C.P. v. Secretary of Hous. & Urb. Dev.,*
  817 F.2d 149 (1st Cir. 1987) .............................................. 44

*National Insts. of Health v. American Pub. Health Ass'n,*
  No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) ................... 26-27

*National Treasury Emps. Union v. Vought,*
  No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ........... 34, 39

*New York v. Trump,*
  133 F.4th 51 (1st Cir. 2025) ........................................... 41, 56

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................ 57

**Cases**                                                                     **Page(s)**

*Norton v. South Utah Wilderness All.*,
542 U.S. 55 (2004) ................................................................... 40, 42-43

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ............................................................ 33

*Organization for Competitive Mkts. v. U.S. Dep't of Agric.*,
912 F.3d 455 (8th Cir. 2018) ............................................................. 43

*Osediacz v. City of Cranston*,
414 F.3d 136 (1st Cir. 2005) ............................................................. 22

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................ 22

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) ................................................................. 58

*Safari Club Int'l v. Jewell*,
842 F.3d 1280 (D.C. Cir. 2016) ......................................................... 39

*Sampson v. Murray*,
415 U.S. 61 (1974) ......................................................................... 62-63

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) ........................................................................... 32

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) ........................................................................... 22

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................................................... 47

*Somerville Pub. Schs. v. McMahon*,
139 F.4th 63 (1st Cir. 2025) .................................................. 34-35, 57

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985) ......................................................... 29

**Cases**                                                            **Page(s)**

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016)........................................................................ 22

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)........................................................................ 19

*Sustainability Inst. v. Trump,*
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .................. 29

*Thunder Basin Coal Co. v. Reich,*
510 U.S. 200 (1994)........................................................................ 31

*Trafalgar Cap. Assocs., Inc. v. Cuomo,*
159 F.3d 21 (1st Cir. 1998) ............................................................ 39

*Trump v. CASA, Inc.,*
145 S. Ct. 2540 (2025).................................................................61-62

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
578 U.S. 590 (2016)........................................................................ 39

*Union of Concerned Scientists v. Wheeler,*
954 F.3d 11 (1st Cir. 2020) .......................................................44, 46

*United States v. Fausto,*
484 U.S. 439 (1988)........................................................................ 33

*United States v. Morrison,*
529 U.S. 598 (2000)........................................................................ 47

*United States v. Tohono O'Odham Nation,*
563 U.S. 307 (2011)........................................................................ 28

*USP Holdings, Inc. v. United States,*
36 F.4th 1359 (Fed. Cir. 2022)....................................................... 50

*Vaqueria Tres Monjitas, Inc. v. Irizarry,*
587 F.3d 464 (1st Cir. 2009) .......................................................... 58

**Cases**                                                                 **Page(s)**

*Vermont Yankee Nuclear Power Corp. v. Natural Res.*
    *Def. Council, Inc.,*
    435 U.S. 519 (1978) .............................................................. 46

*Vietnam Veterans of Am. v. Central Intel. Agency,*
    811 F.3d 1068 (9th Cir. 2016) ..................................... 42, 44

*We the People PAC v. Bellows,*
    40 F.4th 1 (1st Cir. 2022) ................................................... 52

*Whitman v. American Trucking Ass'ns,*
    531 U.S. 457 (2001) ............................................................ 37

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................ 47

**Constitutions**

U.S. Const.
    art. I, § 1 ............................................................................ 47
    art. II, § 1 ........................................................................... 47
    art. II, § 3 ........................................................................... 47

**Federal Statutes**

Full-Year Continuing Appropriations and Extensions Act 2025,
    Pub. L. No. 119-4, 139 Stat. 9 (2025) ............................ 8, 48

Labor Management Relations Act, 1947, Pub. L. No. 80-101,
    61 Stat. 136 ....................................................................... 48

Minority Business Development Act of 2021, Pub. L. No. 117-58,
    135 Stat. 1445 ................................................................... 48

Museum and Library Services Act of 1996, Pub. L. No. 104-208,
    110 Stat. 3009 ................................................................... 48

## Federal Statutes                                                        Page(s)

5 U.S.C.

§ 701 ................................................................................. 44
§ 702 ................................................................................. 24
§ 704 ............................................................................ 24, 37
§ 706 ............................................................................ 28, 36

15 U.S.C.

§ 9502 ........................................................................... 7, 11
§ 9513 ................................................................................. 7
§ 9522 ................................................................................. 6
§ 9523 ................................................................................. 6
§ 9524 ................................................................................. 6

20 U.S.C.

§ 9108 ................................................................................. 6
§§ 9121-9165 ..................................................................... 6
§ 9133 ................................................................................. 6
§ 9134 ................................................................................. 6
§ 9161 ................................................................................. 6
§ 9162 ................................................................................. 6
§ 9165 ................................................................................. 6
§§ 9171-9176 ..................................................................... 6

28 U.S.C. § 1491 ................................................................... 25

29 U.S.C. § 173 ....................................................................... 7

## Federal Regulation

Exec. Order No. 14,238, Continuing the Reduction of the
   Federal Bureaucracy (Mar. 14, 2025), 90 Fed. Reg. 13043 ................. 9

## Miscellaneous Authorities

Paul J. Larkin, Jr. & John-Michael Seibler, *The President's
   Reorganization Authority* (Heritage Found. Legal Mem. No.
   210) (July 12, 2017) ........................................................... 49

# INTRODUCTION

In March 2025, President Trump issued an executive order directing numerous congressionally created and funded agencies, including the Institute of Museum and Library Services (IMLS), the Minority Business and Development Agency (MBDA), and the Federal Mediation and Conciliation Service (FMCS), to eliminate all functions not required by statute and to reduce their statutorily required functions to the minimum required by law. Defendants implemented that Executive Order by stripping the agencies to the bone, eliminating nearly all staff and leaving the remaining personnel incapable of fulfilling the agencies' statutorily mandated functions.[1]

---

[1] Defendants-appellants are IMLS, MBDA, FMCS, the Office of Management and Budget (OMB), Keith E. Sonderling, in his official capacity as Acting Director of IMLS, Madiha D. Latif, in her official capacity as Deputy Under Secretary of Commerce for Minority Business Development, Howard Lutnick, in his official capacity as Secretary of Commerce, Gregory Goldstein, in his official capacity as Acting Director of FMCS, Russell T. Vought, in his official capacity as Director of OMB, and Donald J. Trump, in his official capacity as President of the United States.

Plaintiffs[2] filed this suit to enjoin defendants' lawless actions and to preserve the States' access to critical funds and services provided by the three agencies at issue. Following briefing and argument, the U.S. District Court for the District of Rhode Island (McConnell, J.) granted plaintiffs' motion for a preliminary injunction specifically tailored to undo defendants' unlawful actions that harmed plaintiffs and to prevent defendants from attempting to unlawfully implement the executive order at the agencies again during the pendency of this case. This Court should affirm.

As an initial matter, defendants make no attempt to demonstrate that the challenged actions were consistent with the statutes governing the operations of the three agencies, and offer no evidence showing that defendants engaged in any reasoning prior to taking the challenged actions, much less reasoning that satisfies the Administrative Procedure Act (APA). And while defendants quibble with whether plaintiffs have

---

[2] Plaintiffs-appellees are the States of Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, the People of the State of Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin.

cognizable constitutional causes of action, they offer no other defense as to the constitutionality of their actions.

Instead, defendants press a series of threshold arguments designed to shield their plainly illegal actions from judicial scrutiny. Several of these arguments were not raised below and so are waived. In any event, the district court correctly rejected defendants' threshold objections, and defendants identify no error in the court's thorough, well-reasoned opinion.

First, the district court properly exercised jurisdiction over plaintiffs' claims. The unrefuted factual record demonstrates that plaintiffs faced actual and imminent injuries that are traceable to defendants' actions and redressable by judicial relief, thus readily satisfying the requirements for Article III standing. Moreover, defendants are mistaken in their efforts to shoehorn plaintiffs' claims into another forum. Plaintiffs' claims about federal funds are not subject to the Tucker Act, 28 U.S.C. § 1491, and thereby relegated to the Court of Federal Claims, because the claims do not arise from a contract dispute. Likewise, plaintiffs' claims are not subject to the review provisions in the Civil Service Reform Act (CSRA), 5 U.S.C. § 1101 et seq., because they call upon no relevant

expertise under the CSRA, and, if relegated there, would receive no meaningful judicial review.

Second, the district court correctly found that plaintiffs are likely to succeed on the merits of their APA and constitutional claims. Defendants orchestrated a set of final agency actions in implementing across-the-board policies meant to cripple the three agencies in accordance with the President's directive and in contravention of congressional appropriations. Those actions are reviewable under the APA, and such review does not interfere with the discretion committed to the agencies by law. Moreover, on the constitutional claims, defendants do not argue on appeal that their actions are consistent with the separation of powers doctrine and the Take Care Clause. Their only argument—that no constitutional cause of action is available to plaintiffs—misconstrues the governing law as well as the authority they cite.

Finally, the district court properly exercised its discretion in concluding that the equities weighed strongly in favor of a preliminary injunction and in crafting relief that remedied plaintiffs' injuries while preserving operational flexibility for defendants.

