No. 25-1477

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAII;
STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF
CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND; COMMONWEALTH OF
MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF
WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

*Plaintiffs-Appellees*,

*(caption continued on next page)*

On Appeal from the United States District Court
for the District of Rhode Island

## BRIEF OF LAW SCHOLARS *AMICI CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLEES, INCLUDING
## AFFIRMANCE OF THE DISTRICT COURT'S PRELIMINARY
## INJUNCTION

Susannah Landes Weaver
ENVOLVE LAW
5100 Wisconsin Ave. NW, Suite 306
Washington, DC 20016
(202) 556-7898

Jonas Monast
Patrick R. Jacobi
Alexandra L. St. Romain
CENTER FOR APPLIED ENVIRONMENTAL
    LAW AND POLICY
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@caelp.org

*Counsel for Law Scholars* Amici Curiae

v.

DONALD J. TRUMP, in their official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in their official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in their official capacity as Deputy Under Secretary of Commerce for Minority Business Development; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in their official capacity as Acting Director of the Federal Mediation and Conciliation Service; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the Office of Management and Budget; U.S. OFFICE OF MANAGEMENT AND BUDGET,

*Defendants-Appellants*,

U.S. INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in their official capacity as Acting Executive Director of the US Interagency Council of Homelessness,

*Defendant*.

ii

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, counsel for Law Scholars *Amici Curiae*

states that no party to this brief is a publicly held corporation, issues stock, or has a

parent corporation.

Dated:  September 2, 2025                    */s/ Patrick R. Jacobi*
                                              Patrick R. Jacobi

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ..................................... iii

TABLE OF CONTENTS .......................................................................... iv

TABLE OF AUTHORITIES ........................................................................v

INTEREST OF *AMICI CURIAE* ...............................................................1

ARGUMENT ..........................................................................................2

I.      The Unitary-Executive Cases Recognize the Need for and Reality of Presidential Control Over Agency Leadership and Function, but They Do Not Authorize the President to Direct Agencies to Violate Statutes. .............7

II.     The Major-Questions-Doctrine Cases Have Constrained Executive Authority Even Where the President Has Exerted Significant Control Over Agencies. ....................................................................................................12

III.    This Court Should Uphold the District Court's Injunction and Recognize Congress's Central Role in Empowering and Constraining the President and His Subordinates Alike. ..................................................................17

CONCLUSION .....................................................................................24

CERTIFICATE OF COMPLIANCE .........................................................26

CERTIFICATE OF SERVICE ..................................................................27

# TABLE OF AUTHORITIES

## Cases

*Am. Forest Res. Council v. United States*,
  77 F.4th 787 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 1110 (2024) ............... 19

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ..................................................... 12, 16, 17, 20

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ..................................................... 10, 11

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ..................................................... 19, 21

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..................................................... 2

*Collins v. Yellen*,
  594 U.S. 220 (2021) ..................................................... 9

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..................................................... 18, 19

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ..................................................... 19

*FCC v. Consumers' Research*,
  145 S. Ct. 2482 (2025) ..................................................... 15, 21, 22

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ..................................................... 7, 8, 10, 23

*INS v. Chadha*,
  462 U.S. 919 (1983) ..................................................... 22

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ..................................................... 3, 8, 12

*In re United Mine Workers of Am. Int'l Union*,
    190 F.3d 545 (D.C. Cir. 1999) ..............................................................23

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ..............................................................................23

*Kennedy v. Braidwood Mgmt.*,
    145 S. Ct. 2427 (2025).........................................................................20

*Kovac v. Wray*,
    109 F.4th 331 (5th Cir. 2024) ............................................................24

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ..........................................................6, 7, 18, 19, 22

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..............................................................................2, 6

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...........................................................................6, 21

*Nat'l Fed. of Indep. Bus. v. Dep't of Lab.*,
    595 U.S. 109 (2022) ...........................................................................14

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ........................................................................7, 9, 10

*Trump v. Am. Fed. of Gov't Emps.*,
    No. 24A1174, 2025 U.S. LEXIS 2667 (July 8, 2025).......................11

*Trump v. United States*,
    603 U.S. 593 (2024) ........................................................................3, 6, 11

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ...............................................................................9, 10

*United States v. Texas*,
    599 U.S. 670 (2023) ...........................................................................22

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ...................................................................13, 14

*West Virginia v. EPA*,
597 U.S. 697 (2022) .............................................................12, 13, 14, 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...............................................6, 11, 21, 22, 23

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 7.................................................................20

U.S. Const. art. II, § 1, cl. 1 .................................................................7

U.S. Const. art. II § 3 ...........................................................................7

**Regulations**

EPA, Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired
Electric Generating Units: Federal Register, 90 Fed. Reg. 25752 (June 17,
2025) .................................................................................................5