## ISSUES PRESENTED

1.     Whether the district court properly exercised jurisdiction over plaintiffs' claims, which seek equitable relief to redress injuries caused to plaintiffs by defendants' actions dismantling IMLS, MBDA, and FMCS.

2.     Whether the district court correctly found that plaintiffs are likely to succeed on the merits of their APA and constitutional claims, where plaintiffs challenge final and discrete agency actions that unlawfully usurped Congress's powers and flouted multiple statutory mandates.

3.     Whether the district court abused its broad discretion in balancing the equities and crafting preliminary injunctive relief tailored to remediate the irreparable harms that plaintiffs demonstrated.

## STATEMENT OF THE CASE

### A.     Congress Establishes the Three Agencies at Issue

This case involves three federal agencies created by Congress, each of which serves critical and statutorily mandated functions.

*IMLS*. IMLS is the primary federal agency responsible for supporting the country's museums and libraries through grantmaking, research, and policy development. (Appendix (A.) 68.) The agency is responsible for (among other things) supporting museums and libraries by disbursing

5

and expending appropriated funds and providing other forms of assistance. 20 U.S.C. §§ 9121-9165 (libraries), 9171-9176 (museums).

IMLS's largest funding program—and the largest source of federal funding for library services—is the "Grants to States Program." (A. 69.) *See* 20 U.S.C. § 9133(a). In administering that program, IMLS evaluates dozens of plans each year, *see* 20 U.S.C. § 9134(e)(1), distributes funding in accordance with the plans, *id.* § 9133(a), and monitors States' expenditures, *see id.* § 9133(c). In addition, IMLS is required to administer a series of competitive grant programs each year. *See, e.g.*, *id.* §§ 9161, 9162, 9165. (A. 69-70.) Congress has also directed IMLS to engage in regular research and data collection to "extend and improve the Nation's museum, library, and information services." 20 U.S.C. § 9108.

*MBDA*. MBDA is a federal agency responsible for facilitating the growth of minority businesses through various forms of assistance. *See* 15 U.S.C. §§ 9522, 9523(a)(1)-(3). (*See* A. 80-81.) Congress has instructed that the MBDA "shall" provide financial awards and technical assistance to MBDA business centers, 15 U.S.C. § 9523(a)(3), and laid out criteria the agency must use in awarding funds, *id.* § 9524(d). MBDA is required to establish a "regional office . . . for each of the regions of the United

6

States," *id.* § 9502(e)(2)(A), with statutorily enumerated duties for each of those offices, *id.* § 9502(e)(2)(B).

Congress also requires MBDA to collect and analyze data relating to minority business enterprises, *id.* § 9513(a)(1)(A), to conduct economic research, studies, and surveys, *id.* § 9513(a)(1)(B)(i), and to provide outreach, educational services, and technical assistance in at least five languages, *id.* § 9513(a)(1)(C).

*FMCS.* Established in 1947, FMCS is the federal agency responsible for "assisting parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation." (A. 89.) *See* 29 U.S.C. § 173(a). FMCS is required by statute to perform various functions promoting the peaceful resolution of labor disputes, such as providing mediation and conciliation services, 29 U.S.C. § 173(a)-(c), conducting grievance mediations in certain cases involving collective-bargaining agreements, *id.* § 173(d), and supporting "the establishment . . . of joint labor management activities," *id.* § 173(e). (A. 89-90.) Still more, the agency appoints arbitration panels and arbitrators; it conducts skills development and conflict resolution training; and it verifies signed union authorization cards when employers agree to use that method to

7

recognize a union. (A. 90.) These services are provided to parties at no cost (for mediation, educational, and training services) or at below-market cost (for arbitration panels and arbitrators). (A. 89-90.)

FMCS's services are sought after. In fiscal year 2024, the agency mediated 2,318 collective-bargaining negotiations, 1,362 high-impact grievance mediations, and 792 alternative-dispute resolution cases. It conducted 1,477 single or multi-day training and intervention panels, provided 10,004 arbitration panels, and appointed 4,350 arbitrators. (A. 90.)

For the 2025 fiscal year, Congress appropriated $294.8 million to IMLS, $68.25 million to MBDA, and $53.7 million to FMCS. *See* Full-Year Continuing Appropriations and Extensions Act 2025 § 1101(a)(2), (8), Pub. L. No. 119-4, 139 Stat. 9, 10-11 (2025).

**B.    The Executive Order Directing the Dismantling of the Three Agencies and Its Implementation**

On March 14, 2025, the President issued an executive order that directed seven federal agencies, including IMLS, MBDA, and FMCS, to dramatically curtail their operations.[3] *See* Exec. Order No. 14,238, Continuing the Reduction of the Federal Bureaucracy § 2(a) (Mar. 14, 2025), 90 Fed. Reg. 13043 ("*Reduction* EO"). The agencies were ordered to eliminate all "non-statutory components and functions . . . to the maximum extent consistent with applicable law," and to "reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* The order further instructed OMB to deny the agencies authorization to spend federal funds for any functions beyond the minimum required by statute. *See id.* § 2(c). All of the subject agencies were required to report within one week that they had achieved "full compliance" with the order. *Id.* § 2(b).

---

[3] The other agencies are the United States Interagency Council on Homelessness (USICH), the Community Development Financial Institutions Fund, the United States Agency for Global Media, and the Woodrow Wilson International Center for Scholars in the Smithsonian Institution. On June 12, 2025, plaintiffs filed an amended complaint adding USICH as an additional defendant in this case, but the preliminary injunction at issue on this appeal does not apply to USICH. (*See* A. 1121-1199.)

Defendants implemented the *Reduction* EO through an indiscriminate reduction in force and termination of grants. The agencies stated openly that they were taking these actions to implement the *Reduction* EO. In IMLS, for example, a staff of seventy-seven employees was reduced to "a skeleton crew" of twelve. (A. 71, 73.) The agency told employees that the agency would be "stripped down to the studs" (A. 810 (quotation marks omitted)), and notified state librarians that "all [IMLS] staff are going to be placed on administrative leave" (A. 115). In just one day, IMLS terminated over 1,000 grants (A. 929-930)—with each termination authorized "in alignment with" the *Reduction* EO. (*See, e.g.*, A. 202-203, 705-706, 948-949.)

MBDA placed nearly all of its staff on administrative leave and notified employees that it was "abolishing all positions within MBDA" as part of the agency's "plan to eliminate [its] non-statutory components and functions." (A. 931-932 (quotation marks omitted).) MBDA circulated a memorandum announcing a Reduction in Force (RIF) "[i]n accordance with" the *Reduction* EO. (A. 117.) Left virtually without staff, MBDA (i) terminated all preexisting grant awards, (ii) ceased posting new grant solicitations, (iii) stopped collecting data or engaging in required commu-

10

nications with MBDA centers, and (iv) could not staff a regional office for each region of the country as required by statute. (*See* A. 816-818.) *See also* 15 U.S.C. § 9502(e)(2)(A).

Similarly, FMCS placed nearly all of its employees on administrative leave and announced that it would cease "[a]ll Public Sector work" as of April 18, 2025. (A. 91-92, 119.) The memorandum announcing the end of FMCS's public sector services specifically cited the *Reduction* EO. (*See* A. 119.) FMCS also initiated a RIF, "aimed at all competitive areas and positions of the organization," "in accordance with" the *Reduction* EO. (A. 822-823.) These actions resulted in the immediate cessation of all FMCS assistance in the mediation of labor management disputes in the public sector and the immediate cessation of all FMCS assistance in grievance mediation in the public sector. (A. 91.) As one employee explained, "[n]early all" of the services FMCS had previously provided "are no longer going to be provided." (A. 92 (quotation marks omitted).) Some unions were notified that "FMCS is basically being shut down." (A. 806.)

## C.    This Lawsuit

In April 2025, plaintiff States filed this action and moved for a preliminary injunction to enjoin defendants' implementation of the *Reduction* EO.[4]

In support of the motion, plaintiffs submitted dozens of declarations explaining the steps that defendants have taken to dismantle IMLS, MBDA, and FMCS, and cataloguing how States have been or will be harmed in consequence. Defendants' actions at the three agencies triggered "chaos at the local level" (A. 135), including, for example, the following harms.

- The drastic cuts at IMLS resulted in the termination of grants to numerous States (A. 73; *see* A. 182, 200, 697); disrupted state library programs (A. 181-183); jeopardized plaintiffs' abilities to hire and pay staff (A. 419-420, 618; *see* A. 1042); and delayed important state projects (A. 199). States also lost access to IMLS's research and data collection services (A. 78-79, 199), as well as the agency's industrywide guidance (A. 330, 332).

- MBDA terminated grants to States, which inflicted harm such as displacing students and staff (A. 343) and halting essential programs (A. 349-350). States also lost access to critical services furnished by MBDA, such as technical

_____

[4] Plaintiffs initially moved for a temporary restraining order, which was converted to a preliminary injunction. (*See* ECF No. 31.)

assistance (A. 336-337, 347-348) and analytical tools (*see* A. 86).

- Eliminating FMCS's public sector services harmed plaintiff States, including by preventing States from using FMCS to resolve ongoing labor disputes (A. 606); making future work stoppages in the States more likely (A. 996); and frustrating State laws and collective bargaining agreements that require use of FMCS services (*see* A. 803).

Defendants disputed none of these harms and submitted no evidence in response.