**Executive Branch Materials**

Exec. Order 14217, 90 Fed. Reg. 10577 (Feb. 25, 2025)........................21

Exec. Order 14238, 90 Fed. Reg. 13043 (Mar. 20, 2025) ...................2, 19

Memorandum on Directing the Repeal of Unlawful Regulations, 2025 Daily
Comp. Doc. 466 (Apr. 9, 2025)............................................................5

Off. of Mgmt. & Budget, M-25-28, Guidance Implementing the President's
Memorandum Directing the Repeal of Unlawful Regulations (May 7, 2025),
https://perma.cc/8PF7-NWK9 ...............................................................5

Remarks at Georgetown University, 2013 Daily Comp. Pres. Doc. 452 (June 25,
2013).................................................................................................15

Remarks by the President in Announcing the Clean Power Plan, 2015 Daily Comp. Pres. 546 (Aug. 3, 2015)......................................................................................15

**Other Authorities**

Andrew Kent, Ethan J. Leib, & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019)....................................................23

Appl. to Stay the Order Issued by the U.S. District Ct. for the Northern District of California and Req. for an Immediate Administrative Stay, *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174 (June 2, 2025), https://www.supremecourt.gov/DocketPDF/24/24A1174/362080/20250602120234175_Trump_v_AFGE_Stay_Appl_2.pdf ......................................................5

Jodi L. Short & Jed H. Shugerman, *Major Questions About Presidentialism: Untangling the "Chain of Dependence" Across Administrative Law*, 65 B.C. L. Rev. 511 (2024) ........................................................................................14, 16

Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 47 Wm. & Mary Env't L. & Pol'y Rev. 47 (2022)..........................................................................................13

Noah A. Rosenblum & Roderick M. Hills, Jr., *Presidential Administration after* Arthrex, 75 Duke L.J. (forthcoming 2026), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5122594 ......................8, 9

## INTEREST OF *AMICI CURIAE*[1]

Law Scholars *Amici Curiae* are law professors who teach and write in the
fields of constitutional and administrative law.  *Amicus* William W. Buzbee is the
Edward and Carole Walter Professor of Law at Georgetown University Law
Center.  *Amicus* Noah Rosenblum is an Associate Professor of Law at New York
University School of Law.  *Amicus* Jodi Short is the Mary Kay Kane Distinguished
Professor of Law at University of California College of Law, San Francisco.

Law Scholars *Amici Curiae* have a strong interest in the sound development
of constitutional and administrative law in the federal courts.  They submit this
brief because of the important separation-of-powers issues implicated by the
Trump Administration's recent attempts to unilaterally dismantle three
congressionally created agencies.  As leading constitutional- and administrative-
law scholars, Law Scholars *Amici Curiae* are well-positioned to provide insights
that may assist the Court in evaluating the parties' arguments concerning
separation-of-power principles.

---

[1] Counsel for Law Scholars *Amici Curiae* certifies that the parties in these
consolidated proceedings have been consulted, and that no party opposes the
timely filing of this brief.  Pursuant to Fed. R. App. P. 29(a)(4), counsel for Law
Scholars *Amici Curiae* states that no party or party's counsel authored this brief in
whole or in part, and that no other person besides Law Scholars *Amici Curiae* or
their counsel contributed money intended to fund the preparation or submission of
this brief.

# ARGUMENT

This case requires this Court to determine the proper relationship between Congress and the Executive Branch.  The Administration here relies on an unbounded view of presidential power to support its "attempts to dismantle" three "congressionally sanctioned agencies" through withholding of appropriated funds and large-scale reductions in force ("RIFs") of the staff necessary to perform the agencies' statutorily mandated duties.  Appendix ("A.") 2; *see also* A. 7–9.  In this Court, the Administration argues that its actions carrying out President Trump's Executive Order, "Continuing the Reduction of the Federal Bureaucracy," Exec. Order 14238, 90 Fed. Reg. 13043 (Mar. 20, 2025), are not reviewable.

Appellees' Brief correctly explains why judicial review is warranted here. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also* Appellees' Br., Doc. 00118332945, at 47 (discussing *Clinton* and other authority).  Accordingly, neither the President nor an executive agency may, without Congress, dismantle statutorily created federal agencies.  *See* A. 39–40. For those reasons alone, the Administration's arguments fail.