Following briefing and oral argument, the district court concluded in a thorough forty-nine-page decision that plaintiffs were entitled to a preliminary injunction. (*See* A. 1-49.) The district court found that plaintiffs had standing (A. 11-12), that the claims were ripe for judicial review (A. 12-14), and that the court had jurisdiction over plaintiffs' claims, including where those claims implicated grant disbursements (A. 14-18) and mass reductions in force (A. 18-21). On the merits, the district court ruled that defendants' actions were reviewable under the APA (A. 21-26), were likely arbitrary and capricious (A. 26-31), contrary to law (A. 31-39), and unconstitutional (A. 39-40). Further, the district court held that plaintiffs established irreparable harm (A. 41-45) and

that the balance of the equities and public interest weighed "strongly in favor of equitable relief" (A. 46-47).

After inviting the parties to submit proposed orders and adopting all of the revisions proposed by each side, the district court entered a preliminary injunction order on May 6, 2025. The order directed defendants to, among other things, (i) reverse actions taken to implement the *Reduction* EO with respect to the three agencies; (ii) restore employees and personal service contractors who were involuntarily placed on leave or terminated due to the *Reduction* EO's implementation; and (iii) resume processing, disbursing, and paying funds to recipients in plaintiff States that were stalled or terminated because of the *Reduction* EO. (A. 51-53.)

Pursuant to language specifically requested by defendants, the order does not apply to "personnel decisions that are not related to or motivated by" the *Reduction* EO, and expressly permits defendants to "tak[e] actions that would improve Agency efficiency or reduce the size or scope of the Agenc[ies]," so long as they "provide[] a reasoned explanation for such action" and such "action will not prevent the Agenc[ies] . . . from fulfilling any of their statutory obligations." (A. 52-53.) By its terms, the

14

order does not affect funding actions based on "non-compliances with applicable grant or contract terms."[5] (A. 52-53.)

## STANDARD OF REVIEW

This Court "will uphold a decision to grant a preliminary injunction unless it constitutes an abuse of discretion." *Comcast of Me./N.H., Inc. v. Mills*, 988 F.3d 607, 611 (1st Cir. 2021). Under this "deferential" standard, "a preliminary injunction will stand unless the district court mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the interim relief." *Mercado-Salinas v. Bart Enters. Int'l, Ltd.*, 671 F.3d 12, 19-20 (1st Cir. 2011) (quotation marks omitted).

---

[5] Following the district court's order, plaintiffs amended their complaint and moved for summary judgment. Briefing on cross-motions for summary judgment is scheduled to conclude on October 10.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's decision to grant a preliminary injunction to plaintiff States.

I. The district court properly exercised jurisdiction over this action. The undisputed record evidence establishes plaintiffs' Article III standing because plaintiffs receive critical funds and services directly from the agencies, and defendants' actions have resulted in many actual and imminent injuries to plaintiffs. Defendants identify no error in the district court's factual findings.

Similarly, the district court correctly found that the Tucker Act does not divest the district court of jurisdiction to hear plaintiffs' claims because plaintiffs' claims do not arise from a contract dispute. The legal rights on which plaintiffs base their claims stem from the Constitution and statutory law, not grant agreements or any other contract with the federal government, and the Court of Federal Claims is incapable of affording plaintiffs the equitable relief they seek. Likewise, the Civil Service Reform Act does not preclude the district court from ordering the reinstatement of agency personnel to remedy plaintiffs' harms.

II. The district court correctly held that plaintiffs are likely to succeed on the merits of their claims.

As to the APA claims, the district court found that defendants' actions were arbitrary and capricious and contrary to law, and defendants offer no argument to the contrary on appeal. Contrary to defendants' arguments, the district court properly found that plaintiffs' claims are reviewable under the APA because plaintiffs challenge final and discrete agency actions, and none of the challenged actions are committed to agency discretion by law.

The district court was similarly correct in finding that plaintiffs are likely to succeed on their claims that defendants unconstitutionally usurped Congress's powers and failed to faithfully execute the laws Congress enacted. Defendants insist that no constitutional cause of action arises from the Executive's violation of a statute but that argument misunderstands plaintiffs' claims. Plaintiffs do not argue that defendants exceeded the authority delegated to the agencies by statute, but rather that defendants acted without any authority whatsoever.

III. The district court properly exercised its discretion in balancing the equitable factors and crafting injunctive relief.

17

Plaintiffs demonstrated irreparable harm through hundreds of pages of declarations detailing defendants' efforts to incapacitate the agencies and the consequent harms plaintiffs experienced and would continue to experience absent injunctive relief. Defendants submitted no evidence to rebut plaintiffs' showing. For similar reasons, the balance of the equities and public interest weigh strongly in favor of injunctive relief. There is no public interest in dissolving the preliminary injunction so that defendants can resume unlawful actions they do not even defend on the merits. For plaintiffs, on the other hand, vacating the preliminary injunction would perpetuate the irreparable harm that the injunction is designed to prevent.

The district court also acted well within its discretion in crafting the preliminary injunction order to remediate the specific forms of irreparable harm plaintiffs demonstrated. Contrary to defendants' arguments, the order is appropriate in scope and leaves ample room for defendants to exercise lawful discretion in managing the agencies.

## ARGUMENT

### I.   THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION OVER PLAINTIFFS' CLAIMS.

### A.   Plaintiffs Have Demonstrated Article III Standing.

A State has standing to challenge a federal official's or agency's conduct if the State has suffered "a concrete and imminent harm to a legally protected interest . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). The unrebutted factual record assembled by plaintiffs identifies numerous actual and imminent injuries traceable to defendants' actions and redressable by judicial relief. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

At the outset, because defendants do not challenge the preliminary injunction as to the Grants to States program (Br. for Defs.-Appellants (Br.) at 25), defendants effectively concede that plaintiffs have standing to challenge the dismantling of IMLS to the extent it affects the implementation of that program. Having not challenged this aspect of standing, defendants do not explain why plaintiffs lack standing to challenge the dismantling of any of IMLS's other functions. At most, such questions

19

would go to the appropriate scope of injunctive relief. And in fact, the undisputed record demonstrated that defendants' implementation of the *Reduction* EO as to IMLS caused and threatened imminent harm to the States. For instance, it caused the Maine State Library to close its doors for two weeks (A. 987-988; *see* A. 1084) and threatened similar disruptions in other library systems across plaintiff States (*see, e.g.*, A. 130-131 (Arizona), 194-195 (Connecticut), 253 (Delaware)).

The record also showed that lost or delayed MBDA funding would have an "immediate" impact in plaintiff States. (A. 348.) Among other things, defendants' actions would result in diminished services to local businesses (A. 338), "the erasure of the support system" those businesses rely on (A. 349), and layoffs at MBDA-funded initiatives (A. 457). Cuts to MBDA funding threatened to displace students and staff in Hawaii (A. 343) and Arizona (A. 1018). And any loss of funding would prevent the Hawaiʻi MBDA Business Center from continuing to support clients' projects and force it to default on a contract with the Hawaiʻi YWCA to provide services to other small Hawaiʻi businesses. (A. 338.)

With respect to FMCS, defendants "d[id] not dispute that the agency has completely stopped their public sector services," which the

States depend on to avert labor disputes that would disrupt essential services such as healthcare, transportation, and child welfare. (A. 43.) The States cannot easily replace the loss of FMCS's services. (A. 43; *see* A. 359-360, 604-606, 803 (noting that forty-two states and the District of Columbia incorporate "specific provisions either allowing for or mandating the use of FMCS in labor-management relations").) And the absence of such services "set[s] the stage for ongoing and imminent harms." (A. 44; *see* A. 1055-1056.) In Rhode Island, for example, the abrupt loss of FMCS's mediation services "dramatically increased the risk of an imminent work stoppage—with life-and-death consequences—at the busiest medical center in the region," and indeed a strike came to fruition after the parties lost access to the federal mediator. (A. 996; *see also* A. 292 (noting FMCS's importance "to vital health care services for the people of Hawai'i").)

In the district court, the core of defendants' standing argument was that any equitable relief should be limited to the plaintiffs themselves. (A. 11-12, 1058-1059.) And so it was. (*See* A. 51-53.) Now on appeal, defendants raise a host of boilerplate assertions about Article III standing, none of which are applicable here. *See* Br. at 12-15. For example,

overwhelming record evidence disproves defendants' assertion (Br. at 12-14) that plaintiffs' injuries are "generalized," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974), "abstract," *Raines v. Byrd*, 521 U.S. 811, 829 (1997), or "divorced from any concrete harm," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Plaintiffs provided numerous examples of real-world harm created by defendants' actions, unlike in the cases defendants cite. *See Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005) (dismissing claim because the plaintiff's "only claim of injury" was that government policy "has a chilling effect on the speech of others"). Defendants do not dispute those factual findings. The record evidence also refutes defendants' claim (Br. at 14-15) that plaintiffs' injuries are not "fairly traceable" to the agency actions under challenge. In fact, the agencies eliminated operations with the express purpose of effectuating the *Reduction* EO. (*See, e.g.*, A. 117, 119, 202, 705.)