The Administration's position here reflects its larger attempt to disrupt the judiciary's duty to "say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  It seeks to frustrate or even preclude judicial review in cases challenging

this President's actions while supercharging review in cases challenging the prior President's actions.  But when, as here, the power at issue derives from delegation in congressionally enacted statutes rather than a "conclusive and preclusive" authority of the President, *Trump v. United States*, 603 U.S. 593, 607 (2024) (citation omitted), courts must ensure that the entire Executive Branch complies with those statutes, regardless of the action under review.  The Administration cannot simply avoid statutory requirements or judicial review by appeal to "the President's policy priorities."  Appellants' Br., Doc. No. 00118318361, at 46; *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (rejecting this argument).  This amicus brief explains why this conclusion follows from two emerging bodies of the Supreme Court's separation-of-powers jurisprudence:  one focused on presidential removal power and another focused on review of executive-agency actions.

In a series of cases relying on aspects of the "unitary-executive theory" to extend the President's authority to remove certain agency leadership, the Supreme Court has proclaimed the President the most democratically accountable government official and has stressed the practical and legal importance of a "chain of dependence" between the President and leadership in the Executive Branch.  It is that "chain of dependence," the Court has explained, that provides political accountability and democratic legitimacy to Executive Branch actions.

In a separate set of cases, the Supreme Court coined the "major-questions doctrine" to subject executive-agency actions carrying out presidential directives to stringent review, characterizing them as the work of politically unaccountable bureaucrats. The Court grounds these major-questions-doctrine limits in a constitutional imperative to protect the authority vested in a democratically elected Congress. Yet the invalidated actions were duly taken at the direction of the President by his appointed and confirmed agency secretary or administrator, through the same "chain of dependence" that is central to the unitary-executive-removal cases.

The Supreme Court has yet to clarify how these two lines of cases interact with one another. This case presents an opportunity for this Court to harmonize them. It cannot be true that the President is the most democratically accountable government actor based on his connection to executive agency leadership through a chain of dependence *and* that executive agencies must be subject to stringent review because they are not accountable to the people. This disconnect is particularly acute in the major-questions-doctrine cases where the Court has subjected agency actions of vast economic and political significance carried out at the direction of the President to heightened judicial scrutiny.

The Trump Administration attempts to exploit the potential tensions between these two doctrines. When seeking to drastically reduce or even eliminate

executive agencies through mass RIFs or the withholding of congressionally

appropriated funds, the Administration seeks unbounded power for the Executive

Branch. *See, e.g.*, Appellants' Br. at 46–47 (urging the Court not to insert itself

"into the day-to-day, internal operations of a federal agency, impinging on its

flexibility to shift resources and make staffing decisions").[2]  By contrast, when

seeking to repeal the previous Administration's duly promulgated, still-valid

regulations with minimal or no regard for statutory requirements, the Trump

Administration invokes the major-questions-doctrine cases that constrain

Executive Branch authority.[3]  Yet there is no principled way to distinguish these

cases.  This "heads I win, tails you lose" approach to judicial review of executive

---

[2] In a Supreme Court filing regarding the dismantling of various agencies via large-scale RIFs, the Administration expressly relied on some of the unitary-executive-removal cases discussed in this brief. *See* Appl. to Stay the Order Issued by the U.S. District Ct. for the Northern District of California and Req. for an Immediate Administrative Stay at 1–2, 5, 22–25, *Trump v. Am. Fed'n of Gov't Emps.*, No. 24A1174 (June 2, 2025), https://www.supremecourt.gov/DocketPDF/24/24A1174/362080/20250602120234 175_Trump_v_AFGE_Stay_Appl_2.pdf.

[3] *See* Memorandum on Directing the Repeal of Unlawful Regulations, 2025 Daily Comp. Doc. 466 (Apr. 9, 2025); Off. of Mgmt. & Budget, M-25-28, Guidance Implementing the President's Memorandum Directing the Repeal of Unlawful Regulations (May 7, 2025), https://perma.cc/8PF7-NWK9.  Agencies have started carrying out this guidance. *See, e.g.*, EPA, Repeal of Greenhouse Gas Emissions Standards for Fossil Fuel-Fired Electric Generating Units: Federal Register, 90 Fed. Reg. 25752, 25765 (June 17, 2025) (justifying its proposed rollback as "necessary to avoid implicating the major questions doctrine as articulated by the Supreme Court in *West Virginia*").

5

action threatens to subvert separation-of-powers principles embedded in the Constitution. *See Mistretta v. United States*, 488 U.S. 361, 380 (1989) ("[T]he separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 629 (1952) (Douglas, J., concurring) ("The doctrine of the separation of powers was adopted . . . to preclude the exercise of arbitrary power. The purpose was . . . to save the people from autocracy." (citation omitted)).