Nor can defendants credibly argue that redressing plaintiffs' injuries would intrude on government policymaking. *See* Br. at 14. As the district court made clear, "[n]othing in the Preliminary Injunction stops the Defendants from taking lawful steps to manage the three agencies

going forward." (A. 1116; *see* A. 52.) And the cases on which defendants rely for this proposition (Br. at 14) are readily distinguishable because plaintiffs do not claim an interest in federal expenditures based on their status as taxpayers, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 343-44 (2006), or seek systemic reforms like desegregating a school district, *see Missouri v. Jenkins*, 515 U.S. 70, 74 (1995). In other words, plaintiffs are not alleging that their injury derives from defendants' exercise of their duties in a particular way, such as the denial of an "individual grant[] and program[]" (Br. at 14). Rather, the States' injuries derive from the agencies' inability to function because they have been gutted beyond recognition, inflicting concrete harms on plaintiffs in numerous ways.

## B.  The Tucker Act Does Not Divest the District Court of Jurisdiction.

Where, as here, plaintiffs seek equitable relief enjoining final agency action, the APA provides for judicial review in federal district court. *See* 5 U.S.C. § 704; *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The APA waives federal sovereign immunity for suits that allege injury by agency action and seek "relief other than money damages." 5 U.S.C. § 702. This waiver of sovereign immunity does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* When another statute is alleged to forbid APA relief, the question becomes whether that other statute addresses "'the type of grievance which the plaintiff seeks to assert.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (quoting Letter of Assistant Att'y Gen. A. Scalia (May 10, 1976)). If the answer is no, "then the statute cannot prevent an APA suit." *Id.*

Defendants are wrong to assert (Br. at 25-30) that the Tucker Act, 28 U.S.C. § 1491, divests the federal district courts of jurisdiction to hear plaintiffs' claims to the extent they involve funding. As an initial matter, defendants do not challenge the preliminary injunction as to the Grants

to States program. (Br. at 25.) Any Tucker Act argument with respect to that portion of the preliminary injunction is, therefore, outside the scope of this appeal. The remainder of plaintiffs' arguments fail on the merits.

The Tucker Act grants the Court of Federal Claims (CFC) jurisdiction over claims "founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Here, the district court correctly held that plaintiffs' claims are not founded on any contract and therefore do not fall within the Tucker Act's ambit. (*See* A. 14-18.)

Defendants' grant terminations comprised only one facet of defendants' categorical decision to incapacitate the agencies. With respect to FMCS, for example, plaintiffs' harms did not stem from grant terminations at all but from eliminating agency programs and dismantling key agency functions that benefitted the States. (*See, e.g.*, A. 43-45, 683-684, 916-917.) Likewise, the harms from gutting MBDA manifested primarily in the agency's inability to perform its statutory functions, service existing MBDA centers, and issue new grant solicitations. (*See, e.g.*, A. 336-338, 342-343, 816-818.) And grantmaking aside, IMLS could no longer perform research and data collection as required by statute, depriving the States of these important resources. (*See* A. 79.)

Accordingly, the legal theories underpinning plaintiffs' claims about the illegality of defendants' actions are the same whether or not grant funding is at stake. That plaintiffs cite grant terminations as one component of harm does not transform this action into a contract dispute, especially because the grants were terminated wholesale to shutter the agencies in compliance with the *Reduction* EO—not because any contract-specific reasoning or language compelled the terminations.

Indeed, the Supreme Court recently confirmed that challenges to categorical agency policies belong in the district courts, not the CFC, even if the policies pertain to grants. In *National Institutes of Health v. American Public Health Ass'n*, the Court denied the government's request to stay a district court judgment insofar as it vacated internal agency guidance about grant funding. No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025). Five Justices agreed that challenges to "policies related to grants" are properly brought in federal district court under the APA. *See id.* at *2 (Barrett, J., concurring); *see also id.* at *3 (Roberts, C.J., concurring in part) (reasoning that the plaintiffs' challenge to grant-related policies fell "well within the scope of the District Court's jurisdiction under the Administrative Procedure Act"); *id.* at *10 (Jackson, J.,

concurring in part) (noting that five Justices agreed that "district courts may still exercise jurisdiction over—and vacate—grant-related policies that contravene federal law"). "That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." *Id.* at *2 (quoting 28 U.S.C. § 1491(a)(1)) (Barrett, J., concurring).

In addition, plaintiffs' claim is not "at its essence a contract claim." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025). The "longstanding test" for evaluating a claim's essential character under the Tucker Act hinges on (i) "the source of the rights upon which the plaintiff bases its claims" and (ii) "the type of relief sought." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quotation marks omitted).

Both prongs of this test demonstrate that plaintiffs' claim is not contractual. The legal rights on which plaintiffs base their claims stem from the Constitution and statutory law—rights that "exist[ed] prior to and apart from rights created under" grant agreements or any other contract with the federal government. *Id.* at 1107 (quotation marks

omitted). Whatever the grant terms stipulate, defendants do not assert that they can (or do) supplant the constitutional and statutory duties underpinning plaintiffs' claims. (A. 16.) In addition, the CFC is incapable of affording plaintiffs the equitable relief they seek. *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 313 (2011). Plaintiffs seek an order enjoining defendants' implementation of the *Reduction* EO, not an order compelling specific performance or compensation under the grant agreements. (A. 17.) Unlike the CFC, district courts have jurisdiction to grant equitable relief enforcing an agency's compliance with federal law. *See* 5 U.S.C. § 706. And district courts do not lose that jurisdiction just because an agency's compliance with federal law may result in "the payment of money." *Bowen*, 487 U.S. at 900.[6]

---

[6] Defendants respond by citing primarily to the Supreme Court's stay order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). But the district court properly found that *California* "does not render [the district court] an improper forum" for plaintiffs' APA claims. (A. 15.) *California*, which contains minimal discussion, does not purport to disturb well-settled law channeling only contract disputes to the CFC. (*See* A. 15-16.) Both before and after *California*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910).

The other cases defendants cite (Br. at 26-29) do not change the result either. In *Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025), the Fourth Circuit noted that the subject grants were "authorized by omnibus appropriations statutes," but the grants at issue here arise from specific statutes defining the agencies' responsibilities. (*See* A. 3-6.) Other cases defendants cite involve claims expressly framed as breaches of contract, *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1363 (Fed. Cir. 2021); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); or, equivalently, "turn[] entirely on the terms of a contract," *Albrecht v. Committee on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004) (emphasis omitted); *see Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) ("seek[ing] an order compelling the government to pay money owed in exchange for goods procured under an executory contract"). As explained above, plaintiffs' claims are substantively and legally distinct from contract claims.

29

**C.    The Civil Service Reform Act Does Not Bar the District Court from Ordering Reinstatement of Agency Personnel.**

Defendants are also wrong to argue (Br. at 36-39) that the CSRA precludes the district court from ordering the reinstatement of agency personnel to remedy plaintiffs' harms. "Provisions for agency review," like the CSRA, "do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue are of the type Congress intended to be reviewed within th[e] statutory structure." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted).

To guide that inquiry, courts ask three questions derived from the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994): (i) "could precluding district court jurisdiction 'foreclose all meaningful judicial review' of the claim?"; (ii) "is the claim 'wholly collateral to the statute's review provisions?'"; and (iii) "is the claim 'outside the agency's expertise'?" *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 185-86 (2023) (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212-13). If "the answer to all three questions is yes," the court presumes "that Congress does not intend to limit jurisdiction." *Id.* at 186 (quotation marks omitted). The "same conclusion might follow if the

factors point in different directions": "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

The district court correctly applied the *Thunder Basin* factors to conclude that plaintiffs' claims are not "the type Congress intended to be reviewed within [the CSRA's] statutory structure," *Axon Enter., Inc.*, 598 U.S. at 186 (quotation marks omitted). (*See* A. 18-21.) As the district court noted, accepting defendants' preclusion argument under the CSRA would mean foreclosing all meaningful judicial review over all claims about agency action that involve personnel decisions. (A. 19.) This factor "is all but dispositive here." *Lucas v. American Fed'n of Gov't Emps., (AFGE)*, No. 23-7051, 2025 WL 2371197, at *12 (D.C. Cir. Aug. 15, 2025). In addition, plaintiffs' claims are "'wholly collateral' to CSRA's review provisions because they invoke constitutional and administrative questions" about the agencies' authority (or lack thereof) to dismantle themselves. (A. 20-21.) *See Thunder Basin Coal Co.*, 510 U.S. at 212-13. For similar reasons, the resolution of plaintiffs' claims does not call for any expertise relevant to adjudging employee grievances under the CSRA.

31

(A. 20.) That is because plaintiffs' claims raise questions of constitutional and administrative law "relating not at all to 'considerations of agency policy.'" *Axon Enter., Inc.*, 598 U.S. at 188 (quoting *Free Enter. Fund*, 561 U.S. at 491); *see Carr v. Saul*, 593 U.S. 83, 92 (2021) ("[T]his Court has often observed that agency adjudications are generally ill suited to address structural constitutional challenges"); *American Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1032 (9th Cir. 2025).

Defendants do not dispute that their reading of the CSRA would all but eliminate judicial review of decisions to dismantle federal agencies through mass RIFs, but suggest that such an outcome counsels in favor of preclusion. *See* Br at 17. That position is "contrary to common sense," *Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025), and upends "the strong presumption in favor of judicial review," *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018) (quotation marks omitted). It would mean that States can *never* sue over an agency action that involves the termination of employees, no matter how directly or acutely the action injures the States.