Reading these two bodies of cases together leads to two straightforward conclusions. First, a president's ability, as head of the Executive Branch, to direct agency action does not preclude or constrain judicial review of that action for compliance with substantive or procedural statutory requirements. If it did, the presidentially directed policies at issue in the major-questions-doctrine cases would not have been subject to review, much less heightened scrutiny. Second, judicial review of a president's authority in executing statutes should not be supercharged in some cases and neutered in others. Courts should align review of presidential and agency action where the authority being exercised is not within a specifically identified "conclusive and preclusive" constitutional authority of the President, *Trump*, 603 U.S. at 607 (citation omitted), but rather is governed by the statutory delegation of authority from Congress. In every case, courts should "say what the law is," *Marbury*, 5 U.S. at 177, under the "best reading" of the relevant statutes,

6

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)*,* and need not place a thumb on the scale for or against executive action based on the political significance of the case.

I.    **The Unitary-Executive Cases Recognize the Need for and Reality of Presidential Control Over Agency Leadership and Function, but They Do Not Authorize the President to Direct Agencies to Violate Statutes.**

Since 2010, the Supreme Court has issued a series of opinions that bolster the President's control over agency leadership and function.  Specifically, these cases rely on aspects of the unitary-executive theory, under which "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'"  *Seila L., LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3).  These cases recognize the President as "the most democratic and politically accountable official in Government" and require a "chain of dependence" between the President and the agencies that Congress charges with faithfully executing myriad laws.  *Seila L.*, 591 U.S. at 224 (citation omitted); *see also, e.g.*, *id.* at 204 ("[T]he Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.' . . . 'Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else.'" (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010))).  But none of these cases, nor *Trump v. United States*,

suggests that the President may act outside the bounds of congressionally delegated authority as set out in statutes. *See Aiken Cnty.*, 725 F.3d at 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he Executive must abide by statutory mandates and prohibitions. Those basic constitutional principles apply to the President and subordinate executive agencies.").

The modern line of cases reflecting this unitary-executive vision began in 2010 in *Free Enterprise Fund*, 561 U.S. 477. There, the Supreme Court concluded that the two-layer statutory scheme protecting the tenure of Public Company Accounting Oversight Board members unduly restricted the President's power to remove them. *Id.* at 483–84. The Court elaborated on the need for presidential control over agency function: "The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the executive's control, and thus from that of the people." *Id.* at 499. The President needs command of government officials— described as a "chain of dependence"—because he is the conduit by which the people control the agency. *Id.* at 498 (citation omitted). *Free Enterprise Fund* "shifted the grounds of judicial review" of removal power from "a small set of formalistic limits" to "a probing theoretical question"—whether "the design of the agency undercut the connection between the people, the president, and the bureaucracy putatively necessary to maintain a democratic state?" Noah A.

Rosenblum & Roderick M. Hills, Jr., *Presidential Administration after* Arthrex, 75 Duke L.J. (forthcoming 2026) (manuscript at 31).[4]

The Court further delineated the scope of the President's removal power over agency leadership in the ensuing years. In *Seila Law,* the Court struck down statutory removal protections for the Director of the Consumer Financial Protection Bureau ("CFPB"), an agency considered to be otherwise "independent" from executive control, because the Director must be held accountable to "the most democratic and politically accountable official in Government"—the President. 591 U.S. at 224–25. In *Collins v. Yellen*, the Court deemed unlawful the statute limiting the President to for-cause removal of the Federal Housing Finance Agency's single Director because agency heads must "serve the people effectively and in accordance with the policies that the people presumably elected the president to promote." 594 U.S. 220, 226–28, 252 (2021) (citations omitted).

In *United States v. Arthrex, Inc.*, the Court addressed not the President's authority to remove agency heads at will, but rather the degree of presidential control over substantive agency decision-making that Article II demands. 594 U.S. 1 (2021). The Court held unlawful the structure of the Patent and Trial Appeal Board ("PTAB"), which had authority to make final, binding decisions to

---

[4] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5122594.

invalidate previously issued patents in proceedings brought by private parties, because "the President can neither oversee the PTAB himself nor 'attribute the Board's failings to those whom he *can* oversee.'" *Id.* at 8–9, 17 (quoting *Free Enter. Fund*, 561 U.S. at 496). To remedy the constitutional violation, the Court ordered that the presidentially appointed Director of the Patent and Trademark Office exercise review of the PTAB's decisions. *Id.* at 26 (plurality), 44 (Breyer, J., dissenting but joining remedy).