Defendants also insist that judicial review is unavailable because the CSRA is a "comprehensive" review scheme. Br. at 36, 38. But calling

a statute "comprehensive" is not enough to oust district courts of jurisdiction under *Thunder Basin*. The dispositive question is "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Axon Enter., Inc.*, 598 U.S. at 185-86 (quotation marks omitted). As the district court explained, "[t]here is no dispute that the CSRA 'established a comprehensive system for *reviewing personnel action taken against federal employees*.'" (A. 18 (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988) (emphasis added)).) Plaintiffs did not ask the court to review the propriety of personnel actions, however. They alleged that defendants used mass terminations as a tool to dismantle the agencies. The CSRA therefore does not channel plaintiffs' claims to another tribunal.

Unlike the cases on which defendants rely, plaintiff States do not sue on behalf of federal employees to challenge individual employment decisions. *Cf. Fausto*, 484 U.S. at 440-41 (challenging individual employee's suspension), *Elgin v. Department of Treasury*, 567 U.S. 1, 6-7 (2012) (challenging individual employee terminations); *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 495 (D.C. Cir. 2009) (challenging employees' denial of promotions); *Nyunt v. Chairman, Broad. Bd. of*

33

*Governors*, 589 F.3d 445, 447 (D.C. Cir. 2009) (similar). Nor do plaintiffs'

claims implicate the nuances of "federal labor-management relations."

*American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 753 (D.C. Cir.

2019).

To be sure, panels of the D.C. Circuit and the Fourth Circuit have

recently relied on the CSRA to vacate or stay preliminary injunction

orders that reinstated terminated federal employees. *See National

Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *1

(D.C. Cir. Aug. 15, 2025); *Maryland v. U.S. Dep't of Agric.*, No. 25-1338,

2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025). But those orders lack

persuasive authority for at least four reasons. First, *National Treasury

Employees Union* is distinguishable because it held only that the CSRA

precluded district court jurisdiction as to claims brought by organizations

representing federal employees. *See* 2025 WL 2371608, at *3-5. Second,

this Court has distinguished *Maryland* on the basis that the summary

order in that case does not explain whether it was based on the CSRA or

Article III standing. *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 72

(1st Cir. 2025). Third, *Maryland* concerned only the termination of

probationary employees, not the widescale displacement of employees "at

34

all levels of an agency" as in this case. *See id.* And fourth, *Maryland* "involved at least one claim that was properly within the jurisdiction of the [Merit Systems Protection Board] or [Federal Labor Relations Authority]." *See American Fed'n of Gov't Emps.*, 139 F.4th at 1031. By contrast, here, plaintiffs are suing to redress their own injuries resulting from the agencies' incapacitation, which was carried out in part through mass terminations.

Defendants do not dispute that the mass terminations, if allowed to stand, would make it impossible for the agencies to carry out their statutorily mandated functions. Nor do defendants dispute the harm this would wreak on plaintiff States. It is both contrary to law and absurd to suggest that plaintiffs harmed by government action are powerless to challenge it simply because the government utilized employment actions as one means of carrying out illegal conduct. For all those reasons, this case is not subject to the CSRA.

II.   **THE DISTRICT COURT CORRECTLY FOUND THAT PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

A.    **Plaintiffs Are Likely to Succeed on the Merits of Their Administrative Procedure Act Claims.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quotation marks omitted). It directs that agency action be "set aside" if found to be arbitrary and capricious or "not in accordance with law." *See id.* (quotation marks omitted); 5 U.S.C. § 706(2)(A). To survive APA review, an agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

As the district court correctly found, plaintiffs are likely to succeed on their claims that defendants' implementation of the *Reduction* EO violated the APA because it was both contrary to law and arbitrary and capricious. (*See* A. 26-39.) Defendants offer no argument to the contrary on appeal.

Instead, defendants argue (Br. at 15-24, 30-34) that the challenged agency actions are unreviewable under the APA because they are (1) not "final" actions or "discrete" actions, (2) not "actions" at all, or in any

36

event, (3) are actions committed by law to the agencies' discretion. Each of these arguments is incorrect.

### 1. Plaintiffs challenge final agency action.

The APA permits judicial review of "final agency action." 5 U.S.C. § 704. The type of "action" reviewable under the statute includes "comprehensively every manner in which an agency may exercise its power." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 478 (2001). An agency action is "final" if it (1) marks the consummation of the agency's decisionmaking process and (2) determines rights or obligations or creates legal consequences. *Corner Post, Inc. v. Board of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (citing *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). This is necessarily a "pragmatic and flexible" inquiry. *Friedman v. Federal Aviation Admin.*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quotation marks omitted).

As the district court correctly held, the actions challenged by plaintiffs here represent final agency action subject to review under the APA. (*See* A. 22-26.) The unrefuted evidence established that defendants adopted policies to eliminate all non-statutorily mandated functions and to reduce to the minimum all statutorily required functions, just as the

*Reduction* EO directed. And they implemented those categorical policies by severely curtailing the agencies' operations, implementing mass reductions of staff, ending categories of services, and terminating grants en masse. As defendants agree, such decisions "necessarily follow from a series of internal (and potentially external) deliberations, communications, and analyses." Br. at 17. In other words, the policies necessarily marked the consummation of a decisionmaking process. (A. 25-26.)

At the end of this decisionmaking process, the agencies terminated grants (*e.g.*, A. 202-203, 706, 929-930), cut staff (*e.g.*, A. 810, 822-823), and ended services (*e.g.*, A. 119)—each specifically citing to the *Reduction* EO as all or part of its justification. There is no evidence—and defendants do not argue—that these decisions were in any way "tentative or interlocutory." *Bennett*, 520 U.S. at 178. Released MBDA employees, for example, were notified of a "final salary payment" date and their right to appeal the agency's decision. (A. 934-935.) And FMCS announced a "finalized and approved" list of "competitive areas" affected by its reduction in force. (A. 822.)

Though "operational decisions may be reversed" (Br. at 23), that possibility "is a common characteristic of agency action, and does not

make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *accord Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016). Defendants definitively conveyed the agencies' positions in implementing the *Reduction* EO, and thereby forfeited "the benefit of postponed judicial review." *Ciba-Geigy Corp. v. U.S. Env't Prot. Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986); *see Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) ("final agency action" requires "'definitive statement [] of [the agency's] position'" (quoting *Federal Trade Comm'n v. Standard Oil Co.*, 449 U.S. 232, 241 (1980)).

In addition, the challenged agency actions gave rise to a host of legal consequences. As the district court recounted, plaintiffs lost access to previously awarded funds and to services that the States relied on.[7] (A. 26.) It is undisputed that the challenged actions would leave the agencies unable to expend their statutory appropriations. Indeed, defen-

---

[7] These undisputed legal consequences contrast starkly with *National Treasury Employees Union*, for example, where an alleged agency action "triggered no appreciable legal consequences" because "[i]t neither terminated any employees nor cancelled any contracts." 2025 WL 2371608, at *11.

dants do not dispute that these legal consequences occurred. *See* Br. at 23 (acknowledging that "evidence at most would suggest that the agency has taken a series of independently final subsidiary actions").

Defendants nevertheless assert that the lawsuit is an impermissible "programmatic attack." *See* Br. at 15-19. But the cases cited by defendants disprove their argument. For example, unlike the plaintiff in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), plaintiffs here identify "a completed universe of particular [agency] orders and regulations," *id.* at 890, that violate the APA. Plaintiffs do not challenge "abstract" policy goals or strategy. *Cf. Norton v. South Utah Wilderness All.*, 542 U.S. 55, 66 (2004); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). Rather, plaintiffs challenge each agency's express adoption of a policy to eliminate *all* non-statutorily mandated functions and to reduce their remaining functions to the bare minimum, in conjunction with the concrete actions that flowed from those categorical policies. *Lujan* itself makes clear that if an agency applied "some particular measure across the board," then it could "of course be challenged under the APA." 497 U.S. at 890 n.2. And defendants cite no

authority holding that a collection of "independently final subsidiary actions" (Br. at 23) becomes unreviewable in aggregate.

Indeed, courts routinely recognize final agency action in a series of "broad, categorical" agency decisions that seek to accomplish an overarching directive. *See New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025); *see also Lubow v. U.S. Dep't of State*, 783 F.3d 877, 883 (D.C. Cir. 2015) (reviewing "four final agency actions" by multiple agencies); *Hispanic Affs. Project v. Acosta*, 901 F.3d 378, 387-88 (D.C. Cir. 2018) (rejecting government's argument under *Lujan* and allowing APA review of agency practice). That is because nothing in the APA "bars a plaintiff from challenging a number of discrete final agency actions all at once." *New York*, 133 F.4th at 68. That the final agency actions here—including grant terminations, service terminations, and RIFs—expressly cited to the *Reduction* EO underscores the conclusion that they were all carrying out a single, overarching directive. And an unlawful policy is not immunized from APA review simply because it consists of multiple unlawful parts.

### 2. Plaintiffs' claims are not subject to review as claims seeking to compel unlawfully withheld or unreasonably delayed actions.