All these cases embrace the unitary-executive theory and conclude that a "chain of dependence" from agency leadership to the President ensures agencies' democratic accountability. Yet in none of these cases did the Supreme Court question, much less invalidate, the statutes that govern Executive Branch behavior in a host of ways that leave intact the chain of dependence from the President to agency leadership. *See, e.g.*, *Seila L.*, 591 U.S. at 235 ("The provisions of the Dodd-Frank Act bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction."); *Free Enter. Fund*, 561 U.S. at 509 ("The Sarbanes-Oxley Act remains 'fully operative as a law' with these tenure restrictions excised." (citations omitted)). Accordingly, executive-agency "officers are duty-bound to give effect to the policies embodied in the President's direction" but only "to the extent allowed by the law." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). It remains the case that "the President's power [under

Article II, § 3] to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker," *id.* (quoting *Youngstown*, 343 U.S. at 587 (alteration in *Allbaugh*)), and that *how* laws shall be carried into execution remains a firmly Article I power, *see Youngstown*, 343 U.S. at 588 (observing that Article I provides "that Congress may 'make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof'"). Presidents therefore can select and oversee executive-agency leadership but cannot unilaterally ignore or rewrite statutes, including appropriations statutes.

This reading of the unitary-executive-removal cases comports with the Supreme Court's more recent articulation of executive power in *Trump v. United States,* 603 U.S. 593 (2024). Where the President cannot rely on "his exclusive constitutional power" to take an action, and the Executive Branch must derive its authority from a statute, *id.* at 607–09, all links in the chain of Executive Branch dependence (including the President) must abide by the terms of the statutory delegation, *see Trump v. Am. Fed. of Gov't Emps.*, No. 24A1174, 2025 U.S. LEXIS 2667, at *17 (July 8, 2025) (Jackson, J., dissenting) ("While the President no doubt has the authority to manage the Executive Branch, our system does not allow the President to rewrite laws on his own under the guise of that authority."). In other

words, "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections."  *Aiken Cnty.*, 725 F.3d at 259.

## II.   The Major-Questions-Doctrine Cases Have Constrained Executive Authority Even Where the President Has Exerted Significant Control Over Agencies.

While the Supreme Court was developing its unitary-executive-removal precedents, it was also developing another body of cases constraining exercises of executive-agency discretion by invoking Congress's constitutional primacy to address politically and economically significant issues through the legislative process.  To date, the Court's major-questions-doctrine cases have largely invalidated challenged actions as beyond the bounds of the discretionary authority delegated to executive agencies.  *See generally, e.g.*, *Biden v. Nebraska*, 600 U.S. 477 (2023) (invalidating the Secretary of Education's student-loan-forgiveness program); *West Virginia v. EPA*, 597 U.S. 697 (2022) (striking down the Environmental Protection Agency's ("EPA") Clean Power Plan).  This was so even though the President had directed the agencies to adopt each of the policies in question.  Although the major-questions doctrine is not at issue in this case, these cases demonstrate that the Executive Branch may not act contrary to or exceed its statutorily delegated authority, even when the President directs executive agency action through the chain of dependence, and that courts must police the Executive Branch's compliance with statutory law.

12

As set out in 2022, the major-questions doctrine may apply in "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer" sufficient authority for the challenged regulation, absent "clear congressional authorization." *West Virginia*, 597 U.S. at 721, 723 (citations omitted) (cleaned up). Scholars have boiled down the *West Virginia* majority's test for when the doctrine applies to roughly three factors: whether the assertion of agency authority is unheralded, transformative, and of vast economic and political significance. *See generally, e.g.*, Natasha Brunstein & Donald L. R. Goodson, *Unheralded and Transformative: The Test for Major Questions After* West Virginia, 47 Wm. & Mary Env't L. & Pol'y Rev. 47 (2022). Where the Court determines that those factors are met, it requires a heightened showing of statutory clarity before it can conclude that Congress delegated sufficient authority for the challenged action. *Id.*

The Supreme Court's constraints on agencies are particularly pronounced in precisely the cases where the President is most likely to direct agency decision-making: those of vast political and economic significance. Yet those cases are largely silent about the President's role. Instead, members of the Court have, for example, faulted agencies for "laying claim to extravagant statutory power over the

national economy," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014),[5] and

seeking "to exploit some gap, ambiguity, or doubtful expression in Congress's

statutes to assume responsibilities far beyond its initial assignment," *Nat'l Fed'n of*

*Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., joined by

Thomas, J., and Alito, J., concurring). Justices have even invoked separation-of-

powers principles to frame the major-questions doctrine as protective of the

Constitution's vesting of all legislative power in Congress against "a regime

administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*,

597 U.S. at 737 (Gorsuch, J., joined by Alito, J., concurring) (citation omitted).

This focus on "unaccountable bureaucrats" obscures a key feature of the

agency policies invalidated as major questions: the role that a succession of

presidents played in directing and shaping the challenged agency policies. *See* Jodi

L. Short & Jed H. Shugerman, *Major Questions About Presidentialism:*

*Untangling the "Chain of Dependence" Across Administrative Law*, 65 B.C. L.