Alternatively, defendants argue that the district court should have analyzed plaintiffs' APA claims as seeking to "'compel agency action unlawfully withheld or unreasonably delayed.'" Br. at 21-22 (quoting 5 U.S.C. § 706(1)). As an initial matter, defendants waived this argument by failing to raise it before the district court. *See Emigrant Residential, LLC v. Pinti*, 134 F.4th 626, 637 (1st Cir. 2025).

This argument also fails on the merits. Plaintiffs elected to bring claims under § 706(2). *See Connectu LLC v. Zuckerberg*, 522 F.3d 82, 93 (1st Cir. 2008) (noting that plaintiff "has the power to 'decide what law [it] will rely upon'" (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913))). By contrast, defendants' cited cases largely involve claims raising § 706(1) as the exclusive means for relief. *See Norton*, 542 U.S. at 61 (plaintiff "contended that it could sue to remedy these three failures to act" under § 706(1)); *Vietnam Veterans of Am. v. Central Intel. Agency*, 811 F.3d 1068, 1071 (9th Cir. 2016) (similar). Those cases do not support this Court reframing plaintiffs' § 706(2) claims as § 706(1) claims and requiring that they satisfy that separate standard.

Plaintiffs here did not need to bring their claims under § 706(1) because their challenge is based on affirmative steps defendants took to implement the *Reduction* EO, not on the subsequent omission of a particular action. *See Norton*, 542 U.S. at 62-63 (explaining the difference between "failure to act" and "denial"). Insofar as plaintiffs challenge "an alleged failure to perform required functions" (Br. at 22), the failure was caused by affirmative steps defendants took to functionally incapacitate the agencies. That is different from cases in which an agency simply declines to take action. *See Organization for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 462 (8th Cir. 2018) (involving agency's alleged failure to meet congressional deadline).

In any event, even if § 706(1) applied, the same result would obtain. The district court correctly identified multiple statutory mandates that defendants' actions likely violated, including each agency's appropriations statutes. (*See* A. 31-39.) For example, IMLS emptied "the office primarily responsible for conducting the regular research and data collection" that the agency is statutorily required to perform (A. 33), while MBDA "ceased performing many of its statutory duties" (A. 34), and FMCS stopped offering services that Congress directed it to provide

(A. 34-35). Such failures to carry out statutory commands, which defendants simply ignore, would support relief under § 706(1). *See Vietnam Veterans of Am.*, 811 F.3d at 1075-76. So, whether defendants' actions are framed as a series of unlawful actions or unlawful failures to act, the district court was "empowered to order a remedy." *N.A.A.C.P. v. Secretary of Hous. & Urb. Dev.*, 817 F.2d 149, 161 (1st Cir. 1987).

### 3. Plaintiffs do not challenge action committed to agency discretion by law.

Finally, defendants assert (Br. at 30-34, 41-43) that the challenged agency actions are unreviewable because they implicate decisions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception to judicial review under § 701(a)(2) has been interpreted "quite narrowly" in light of the APA's overarching presumption favoring judicial review. *Department of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation marks omitted); *see Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). Section 701(a)(2) precludes judicial review in "rare circumstances" when the relevant statute provides "no meaningful standard against which to judge the agency's exercise of discretion." *Department of Com.*, 588 U.S. at 772 (quotation marks omitted). And its

application has generally been limited to "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Id.* (quotation marks omitted).

The agency actions challenged here do not fall within § 701(a)(2)'s narrow exception. The agencies have carried out the *Reduction* EO's mandate by terminating programs, eliminating funding, and implementing large-scale RIFs of agency employees. The district court identified multiple statutory commands that defendants' actions likely violated, including each agency's appropriations statutes. (*See* A. 31-39.)

As defendants' own cases explain, statutory commands "circumscribe agency discretion to allocate resources." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). So, whatever discretion the agencies may exercise in making individual funding and staffing decisions, "an agency is not free simply to disregard statutory responsibilities." *Id. See Community Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 352 (10th Cir. 1989) ("It is beyond doubt that the district court in this instance possessed jurisdiction to determine whether [the agency] violated federal statutes in terminating [the plaintiff's] grant."); *Milk Train, Inc. v. Veneman*, 310 F.3d 747,

752 (D.C. Cir. 2002) (allowing APA review insofar as claim implicated Congressional limits on agency's ability to disburse funds).[8]

For example, in *Union of Concerned Scientists*, on which defendants rely (Br. at 30, 41), this Court permitted APA review to determine whether an agency's changing approach to staffing its advisory committees violated federal law. 954 F.3d at 18-19. The Court explained "[t]hese are clearly not individual hiring decisions committed to discretion, but an agency-wide policy" subject to statutory constraints. *Id.* at 18 n.5. Similarly, here, defendants' "agency-wide" actions are subject to—and likely violate—statutory restrictions. (*See, e.g.*, A. 26, 36; *see* A. 99, 105.)

---

[8] Defendants' other cases are also inapt. Plaintiffs do not seek to limit the agencies' discretion in undertaking enforcement actions, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), or impose procedural requirements in addition to those already mandated by the APA, *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978).

**B.    Plaintiffs Are Likely to Succeed on the Merits
of Their Constitutional Claims.**

The district court correctly concluded that plaintiff States established a likelihood of success on their claims that defendants' actions violate the Constitution's separation of powers doctrine and Take Care Clause. (*See* A. 40.)

"[T]he Framers crafted the federal system of Government so that the people's rights would be secured by the division of power." *United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000). The Constitution vests "[a]ll legislative Powers" in Congress, which makes laws, and it vests the "executive Power" in the President, who "shall take Care that the Laws be faithfully executed." U.S. Const. art. I, § 1; *id.*, art. II, § 1, cl. 1; *id.*, art. II, § 3. This separation of powers, which is "foundational" to our system of government, *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 227 (2020), means that the Executive has no power to enact, amend, or repeal statutes, *Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998). Nor does the President have—under the Constitution or otherwise—the power to disregard or act contrary to statutes, even in an emergency. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952).

47

Congress created IMLS, MBDA, and FMCS, assigned the agencies "a comprehensive set of statutory responsibilities," and every year appropriated funds it deemed necessary to carry out those agency functions. (A. 39.) *See* Labor Management Relations Act, 1947, Pub. L. No. 80-101, § 202, 61 Stat. 136, 153 (establishing FMCS); Museum and Library Services Act of 1996, Pub. L. No. 104-208, § 203(a), 110 Stat. 3009, 3009-293–294 (establishing IMLS); Minority Business Development Act of 2021, Pub. L. No. 117-58, § 100003(a), 135 Stat. 1445, 1448 (authorizing MBDA); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1101(a)(2), (8), 139 Stat. 9, 10-11 (2025).

Defendants' attempts to dismantle IMLS, MBDA, and FMCS through executive fiat usurped Congress's powers and failed to faithfully execute the laws Congress enacted. (*See* A. 39-40.) "[S]ettled, bedrock principles of constitutional law" require the Executive to expend the funds that Congress duly authorizes and appropriates. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). By withholding funds that Congress recently appropriated to the agencies, defendants sought to override Congress's power of the purse as well as its authority to create and abolish federal agencies. (A. 57-58, 1075.) In the same vein, defen-

dants' actions disabled the agencies from carrying out many of their statutory duties. These unilateral actions infringe on Congress's powers and are therefore unconstitutional. *See, e.g.*, *American Fed'n of Gov't Emps.*, 139 F.4th at 1035.[9] "And it is established practice" to "sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see Free Enter. Fund*, 561 U.S. at 491 n.2.

Defendants contend that no constitutional cause of action is available to plaintiffs here. Br. at 24-25. This argument misreads *Dalton v. Specter*, 511 U.S. 462 (1994), the case on which defendants principally rely.

*Dalton* involved a challenge to the President's decision to close a Naval shipyard in Philadelphia following an "elaborate" administrative process set out by statute. 511 U.S. at 464. The statute "d[id] not at all limit the President's discretion in approving or disapproving" shipyard

---

[9] *See also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority* 3 (Heritage Found. Legal Mem. No. 210) (July 12, 2017) ("[T]he President has no statutory authority to reorganize the executive branch, except where acts of Congress delegate authority to make particular changes.").

closures, *id.* at 476, enabling him to decide to do so "for a good reason, a bad reason, or no reason" at all, *id.* at 478 (Souter, J., concurring). When the President exercised that discretion to approve the Philadelphia shipyard closure, opponents sued to enjoin the decision and claimed that it did not comport with the statute. *Id.* at 466-67. The question presented for the Supreme Court was whether this alleged statutory violation gave rise to a constitutional claim subject to judicial review. *Id.* at 468. The Court's answer was no. *Id.* When the President exercises discretion committed to him by statute, a claim that the President exceeded his statutory authority is not necessarily reviewable as a constitutional claim. *See id.* at 472-73; *see also Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996); *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022).

*Dalton* does not foreclose plaintiffs' constitutional claims here, but instead reaffirms a "well established" "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." 511 U.S. at 474. The conclusion that judicial review was unavailable in *Dalton* followed from the Court's interpretation of the relevant statute in that case,

50

which, as noted, conferred on the President unbounded discretion with respect to shipyard closure recommendations. In this case, no statute entrusts the Executive with discretion to unilaterally dismantle IMLS, MBDA, and FMCS. And so "[p]laintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs claimed," but rather that the Executive "act[ed] without any authority, constitutional or statutory" at all. *American Fed'n of Gov't Emps. v. Trump*, No. 25-cv-03698, 2025 WL 1358477, at *18 (N.D. Cal. May 9, 2025). As a result, defendants cannot invoke *Dalton* "to bypass scores of statutory limitations on governmental authority." *Chamber of Com.*, 74 F.3d at 1332. The district court was right to conclude that plaintiffs are likely to succeed on these claims and defendants make no effort to defend the constitutionality of their actions.