Rev. 511, 533–74 (2024) (rigorously detailing how, with the exception of some

dissenting opinions, Justices have largely ignored the President's role in directing

the regulations challenged in what are now considered major-questions-doctrine

---

[5] When the Court first denominated the major-questions doctrine in *West Virginia*, the majority and concurring opinions identified various cases, including *Utility Air Regulatory Group*, as progenitors of the doctrine. *See* 597 U.S. at 721–25, 740–45.

cases over the past twenty-five years).[6]  This history of presidential direction

serves as a vital reminder that, however broad the President's directive authority

might be, it cannot salvage Executive Branch actions that exceed statutorily

delegated authority.  For example, the *West Virginia* Court invalidated the Clean

Power Plan despite President Obama's express direction and active support in

EPA's development of that regulation.  *See, e.g.*, Remarks at Georgetown

University, 2013 Daily Comp. Pres. Doc. 452 (June 25, 2013) ("I'm *directing* the

Environmental Protection Agency to put an end to the limitless dumping of carbon

pollution from our power plants and complete new pollution standards for both

new and existing power plants." (emphasis added)); Remarks by the President in

Announcing the Clean Power Plan, 2015 Daily Comp. Pres. 546 (Aug. 3, 2015)

(emphasizing his role in initiating the policy and his support for the final result).

Where the Court addressed President Obama's involvement, it used his remarks

not to demonstrate the importance of the President's chain of dependence in

carrying out the Clean Power Plan but rather as evidence that the agency had acted

---

[6] Justice Kavanaugh's recent concurrence in *FCC v. Consumers' Research* lends
support to Professors Short and Shugerman's argument:  "Critiques of broad
congressional delegations sometimes focus on officials described as
'unaccountable bureaucrats.'  But that label does not squarely fit delegations to
*executive* agencies.  In those circumstances, the President and his subordinate
executive officials maintain control over the executive actions undertaken pursuant
to a delegation."  145 S. Ct. 2482, 2517 (2025).

outside of the authority that Congress delegated.  *See West Virginia*, 597 U.S. at 745 (concluding that Congress's failure to pass legislation similar to the Clean Power Plan "frustrated the Executive Branch and led it to attempt its own regulatory solution" and quoting President Obama as stating "if Congress won't act soon . . . I will" (citations and internal quotation marks omitted)).

Similarly, in *Biden v. Nebraska*, the Court invalidated President Biden's plan for the Secretary of Education to forgive federal-student debt despite the President's direction of the plan.  Specifically, President Biden undertook well-publicized efforts to campaign on enacting the loan-forgiveness policy, direct the Secretary of Education to pause federal-student-loan repayments on his first day in office, champion the policy throughout its development, and embrace it as part of his re-election campaign.  *See* Short & Shugerman, *supra*, 65 B.C. L. Rev. at 535–39.  While the Court briefly recognized that *the President* had directed extension of debt waivers during the COVID-19 emergency and later declared the emergency over, the Court cited this as evidence that the Secretary of Education lacked the requisite emergency authority to promulgate the debt-forgiveness plan.  *Nebraska*, 600 U.S. at 487, 504.  More puzzling, despite the President's close connection to the policy, the Court described the loan-forgiveness program as allowing the Secretary of Education—the *agency head*—to "enjoy virtually unlimited power to rewrite the Education Act," "unilaterally define every aspect of federal student

financial aid," and "unilaterally alter large sections of the American economy." *Id.* at 502, 507.

The upshot is that presidential direction of and involvement in these policies did not save them from invalidation when the Court concluded that the policies fell outside statutorily delegated authority. Indeed, in subjecting these actions to heightened review, the Court did not account for the democratic accountability of the President so central to its unitary-executive-removal cases. Thus, the Court's major-questions-doctrine cases reinforce that the President's role in directing agencies is not a license for the President *or* the agency to undertake actions outside of statutorily delegated authority, including actions that violate a statutory mandate or prohibition.

### III. This Court Should Uphold the District Court's Injunction and Recognize Congress's Central Role in Empowering and Constraining the President and His Subordinates Alike.

It is critical that courts provide clarity for all three branches of government by harmonizing these two lines of cases. This Court can resolve the separation-of-powers question presented here, as well as align these two doctrines, in a straightforward manner: By reinforcing that, when the Executive Branch is exercising power conveyed by Congress in a statute, the *entire* Executive Branch must act within the bounds of—and consistent with—its constitutional and statutorily delegated authority. It follows from this approach that, here, the

Executive Branch has no power to unilaterally withhold congressionally appropriated funding and engage in large-scale RIFs of the staff necessary to perform statutorily mandated duties, effectively dismantling three agencies. Statutes brought these agencies into being, established their organization, and mandate that they continue fulfilling their missions through the expenditure of congressionally appropriated funds and maintenance of sufficient staff. *See* Appellees' Br. at 45 (explaining the district court holding that the Administration violated the requirements of appropriations statutes (citing A. 31–39)).