### III. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN BALANCING THE EQUITIES AND CRAFTING A TAILORED REMEDY.

The district court did not abuse its discretion in finding that the remaining equitable factors strongly favored granting the preliminary injunction. (*See* A. 41-47.) *See We the People PAC v. Bellows*, 40 F.4th 1, 25 (1st Cir. 2022). As the court explained, the attempted dismantling of IMLS, MBDA, and FMCS irreparably harmed plaintiff States and would have continued to do so if not enjoined. The district court's targeted order serves the public interest by preventing that harm and inflicted no comparable injury on defendants.

### A. Plaintiffs Demonstrated Irreparable Harm.

"District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quotation marks omitted). Here, plaintiffs' preliminary injunction motion was supported by hundreds of pages of declarations detailing defendants' efforts to incapacitate the agencies and the consequent harms plaintiffs experienced and would continue to experience absent injunctive relief. (*See* A. 41.) See *supra* at 19-21. Defendants

submitted no evidence to rebut plaintiffs' showing. In view of the unrefuted record evidence, the court correctly concluded that the States "demonstrated irreparable and continuing harm from the Defendants' de facto dismantling of IMLS, MBDA, and FMCS." (A. 41.)

Though defendants brush away plaintiffs' unrebutted evidence as "insufficient" (Br. at 46), they do not grapple with—much less rebut—the district court's findings of irreparable harm. Contrary to defendants' argument, plaintiffs allege much more than "monetary losses" (*id.*) citing imminent program closures, project delays, and job losses as examples of harm threatened by defendants' dismantling of the agencies. Nor are plaintiffs' injuries limited to agency inaction (*contra id.*) because plaintiffs challenge affirmative steps defendants took to implement the *Reduction* EO.[10] See *supra* at 37-38, 43.

---

[10] Defendants cite two cases (Br. at 46) in which the plaintiffs, unlike plaintiffs here, challenge the government's "decision not to engage in" action. *Flyers Rts. Educ. Fund, Inc. v. Federal Aviation Admin.*, 864 F.3d 738, 743 (D.C. Cir. 2017). Nor do the States seek "an order compelling the [government] to explain the legal authority" for its actions. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 850 (D.C. Cir. 2008).

53

## B.    The Balance of Equities and Public Interest Weigh Strongly in Plaintiffs' Favor.

For similar reasons, the district court did not abuse its discretion in concluding that the balance of the equities and public interest "weigh strongly in favor" of injunctive relief. (A. 46.) *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (noting these factors "'merge when the [g]overnment is the opposing party'") (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

"[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The public interest would be particularly disserved by vacating the preliminary injunction because defendants seek to resume unlawful actions they do not even defend on the merits. Defendants' purported interest in the "lawful direction" of "agency management" (Br. at 46-47) ignores the district court's detailed findings that defendants contravened multiple statutory and constitutional provisions, including the agencies' obligations to expend funds appropriated by Congress. (*See* A. 2.) Likewise, they cannot complain about the few modest restrictions the injunction places on further agency actions. *See* Br. at 48. Those guardrails were necessitated by defendants'

54

demonstrated violation of the law, including the APA's procedural requirements. *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 686 (2020) (finding that agency rulemaking "fully complied with" APA).[11]

With respect to grant funding, defendants have not shown that "the government will be left with no meaningful recourse" to recover inappropriately disbursed funds if they ultimately prevail in this litigation. *Contra* Br. at 49. Plaintiff States have ongoing relationships with the federal government, and defendants themselves have asserted that grant payments ultimately found to be unwarranted "constitute a debt to the federal government" that may be recovered through "debt collection procedures." (*See* Decl. of Kelly Mitchell ¶ 12 (May 19, 2025), ECF No. 63-

---

[11] Defendants cite no evidence that the preliminary injunction "exposes the government to the risk of contempt proceedings and other sanctions over wide swaths of agency-administration matters." Br. at 48. If a specific agency action raises questions about defendants' compliance with the order, defendants can meet and confer with plaintiffs, seek clarification from the Court, or both. Indeed, defendants have conferred with plaintiffs to clarify the scope of the order as it pertains to grant reinstatements. (Defs.' Status Report ¶ 3 (May 20, 2025), ECF No. 64.) As of August 11, 2025, over two months after the district court entered the order, the agencies report having "fully implemented all provisions" of the order without encountering any threat of contempt proceedings or sanctions. (*See* Defs.' Status Report ¶ 1 (Aug. 11, 2025), ECF No. 74.)

2.) Regardless, defendants' claim that making grant payments as required by law constitutes irreparable harm is the same argument already rejected by this Court. *New York*, 133 F.4th at 72. Defendants can make "no showing that dispersing congressionally appropriated funds for statutorily mandated purposes would cause irreparable harm in this case." *Community Legal Servs. in E. Palo Alto*, 137 F.4th at 942.

Recent stay orders issued by the Supreme Court (Br. at 47) do not alter the balance of the equities. *California* (which did not specifically address the balance of equities) is distinguishable for the reasons explained above (*supra* at 28), and defendants cite nothing to support their conclusory claim that programs and services reliant on federal funding in plaintiff States could continue unscathed without such funding. As the district court found—and defendants did not offer any evidence to dispute—even temporary implementation of defendants' unlawful actions would compromise plaintiff States' operations and force them to modify or eliminate important programs and services.

Defendants also cite *McMahon v. New York*, 145 S. Ct. 2643 (2025) (mem.), which differs in several material respects from this case. For instance, defendants here do not purport to transfer agency functions to

other entities, as in *McMahon*, *see Somerville Pub. Schs.*, 139 F.4th at 67, but rather seek to terminate certain services and funding sources to plaintiffs entirely. And *McMahon* does not supply guidance to lower courts as to how to exercise their equitable discretion: the order did not explain its reasoning and it is impossible to know the basis on which the order rested.

On the other hand, vacating the preliminary injunction would "substantially injure the other parties interested in the proceeding." *Nken*, 556 U.S. at 426 (quotation marks omitted). Plaintiff States rely on receiving direct funds and critical services from IMLS, MBDA, and FMCS. (A. 29-31.) In Rhode Island, FMCS ensures labor peace in the healthcare industry (A. 684), and plaintiffs explained in their preliminary injunction motion that labor negotiations with Butler Hospital were "extremely likely to lead toward a strike without the benefit of FMCS mediation" (A. 916.) That strike came to fruition after FMCS shuttered itself and withdrew the federal mediator, illustrating the real-world consequences of unlawful agency action. The stay that defendants now seek would perpetuate the "plethora of injuries" to plaintiff States that the district court's injunction sought to forestall. (A. 46.)

**C.    The Preliminary Injunction Is Appropriately Tailored.**

Plaintiffs agree that a preliminary injunction "must be tailored to the specific harm to be prevented." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000). The "district court is in the best position to tailor the scope of injunctive relief to [the] factual findings," so this Court's review "is for abuse of discretion only." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009). Here, the district court acted well within its discretion by accepting all defendants' edits to the proposed order and crafting the preliminary injunction to remediate the specific forms of irreparable harm that plaintiffs demonstrated.

The preliminary injunction order aims to undo defendants' unlawful actions and to prevent defendants from unlawfully implementing the *Reduction* EO at the agencies again during the pendency of this case. (*See* A. 51-52, 1116.) Accordingly, the order requires the restoration of employees and contractors insofar as they were terminated as part of defendants' improper efforts to incapacitate the agencies and resulted in the agencies being unable to carry out their functions. (A. 52; *see, e.g.*, A. 198 (IMLS funding program in jeopardy "[b]ecause there is no staff to

58

administer" it).) It also requires the agencies to resume disbursing previously awarded grant funds "with respect to recipients in plaintiff States." (A. 53.) The injunction thus properly restored the parties to the status quo before defendants' unlawful actions occurred. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) (determining status quo by "the last uncontested status which preceded the pending controversy" (quotation marks omitted)).

At the same time, the district court's order leaves defendants ample room to exercise their lawful discretion in managing the agencies. As the district court made clear, "[n]othing in the Preliminary Injunction stops the Defendants from taking lawful steps to manage the three agencies going forward." (A. 1116.) The order "does not preclude . . . Defendants from making personnel decisions that are not related to or motivated by" the *Reduction* EO. (A. 1117; *see* A. 52-53.) The agencies may also "pause, cancel, or otherwise terminate" grants or contracts if grantees or contractors breach applicable terms. (A. 52-53.) The order also "expressly permits" defendants to take actions that would improve the agencies' efficiency or reduce the size or scope of the agencies, so long as defendants "'provide[] a reasoned explanation for such action'" and the "'action will

not prevent the [agencies] . . . from fulfilling any of their statutory obligations.'" (A. 1117 (quoting A. 52).)