Reaching this conclusion would reinforce bedrock separation-of-powers and administrative-law principles. Congress may delegate discretionary authority directly to the President in a statute. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 473–76 (1994) (discussing the scope of authority statutorily delegated to the President). Or Congress may delegate discretion to an Executive Branch agency. *See Loper Bright*, 603 U.S. at 394 ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion."). In each instance, a statute prescribes the limits of the delegated authority. And, in each instance, courts must hold the relevant actor in the Executive Branch to those limits.

Indeed, *Loper Bright* expressly requires that courts police these boundaries for agencies. "[T]o stay out of discretionary policymaking left to the political

branches, judges need only fulfill their obligations under the [Administrative
Procedure Act ("APA")] to independently identify and respect such delegations of
authority, police the outer statutory boundaries of those delegations, and ensure
that agencies exercise their discretion consistent with the APA."  603 U.S. at 404.

*Dalton* does not suggest a different result when the President exercises or directs
discretionary authority.  The *Dalton* Court declined to consider whether the
President had abused his congressionally delegated discretion only because *the
statute* placed no limit on that discretion.  511 U.S. at 476–77; *see also id.* at 474
("We may assume for the sake of argument that some claims that the President has
violated a statutory mandate are judicially reviewable outside the framework of the
APA." (citing *Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981))).  *Dalton* has
been distinguished on the same or similar ground multiple times.  *E.g.*, *Am. Forest
Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023), *cert. denied*, 144
S. Ct. 1110 (2024); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1331–32 (D.C. Cir.
1996).[7]  Further, the Supreme Court recently construed the Reorganization Act of

---

[7] Law Scholars *Amici Curiae* note further that *Dalton* does not apply here because
there is no comparable statutory delegation of authority to the President.  Congress
appropriated funds to the relevant agencies.  *See* Appellees' Br. at 8, 47.  Thus,
rather than exercising statutory authority delegated directly to him, as the President
did in *Dalton*, this President issued an Executive Order *directing* the Office of
Management and Budget and agency heads to deny the agencies' authorization to
spend appropriated funds for any functions beyond the minimum required by
statute.  Exec. Order No. 14238, 90 Fed. Reg. at 13043.  Any directive authority

1949 to have "barred *the President* from seizing on a reorganization plan to unilaterally confer new powers on an agency" because only Congress could confer such authority. *Kennedy v. Braidwood Mgmt.*, 145 S. Ct. 2427, 2459 (2025).

These principles apply regardless of whether the Executive Branch is exercising congressionally delegated authority to spend, regulate, or take other action. *See Nebraska*, 600 U.S. at 504–06 (rejecting distinctions in executive power based on the type of congressionally conferred authority being exercised and cautioning that it "would be odd to think that separation of powers concerns evaporate simply because the Government is providing monetary benefits rather than imposing obligations"). They arguably apply with even greater force to decisions about government spending and receipts, which are "in the 'wheelhouse' of the House and Senate Committees on Appropriations," not the Executive Branch. *Id.* at 504–05 ("Among Congress's most important authorities is its control of the purse." (citing U.S. Const., art. I, § 9, cl. 7) (further citation omitted)). It would be an odd constitutional outcome for the judiciary to stop one President from carrying out a student-loan-forgiveness program because it was grounded in an inadequately clear statute, *Nebraska*, 600 U.S. at 505–06, but allow the next President to, for example, impound all funding appropriated for student

---

that the President might possess would have to derive from the Constitution, specifically his duty to faithfully execute the law in Article II.

loans and related support, effectively eliminating the entire federal-student-loan program, in violation of clear statutory commands. No authority provides presidents directing agency action with a blank check to ignore congressional mandates, especially not vague, undefined, and unbounded notions of presidential authority to manage internal government functions. *Cf.* Appellants' Br. at 46–47.

Moreover, it would be "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting . . . in the pursuit of governmental savings." *Chamber of Com.*, 74 F.3d at 1332; *see also* Appellants' Br. at 4 (describing the goals of the "President's reform project" to include "minimiz[ing] Government waste and abuse" (citing Exec. Order No. 14217, 90 Fed. Reg. 10577, 10577 (Feb. 25, 2025))). Otherwise, the President could "bypass scores of statutory limitations on governmental authority." *Chamber of Com.*, 74 F.3d at 1332. Such an approach would also undermine the "purpose of the nondelegation doctrine," which "is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the law.'" *Consumers' Research*, 145 S. Ct. at 2501 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).

Consistent with these principles, the President acts at the "lowest ebb" of his constitutional authority and power when he acts contrary to the will of Congress.