Defendants' complaints (Br. at 46-49) about the purported breadth of the order ring hollow. The district court "accepted all the Defendants' suggestions for ensuring that the injunction was narrowly drafted." (A. 1116.) For example, defendants themselves requested the reasoned-explanation language in paragraph 3 of the order. (*See* ECF No. 65 at 31.) Now on appeal, defendants assail the language they requested as "unwarranted and impermissible." Br. at 48. If defendants thought that a narrower injunction was required, they had ample opportunity to propose acceptable language to the district court. Yet defendants offer no alternative other than vacating the preliminary injunction in its entirety. At this point, defendants have waived any arguments about the specific language in the order.

Defendants also seek to vacate the preliminary injunction on the basis that it is "an impermissible universal injunction" (Br. at 43-44), but this argument fails. The district court issued the injunction based on unrebutted factual findings that defendants' implementation of the *Reduction* EO wreaked irreparable harm on plaintiff States themselves.

60

(*See* A. 41.) Accordingly, the injunction ordered defendants to reinstate funding "to recipients in plaintiff States." (A. 52-53.) Defendants claim the injunction covers implementation "steps" that do not have an effect on plaintiff States (Br. at 44), but defendants have not (a) identified what those steps are, or (b) proposed a feasible alternative to the injunction that would afford plaintiffs complete relief. (*See* A. 1060 (inviting defendants "to propose or craft an order that provides full relief to the Plaintiff States in a way that doesn't affect nonparties").) *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2557 (2025) (noting that enjoining an activity completely is sometimes the "one feasible option" for providing plaintiff with complete relief).

To the extent the injunction incidentally benefits nonparties, that does not make it a universal injunction: "[P]arty-specific injunctions sometimes advantag[e] nonparties." *Id.* at 2557 (quotation marks omitted). The references to third parties in plaintiffs' declarations serve to illustrate the widescale effects of defendants' actions within the States. (*E.g.*, A. 176 (ceasing of MBDA functions threatens "significant economic loss to Arizona and its residents"); A. 339 (explaining why MBDA services are critical to Hawaii's "economy and tax base"); A. 994 (noting the

"devastating impact" defendants' actions could have "throughout Rhode Island").) While the States are not suing on behalf of their citizens (*contra* Br. at 44), it is not surprising that "the court's injunction might have the practical effect of benefiting nonparties." *CASA, Inc.*, 145 S. Ct. at 2557 (emphasis omitted). That is not a basis for vacating the preliminary injunction.

Defendants also argue (Br. at 39-41) that by "ordering employee reinstatement" the preliminary injunction exceeded the district court's equitable powers. As an initial matter, defendants waived this argument by failing to raise it before the district court despite having ample opportunity to do so. *See Emigrant Residential, LLC*, 134 F.4th at 637.

In any event, defendants are incorrect. They cite a string of inapt cases (Br. at 39-40) involving equitable relief in the context of property transfers, *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999), State apportionment, *Baker v. Carr*, 369 U.S. 186, 231 (1962), and the arrest of State officials, *In re Sawyer*, 124 U.S. 200, 212 (1888). Defendants also rely on *Sampson v. Murray*, in which a discharged federal employee sought to enjoin her dismissal pending an administrative appeal. 415 U.S. 61, 62-63 (1974). *Sampson*

does not hold, as defendants contend (Br. at 39), that reinstatement is unavailable in equity. *See Sampson*, 415 U.S. at 84. Although *Sampson* notes that courts of equity are traditionally unwilling "to enforce contracts for personal service either at the behest of the employer or of the employee," *id.* at 83, that principle has no application here. Plaintiffs do not seek to vindicate any particular employment contract or relationship, but rather to ensure that the States receive statutorily mandated funding and services that require agency employees to effectuate them. The States are challenging improper agency action effectuated, in part, through mass terminations. Nothing in *Sampson*—or any other case defendants cite—bars federal courts from remedying such unlawful actions during the pendency of litigation.

The remainder of defendants' objections to the scope of the preliminary injunction merely repackage their arguments against imposing *any* preliminary injunction. (*See* A. 1117.) While the record undoubtedly contains different types of grants and grant recipients, defendants do not explain why these distinctions should change the scope of the injunction. Defendants identify no instance of harm to a State instrumentality, for example, which does not also constitute harm to the

State itself. *See Nebraska*, 600 U.S. at 490 (holding that harm to "public instrumentality of the State" is harm to the State) (quotation marks omitted). Defendants' generic arguments about the scope of injunctive relief do not satisfy their "heavy burden of showing that the district court either committed a mistake of law or abused its discretion" in crafting preliminary injunctive relief. *Gately v. Massachusetts*, 2 F.3d 1221, 1225 (1st Cir. 1993).

## CONCLUSION

The Court should affirm the preliminary injunction.

Dated:   New York, New York
         August 27, 2025

Respectfully submitted,

PETER F. NERONHA
 *Attorney General of Rhode Island*

*/s/ Natalya A. Buckler*
KATHRYN M. SABATINI
 *Chief, Civil Division*
 *Special Assistant Attorney General*
KATHERINE CONNOLLY SADECK
 *Solicitor General*
KEITH D. HOFFMANN
 *Chief of Policy*
 *Assistant Attorney General*
NATALYA A. BUCKLER
 *Assistant Attorney General*
PAUL MEOSKY
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903

ANNE E. LOPEZ
 *Attorney General of Hawaiʻi*

*/s/ Kalikoʻonālani D. Fernandes*
DAVID D. DAY
 *Special Assistant to*
  *the Attorney General*
KALIKOʻONĀLANI D. FERNANDES
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813

*(Counsel listing continues on following pages.)*

LETITIA JAMES
 *Attorney General of New York*

*/s/ Kartik Naram*
BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
KARTIK NARAM
 *Assistant Solicitor General*
28 Liberty Street
New York, NY 10005
(212) 416-6347

KRISTIN K. MAYES
 *Attorney General of Arizona*

*/s/ Syreeta A. Tyrell*
SYREETA A. TYRELL
 *Assistant Attorney General*
2005 North Central Avenue
Phoenix, AZ 85004

ROB BONTA
 *Attorney General of California*

*/s/ Jay C. Russell*
JAY C. RUSSELL
 *Deputy Attorney General*
THOMAS S. PATTERSON
 *Senior Assistant Attorney General*
ANYA M. BINSACCA
 *Supervising Deputy*
   *Attorney General*
ZELDA VASSAR
 *Deputy Attorney General*
455 Golden Gate Avenue,
   Suite 11000
San Francisco, CA 94102

PHILIP J. WEISER
 *Attorney General of Colorado*

*/s/ David Moskowitz*
DAVID MOSKOWITZ
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203

WILLIAM TONG
 *Attorney General of Connecticut*

*/s/ Ashley Meskill*
ASHLEY MESKILL
 *Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General of Delaware*

*/s/ Vanessa L. Kassab*
IAN R. LISTON
 *Director of Impact Litigation*
VANESSA L. KASSAB
 *Deputy Attorney General*
820 North French Street
Wilmington, DE 19801

KWAME RAOUL
 *Attorney General of Illinois*

*/s/ Holly F.B. Berlin*
HOLLY F.B. BERLIN
 *Assistant Attorney General*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
  *Attorney General of Maine*

/s/ *Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
  *Attorney General of Maryland*

/s/ *Keith M. Jamieson*
JULIA DOYLE
  *Solicitor General*
KEITH M. JAMIESON
  *Assistant Attorney General*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*

/s/ *Katherine Dirks*
KATHERINE DIRKS
*Chief State Trial Counsel*
One Ashburton Place, 20th Floor
Boston, MA 02108

DANA NESSEL
  *Attorney General for
    People of Michigan*

/s/ *Neil Giovanatti*
NEIL GIOVANATTI
BREANNA LISTERMANN
  *Assistant Attorneys General*
525 West Ottawa
Lansing, MI 48909

KEITH ELLISON
  *Attorney General of Minnesota*

/s/ *Jacob Harris*
JACOB HARRIS
  *Assistant Attorney General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101

AARON D. FORD
  *Attorney General of Nevada*

/s/ *Heidi Parry Stern*
HEIDI PARRY STERN
  *Solicitor General*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

/s/ *Joshua Bohn*
JOSHUA BOHN
MAX LESSER
  *Deputy Attorneys General*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General of New Mexico*

/s/ *Anjana Samant*
ANJANA SAMANT
  *Deputy Counsel for
    Impact Litigation*
P.O. Drawer 1508
Santa Fe, NM 87504

DAN RAYFIELD
  *Attorney General of Oregon*

*/s/ Brian Simmonds Marshall*
BRIAN SIMMONDS MARSHALL
  *Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201

CHARITY R. CLARK
  *Attorney General of Vermont*

*/s/ Ryan P. Kane*
RYAN P. KANE
  *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
  *Attorney General of Washington*

*/s/ Kate S. Worthington*
KATE S. WORTHINGTON
SARAH E. SMITH-LEVY
  *Assistant Attorneys General*
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504

JOSHUA L. KAUL
  *Attorney General of Wisconsin*

*/s/ Colin T. Roth*
COLIN T. ROTH
  *Assistant Attorney General*
P.O. Box 7857
Madison, WI 53707

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

    1.   This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains  12,154  words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

    2.   This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Century Schoolbook_____  in 14 point_____, **or**

☐ this document has been prepared in a monospaced typeface using _____  with _____.

(s)  Kartik Naram_____

Attorney for  New York et al._____

Dated:  August 27, 2025_____