21

*See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see also United States v. Texas*, 599 U.S. 670, 731 (2023) (Alito, J., dissenting) ("Our Constitution gives the President important powers, and the precise extent of some of them has long been the subject of contention, but it has been widely accepted that the President's power reaches its lowest ebb when he contravenes the express will of Congress, for what is at stake is the equilibrium established by our constitutional system." (citations and internal quotation marks omitted)).  Thus, it is the courts' role to determine what statutory limits Congress placed on the authority delegated to the Executive Branch and to invalidate Executive Branch actions when they are outside of those bounds.  *See Consumers' Research*, 145 S. Ct. at 2515 (Kavanaugh, J., concurring) ("[T]he President generally must act within the confines set by Congress when he implements legislation.  So the President's actions when implementing legislation *are* constrained—namely, by the scope of Congress's authorization and by any restrictions set forth in that statutory text." (citing *Loper Bright*, 603 U.S. at 394–96, 404)); *INS v. Chadha*, 462 U.S. 919, 953–54 n.16 (1983) (concluding that executive action undertaken pursuant to "legislatively delegated authority" "is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review").

Accordingly, Article II does not allow the President (or an agency) to unilaterally override Congress's choices.  Otherwise, Congress would be a secondary branch with a mere advisory role.  *Cf. Youngstown*, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").  To the contrary, the Take Care Clause is an *affirmative* command that requires good-faith execution of duly enacted laws, not a license to ignore the will of Congress.  *See, e.g.*, Andrew Kent, Ethan J. Leib, & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2118 (2019).  The Executive Branch thus violates the Take Care Clause where it undermines statutes enacted by Congress and signed into law—whether through exceedance or avoidance of statutory duty.  *See Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 612–13 (1838) (rejecting the argument that, by charging the President with faithful execution of the laws, the Take Care Clause "implies a power to forbid their execution"); *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) (concluding that "the President is without authority to set aside congressional legislation by executive order").  Notably, here, "Congress has *plenary* control over the salary, duties, and even existence of executive offices."  *Free Enter. Fund*, 561 U.S. at 500 (emphasis added).

Finally, aligning judicial-review principles of the scope of congressionally delegated authority for presidential and executive-agency actions will support

effective governance within the constitutional design.  Consistent with the Court's approach in *Loper Bright*, there would seldom be need for courts to put a thumb on the scale for or against agency action by considering non-statutory factors, such as relative economic and political significance or whether a democratically elected president attempts to direct a policy outcome that is novel, yet consistent with campaign promises.  *See, e.g.*, *Kovac v. Wray*, 109 F.4th 331, 335, 342 (5th Cir. 2024) (admonishing a district court for considering the major-questions doctrine before undertaking *Loper Bright*'s best-reading inquiry and concluding that major-questions-doctrine analysis was unnecessary).  This approach will allow the President to pursue policy goals by directing executive-agency priorities even where the resulting agency actions may have vast political and economic significance, so long as the Executive Branch acts within the bounds of Congress's delegated authority.  Most important, it would ensure that the President does not act beyond the authority that Congress provided and therefore will protect the promise of ordered liberty enshrined in the Constitution.

## CONCLUSION

For the reasons stated above and in the Appellees' Brief, this Court should uphold the U.S. District Court for the District of Rhode Island's preliminary injunction.  This Court should further conclude that when the Executive Branch is

exercising power conveyed by Congress in a statute, the entire Executive Branch

must act within the bounds of—and consistent with—that delegated authority.


Dated: September 2, 2025                          Respectfully submitted,

                                                 */s/ Patrick R. Jacobi*

Susannah Landes Weaver                           Jonas Monast
ENVOLVE LAW                                      Patrick R. Jacobi
5100 Wisconsin Ave. NW, Suite 306                Alexandra L. St. Romain
Washington, DC 20016                             CENTER FOR APPLIED
(202) 556-7898                                       ENVIRONMENTAL LAW AND POLICY
                                                 712 H Street NE, Suite 90006
                                                 Washington, DC 20002
                                                 (703) 405-8950
                                                 patrick.jacobi@caelp.org

                                                 *Counsel for Law Scholars* Amici
                                                 Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) because this brief contains 5667 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and which is less than one-half the length set for a party's principle brief in Fed. R. App. 32(a)((7)(B)(i).  The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  September 2, 2025                      */s/ Patrick R. Jacobi*
                                              Patrick R. Jacobi

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 2nd day of September, 2025, I caused the
foregoing Brief of Law Scholars *Amici Curiae* in Support of Plaintiffs-Appellees,
including Affirmance of the District Court's Preliminary Injunction, to be
electronically filed with the Clerk of the Court for the U.S. Court of Appeals for
the First Circuit using the Court's CM/ECF system, which constitutes service on
all parties and parties' counsel who are registered ECF filers.

*/s/ Patrick R. Jacobi*
Patrick R. Jacobi