No. 25-1477

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

———————————

STATE OF RHODE ISLAND; STATE OF NEW YORK; STATE OF HAWAII; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; PEOPLE OF THE STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; STATE OF ARIZONA,

Plaintiffs-Appellees,

*(caption continued on inside cover)*

———————————

On Appeal from the United States District Court
for the District of Rhode Island

———————————

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7209*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1673*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; INSTITUTE OF MUSEUM AND LIBRARY SERVICES; KEITH E. SONDERLING, in their official capacity as Acting Director of the Institute of Museum and Library Services; MINORITY BUSINESS DEVELOPMENT AGENCY; MADIHA D. LATIF, in their official capacity as Deputy Under Secretary of Commerce for Minority Business Development; FEDERAL MEDIATION AND CONCILIATION SERVICE; GREGORY GOLDSTEIN, in their official capacity as Acting Director of the Federal Mediation and Conciliation Service; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the Office of Management and Budget; US OFFICE OF MANAGEMENT AND BUDGET,

Defendants-Appellants,

US INTERAGENCY COUNCIL ON HOMELESSNESS; KENNETH JACKSON, in their official capacity as Acting Executive Director of the US Interagency Council of Homelessness,

Defendant.

_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION AND SUMMARY ........................................................ 1

ARGUMENT ............................................................................................ 2

I.     Plaintiffs Are Not Likely to Succeed on the Merits ............................... 2

    A.     Plaintiffs' claims are not justiciable. ......................................... 2

        1.     Plaintiffs lack standing to challenge "Closure Decisions." ............. 2

        2.     "Closure Decisions" are not final agency actions subject to APA review ............................................................... 5

        3.     Plaintiffs lack a constitutional cause of action. ............................... 8

    B.     The district court erred by ordering the reinstatement of grants and personnel. ............................................................... 10

        1.     The district court lacked authority to order payment of grant monies. ......................................................... 10

        2.     The district court lacked authority to order reinstatement of personnel. ......................................................... 15

II.    The Preliminary Injunction Is Vastly Overbroad. ............................... 20

III.   The Remaining Preliminary Injunction Factors Favor Vacatur ............ 22

CONCLUSION ....................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*AFGE v. Trump*:
  145 S. Ct. 2635 (2025) ................................................... 10
  782 F. Supp. 3d 793 (N.D. Cal. 2025) ........................... 10
  --- F. Supp. 3d ---, 2025 WL 1482511 (N.D. Cal. May 22, 2025) .......................... 10

*Aiken County, In re*,
  725 F.3d 255 (D.C. Cir. 2013) ....................................... 9

*Allen v. Wright*,
  468 U.S. 737 (1984) ..................................................... 2

*American Pub. Health Ass'n v. National Insts. of Health*:
  145 S. Ct. 2658 (2025) ............................... 1, 12, 13, 14, 24
  145 F.4th 39 (1st Cir. 2025) ......................................... 13
  No. 25-cv-10787, 2025 WL 1747128 (D. Mass. June 23, 2025) ........................... 12

*Anglers Conservation Network v. Pritzker*,
  809 F.3d 664 (D.C. Cir. 2016) ....................................... 8

*Axon Enter., Inc. v. Federal Trade Comm'n*,
  598 U.S. 175 (2023) ............................................... 18, 19

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..................................................... 7

*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) ......................................... 13

*Chamber of Com. of the U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ....................................... 9

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) ......................................... 22

*Climate United Fund v. Citibank, N.A.*,
  --- F.4th ---, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ......................... 10

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ..................................... 11

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ..................................................... 3

*Dalton v. Specter*,
  511 U.S. 462 (1994) ................................................................. 9

*Department of Educ. v. California*,
  604 U.S. 650 (2025) ................................................. 1, 12, 13, 23

*Elgin v. Department of Treasury*,
  567 U.S. 1 (2012) ............................................................ 17, 18, 19

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................. 2, 3

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ................................................. 17

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ................................................... 6

*Global Health Council v. Trump*,
  --- F.4th ----, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ................................. 9, 10

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................ 20

*Hochendoner v. Genzyme Corp.*,
  823 F.3d 724 (1st Cir. 2016) ................................................... 4

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................... 14, 15

*Lujan v. National Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................. 5, 6

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ........................................................... 10-11

*McMahon v. New York*,
  145 S. Ct. 2643 (2025) ........................................................ 1, 23

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ........................................... 14, 15

*Missouri v. Jenkins*,
  515 U.S. 70 (1995) ................................................................. 4

*National Treasury Emps. Union v. Vought,*
   --- F.4th ----, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ...................................... 10

*North Carolina v. Covington,*
   581 U.S. 486 (2017) ........................................................................... 21

*Norton v. Southern Utah Wilderness All.,*
   542 U.S. 55 (2004) ............................................................................ 6, 8

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
   217 F.3d 8 (1st Cir. 2000) ................................................................... 20

*Sampson v. Murray,*
   415 U.S. 61 (1974) ........................................................................... 19

*SAS Inst., Inc. v. Iancu,*
   584 U.S. 357 (2018) .......................................................................... 18

*Starbucks Co. v. McKinney,*
   602 U.S. 339 (2024) .......................................................................... 21

*Sustainability Inst. v. Trump,*
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ......................................... 11

*Trafalgar Cap. Assocs., Inc. v. Cuomo,*
   159 F.3d 21 (1st Cir. 1998) .................................................................... 5

*Trump v. Boyle,*
   145 S. Ct. 2653 (2025) ........................................................................ 23

*Trump v. CASA, Inc.,*
   145 S. Ct. 2540 (2025) ...................................................................... 20, 22

*Union of Concerned Scientists v. Wheeler,*
   954 F.3d 11 (1st Cir. 2020) ........................................................ 13-14, 15, 19

*United States v. Fausto,*
   484 U.S. 439 (1988) .......................................................................... 17

*United States v. Texas,*
   599 U.S. 670 (2023) ........................................................................... 2

*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008) ............................................................................ 22

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 701(a)(2) ............................................................... 13
    5 U.S.C. § 702 ....................................................................... 11
    5 U.S.C. § 706(1) ............................................................... 8, 19

28 U.S.C. § 1491(a)(1) ............................................................. 11

**Other Authority:**

Nicholas R. Parrillo, *The Endgame of Administrative Law:*
    *Governmental Disobedience and the Judicial Contempt Power*,
    131 Harv. L. Rev. 685 (2018) ............................................... 3-4

## INTRODUCTION AND SUMMARY

The district court entered a sweeping preliminary injunction mandating that three federal agencies unwind all compliance with a facially valid Executive Order, even steps taken to comply that have no effect whatsoever on plaintiffs. Moreover, the injunction subjects the Executive Branch officials responsible for those agencies to judicial oversight whenever they use lawful tools for controlling an Executive Branch agency. The plaintiffs who secured this extraordinary remedy plainly disagree with defendants' intention to streamline the agencies in accordance with the President's policies, but federal law prevents them from installing themselves or the courts as supervisors of day-to-day agency operations. Two aspects of the district court's injunction in particular—the required reinstatement of agency personnel and restoration of grant agreements—cannot be reconciled with recent decisions of the Supreme Court granting interim relief from similar orders. *National Insts. of Health v. American Pub. Health Ass'n (APHA II)*, 145 S. Ct. 2658 (2025); *McMahon v. New York*, 145 S. Ct. 2643 (2025); *Department of Educ. v. California*, 604 U.S. 650 (2025).

This Court should promptly relieve the three agencies' politically accountable leaders from the restraints the district court imposed. Plaintiffs cannot establish jurisdiction over this broadside attack on defendants' management of the agencies' employees and operations; no cause of action permits such a challenge; independent obstacles prevent grant- and employee-specific relief; and the injunction is fatally overbroad. Any one of these grounds warrants vacatur in full.

# ARGUMENT

## I.    Plaintiffs Are Not Likely to Succeed on the Merits.

### A.    Plaintiffs' claims are not justiciable.

#### 1.    Plaintiffs lack standing to challenge "Closure Decisions."

"The principle of Article III standing is 'built on a single basic idea—the idea of separation of powers.'" *United States v. Texas*, 599 U.S. 670, 675 (2023) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). "Standing doctrine helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system." *Id.* at 675-76. That doctrine demands a plaintiff show an actual, cognizable injury that is traceable to the challenged conduct and susceptible to judicial remedy. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Plaintiffs do not dispute that their standing theory rests entirely on predicted deprivations of funding and agency programming. Ans. Br. 20-21; *see* Br. 14. To be sure, any such cuts, if realized, might satisfy standing's "injury-in-fact" requirement.[1] *Alliance for Hippocratic Med.*, 602 U.S. at 381. But even assuming plaintiffs could satisfy that requirement, their theory founders at the second and third steps insofar as their suit challenges not individual terminations, but "Closure Decisions" at each agency,

---

[1] Acknowledging this point does not "effectively concede" any part of plaintiffs' flawed standing theory with respect to IMLS (or any other agency). Ans. Br. 19. Rather, as explained, the reinstatement of IMLS's Grants to States was voluntary. Br. 25 n.3.

A67-68.  As the government explained (and plaintiffs do not controvert), Br. 15, the "causation requirement … rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Alliance for Hippocratic Med.*, 602 U.S. at 383.  That is the case here, where the particular hypothesized actions plaintiffs have identified ("Closure Decisions") bear only an attenuated connection to the consequences they say they will (or might) suffer.

Independently, any downstream injury causally linked to a "Closure Decision" cannot serve as a basis for an order against that decision—precisely the sort of order the district court entered, A51-53—because the result is to install a federal court as overseer of continuing agency operations, many of which bear no relationship whatsoever to plaintiffs or their claimed injuries.  *See* Br. 14 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006)).  Standing serves to prevent exactly that result. *Alliance for Hippocratic Med.*, 602 U.S. at 378-80.  It is no answer to say that the injunction permits the government to take "lawful" managerial "steps," Ans. Br. 22-23 (quotation omitted), when the very existence of the injunction casts the threat of sanctions proceedings over agency officials' actions.[2]  And plaintiffs' attempts to

---

[2] Plaintiffs fault the government for citing "no evidence that the preliminary injunction exposes the government to the risk of contempt proceedings and other sanctions," Ans. Br. 55 n.11 (quotation omitted), but the threat of contempt proceedings should be beyond dispute.  *See* Nicholas R. Parrillo, *The Endgame of Administrative Law:  Governmental Disobedience and the Judicial Contempt Power*, 131 Harv. L.

*Continued on next page.*

3

distinguish the cases cited in the government's opening brief are unpersuasive: private-party micromanagement (with judicial enforcement) of an agency's wide-ranging process of complying with a facially valid Executive Order is precisely the sort of "systemic reform" standing doctrine prohibits a federal court from overseeing. Ans. Br. 23 (citing *Missouri v. Jenkins*, 515 U.S. 70, 74 (1995)).  The upshot is that even if plaintiffs might have standing to challenge individual grant terminations and the termination of specific agency programs, Article III does not allow them to bootstrap those limited injuries into an injunction mandating the agency-wide reform they seek. *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 733 (1st Cir. 2016).

What plaintiffs disparage as "boilerplate," Ans. Br. 21, are in fact bedrock standing principles confirming that plaintiffs lack any alternative interest (apart from their grant and programming theories) in dictating the day-to-day details of agency management.  Br. 12-15.  At bottom, however particularized or concrete plaintiffs' claims to individual grants and agency programs might be, plaintiffs have no cognizable interest at the level of a "Closure Decision."

---

Rev. 685, 692 (2018) ("Viewed generally, beyond the context of administrative law, a contempt finding is potent for the obvious reason that a court can back it up with sanctions."); *see also id.* at 697 (concluding after empirical research that although federal courts may be disinclined to permit sanctions against federal officials for violations of preliminary injunctions, "contempt findings . . . nonetheless have a shaming effect that gives them substantial if imperfect deterrent power").

### 2. "Closure Decisions" are not final agency actions subject to APA review.

**a.** Section 706(2) of the APA limits judicial review to final agency action. Br. 17-23. The "Closure Decisions" plaintiffs challenged below are not final agency actions, contrary to the district court's conclusion.

In the district court's words, a "Closure Decision" is a "policy" at each agency "that applies the measure 'of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions' across the board." A22 (quoting Reply in Supp. of Mot. for Prelim. Inj. 14-15, Dkt. No. 44). The government's opening brief explained why that is not a final agency action. First, there is no "policy" in any real or meaningful sense; that term is merely plaintiffs' description of distinct (potentially related or unrelated) and ongoing agency operations. Br. 16-17, 18 & n.2; *see Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890 (1990).

Second, even accepting the district court's unsupported finding that a policy existed—there is, after all, no "definitive statement" or other evidence in the record that would confirm as much, *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (quotation omitted); *see also* Ans. Br. 39 (citing *Trafalgar Capital Associates*)— it is not the sort of policy courts have accepted as final agency action. That is so because an initiative intending to reduce agency operations to the extent permissible by law is not discrete, has no concrete effects (legal or otherwise) on anyone

5

(including plaintiffs), and does not "consummate" a decisionmaking process. Br. 18-19. Confirming the point, it is impossible to analyze plaintiffs' theories sensibly at the level of a "Closure Decision," a point to which plaintiffs offer no rebuttal. *See* Br. 20-21.

Plaintiffs have not established otherwise in their brief. There is not "unrefuted evidence" of a sufficiently particularized policy as plaintiffs allege, Ans. Br. 37; *see also* Ans. Br. 38; there is instead, at most, evidence of a variety of reduction-related activities (*i.e.*, terminations of grants and personnel). Simply applying the label "policy" to an amalgamation of alleged "violation[s] of the law" does not mean that "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action" that harms plaintiffs. *Lujan*, 497 U.S. at 890-91; *see* Ans. Br. 40 (asserting in conclusory fashion that plaintiffs challenge "a completed universe of particular agency orders and regulations," and "some particular measure [applied] across the board," not "'abstract' policy goals or strategy" (first quoting *Lujan*, 497 U.S. at 890 (alteration omitted), then quoting *Lujan*, 497 U.S. at 890 n.2, then quoting *Norton v. Southern Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 66 (2004)). Rather, "Closure Decision" remains an umbrella term for "various decisions, including which programs (and grants) to retain, the number of staff necessary to administer programs and grants that continue to operate, and how and when to terminate unnecessary staff." Br. 16-17 (citing *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006)). For that reason,

the "policies" at issue are nothing like the policies held to be final agency action in the cases plaintiffs cite (at 41), as the government has already explained.  Br. 18-19 (explaining that plaintiffs cite cases in which the relevant agency actions were construed to involve defined practices with uniform results).

Plaintiffs attempt to circumvent this reality by surreptitiously abandoning the Closure-Decision framing altogether.  It is not enough to say that a particular grant termination is not "tentative or interlocutory," *see* Ans. Br. 38 (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)), because that means at most that the government's decisionmaking process with respect to *that grant* has been consummated, *see Bennett*, 520 U.S. at 178.  Simply to restate the concept of a "Closure Decision"—a policy of reducing agency operations to a level consistent with law—by its own terms refutes that any process has been consummated and made concrete.  Similarly, plaintiffs miss the mark in focusing on the "consequences" of individual terminations, Ans. Br. 39-40, when the proper inquiry is into the actual or imminent consequences for plaintiffs of a "policy … of eliminating all functions and components not mandated by statute." A22 (quotation omitted).  Quite plainly, plaintiffs have pointed to none.  Br. 17-18.

**b.**  That the APA contains a cause of action, 5 U.S.C. § 706(1), better suited to the nature of plaintiffs' grievances further supports the conclusion that the district court erred in finding final agency action in the form of "Closure Decisions." Plaintiffs may have "elected to bring claims under § 706(2)," Ans. Br. 42, but that fact only suggests they sought to avoid the considerably more stringent standard of review

under § 706(1).  *See* Br. 21-22.  Tellingly, plaintiffs do not endeavor to explain why reducing the staff working in one of IMLS's offices rises to the level of failing to perform a "'ministerial or non-discretionary' duty" so precise as to amount to "a specific, unequivocal command," *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (quoting *SUWA*, 542 U.S. at 63); *see* Ans. Br. 43, or a "precise, definite act about which an official had no discretion whatever," *SUWA*, 542 U.S. at 63 (alterations and quotation omitted).  That is likely so because "conducting … regular research and data collection," Ans. Br. 43 (quotation omitted) is an ongoing programmatic initiative of precisely the sort the Supreme Court held not to be susceptible to review under § 706(1).  *See SUWA*, 542 U.S. at 64.  Had plaintiffs brought their claims under the appropriate cause of action, the "same result" should not have obtained, *but see* Ans. Br. 43, suggesting that § 706(2) should not be available to circumvent § 706(1)'s limits.

### 3.    Plaintiffs lack a constitutional cause of action.

At its core, the legal theory behind plaintiffs' case is as follows:  the statutes creating the three defendant agencies and authorizing them to perform particular functions contain an (ill-defined) set of obligations, which the government has ceased (or soon will, or may potentially, cease) to perform in violation of those statutes.  *See* Ans. Br. 48.  To this straightforwardly statute-based logic plaintiffs attempt to add a constitutional gloss—that by violating the statutes, defendants have also violated the separation of powers and the Take Care Clause.

The government explained in its opening brief why *Dalton v. Specter*, 511 U.S. 462 (1994), forecloses plaintiffs' attempted constitutionalization of their statutory claims. Br. 24-25. In response, plaintiffs focus on *Dalton*'s holding with respect to statutory discretion conferred on the President. Ans. Br. 50. "But *Dalton* had four holdings," and beyond addressing statutory discretion, it more broadly explained "that statutory claims cannot be transformed into constitutional ones" and that review is unavailable where "the constitutional claim is predicated on underlying statutory violations." *Global Health Council v. Trump*, --- F.4th ----, 2025 WL 2480618, at *8 (D.C. Cir. Aug. 28, 2025) (noting that "[o]nly the fourth holding was at issue in *Reich*"); *see* Ans. Br. 50 (citing *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)). It thus does not matter that *Dalton* implicated a different statute that conferred a purportedly different quantum of discretion. Ans. Br. 50-51. Plaintiffs also cite *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013), for the proposition that the Executive must "expend the funds that Congress duly authorizes and appropriates." Ans. Br. 48. "But the dispute there was about whether a federal agency had to continue with a mandatory licensing process despite lacking sufficient funds to complete the process, thereby only indirectly implicating appropriated funds." *Global Health Council*, 2025 WL 2480618, at *8 (discussing *Aiken County*). And the *Aiken County* plaintiffs sued under § 706(1) of the APA, not the Constitution directly. *See id.* Both features distinguish that case from this one.

9

Plaintiffs also dispute the nature of their argument, saying that it is "not that the President exceeded his statutory authority . . . but rather that the Executive acted without any authority, constitutional or statutory." Ans. Br. 51 (alteration omitted) (quoting *AFGE v. Trump*, 782 F. Supp. 3d 793, 821 (N.D. Cal. 2025)[3]). The D.C. Circuit has repeatedly explained in recent weeks why that argument fails: because where the claim is one that the government has failed to comply with a statutory mandate, it is a claim that the relevant officials have acted in excess of statutory authority, and is thus barred by *Dalton*. *Climate United Fund v. Citibank, N.A.*, --- F.4th ----, 2025 WL 2502881, at *10 (D.C. Cir. Sept. 2, 2025); *Global Health Council*, 2025 WL 2480618, at *8; *National Treasury Emps. Union v. Vought*, --- F.4th ----, 2025 WL 2371608, at *19-20 (D.C. Cir. Aug. 15, 2025).

**B.    The district court erred by ordering the reinstatement of grants and personnel.**

**1.    The district court lacked authority to order payment of grant monies.**

**a.** The parties agree that the government is immune from suit under the APA where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.*

---

[3] The cited language comes from an opinion granting a temporary restraining order. The court that issued that relief reached the same conclusion in identical terms a few weeks later, in an order granting a preliminary injunction. *AFGE v. Trump*, --- F. Supp. 3d ----, 2025 WL 1482511, at *19 (N.D. Cal. May 22, 2025). The Supreme Court stayed that preliminary injunction shortly thereafter. *Trump v. AFGE*, 145 S. Ct. 2635 (2025).

*Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702); *see* Ans. Br. 24.  There

likewise appears to be no dispute about the test applicable to whether the Tucker Act,

which grants the Court of Federal Claims "jurisdiction to render judgment upon any

claim against the United States founded" on "any express or implied contract with the

United States," 28 U.S.C. § 1491(a)(1), operates as such a statute:  if (i) "the source of

the rights upon which the plaintiff bases its claims" and (ii) "the type of relief sought"

are both contractual, the district court lacked jurisdiction.  *Crowley Gov't Servs., Inc. v.

General Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quotation omitted); *see*

Ans. Br. 27.  Under those principles, the source of the alleged entitlement to monies

plaintiffs seek to vindicate is indeed contractual, not statutory or constitutional.[4]  *See*

Br. 27-28.  The same is true of the remedy, specific performance, that they seek.  Br.

28.

In its opening brief, the government explained why the Supreme Court's stay

decision in *Department of Education v. California*, 604 U.S. 650, confirmed that both the

"source" of the plaintiffs' rights and the remedy they seek here are contractual in

---

[4] Plaintiffs err in suggesting that *Sustainability Institute v. Trump*, No. 25-1575 (4th Cir.), is irrelevant because the grants at issue there were "authorized by omnibus appropriations statutes."  Ans. Br. 29 (quotation omitted).  The sentence that plaintiffs quote reads "funded and authorized by omnibus appropriations statutes," *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025), a statement that is true in part here, *see* Br. 32-33.  And in any event, the plaintiffs here, like the *Sustainability Institute* plaintiffs, cannot plausibly point to the statutes authorizing grantmaking as the source of the rights they claim, as it is a set of grant agreements—not the statutes themselves—that allegedly entitle both sets of plaintiffs to payment.

nature, depriving the district court of jurisdiction to order reinstatement of grants.  Br. 28-30.  Since then, the Supreme Court has stayed another district-court order requiring payment of grant monies, bolstering that conclusion even further.  In *APHA II*, the district court vacated two sets of agency actions:  (1) directives concerning funding priorities and grant terminations and (2) grant terminations that resulted from those directives.  145 S. Ct. at 2658; *see American Pub. Health Ass'n v. National Insts. of Health*, No. 25-cv-10787, 2025 WL 1747128, at *1-2 (D. Mass. June 23, 2025) (vacating not only "the Directives set forth in Paragraphs 1(a)-(j) of this Judgment," but also "[t]he Resulting Grant Terminations pursuant to the Directives"). The Supreme Court stayed the vacatur of the grant terminations because, as in *Department of Education*, the district court lacked "jurisdiction to adjudicate claims 'based on' the … grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *APHA II*, 145 S. Ct. at 2659 (quotation omitted) (citing *Department of Educ.*, 604 U.S. at 651).

Were there any doubt in the wake of *Department of Education*, there can be none after *APHA II*:  the district court was without power to require IMLS and MBDA to reinstate and disburse grant funds.  The orders stayed are identical to the district court's order here in both material respects—all three orders apply to claims of funds "based on" federal grant agreements, *APHA II*, 145 S. Ct. at 2659; *Department of Educ.*, 604 U.S. at 651; *see* Br. 27-28, and required specific performance of those agreements, *APHA II*, 145 S. Ct. at 2659; *Department of Educ.*, 604 U.S. at 651; *see* Br. 28.  So

plaintiffs' reliance on *APHA II* for the opposite conclusion is misplaced. Ans. Br. 26-27. Plaintiffs have pointed to nothing resembling the directives and memoranda vacated by the district court in *APHA II*; the label "Closure Decision" is one entirely of their own invention. And plaintiffs' arguments that the source of rights, and relief they seek, are in fact extra-contractual, *see* Ans. Br. 27-28, are identical to those the Supreme Court rejected in *APHA II* and *Department of Education. American Pub. Health Ass'n v. National Insts. of Health (APHA I)*, 145 F.4th 39, 50-52 (1st Cir. 2025) (accepting similar arguments); *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025) (similar).

Plaintiffs cannot sidestep these on-point decisions by emphasizing that "grant terminations comprised only one facet of" their challenge. Ans. Br. 25. The Tucker Act analysis operates at the level of (1) claims and (2) relief awarded on those claims. *See APHA II*, 145 S. Ct. at 2659. Even if plaintiffs attempted to disguise their claims as "Closure Decisions" to avoid the consequences of the Tucker Act, the fact remains that those claims are for grant funding, under grant agreements—the district court therefore lacked jurisdiction to mandate payment under those agreements, whatever the court's jurisdiction to address plaintiffs' other claims might have been. *See* Ans. Br. 25.

**b.** The district court's order to pay grant funds was also improper because those decisions are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus outside the APA's scope of judicial review, *Union of Concerned Scientists v. Wheeler*,

954 F.3d 11, 17 (1st Cir. 2020). In its opening brief, the government explained how binding Supreme Court precedent holds that an agency's decision to discontinue a program previously funded from a lump-sum appropriation and reallocate those funds to other uses is committed to agency discretion by law, Br. 31 (citing *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993)), and how persuasive authority from the D.C. Circuit extends that logic to other funding programs that permit the agency to decide "how the moneys" for a particular program "could best be distributed consistent with" the statute, Br. 31-32 (citing *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002)). The lesson of the cases cited by the government is that where a funding statute instructs an agency to make grants, without more, it is up to the agency to determine the best allocation of those funds, and that determination is unreviewable. The government also explained how the grant programs plaintiffs point to are governed by this principle, Br. 32-33 (citing statutes making lump-sum appropriations), but that the injunction nevertheless indiscriminately sweeps across a myriad of grantmaking programs at two different agencies without accounting for defendants' discretion to allocate funding amongst varying statutes, regulations, or agreements, Br. 34.

Plaintiffs respond by noting that the "district court identified multiple statutory commands that defendants' actions likely violated." Ans. Br. 45 (citing A31-39). But the "statutory commands" or "responsibilities" plaintiffs refer to, Ans. Br. 45 (quoting *Lincoln*, 508 U.S. at 193), mean something *more* than just an instruction or

14

authorization to make grants. *Lincoln*, 508 U.S. at 193 ("Congress *may* always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . But as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." (emphasis added)); *see also Milk Train*, 310 F.3d at 751-52 (pointing to a specific statutory limit on "the Secretary's authority to disburse funds," in direct contrast to a lump-sum appropriation). Neither the district court nor plaintiffs explain why the statutes at issue here contain anything more than a bare instruction to make grants, which—as the authorities cited above make plain—confers unreviewable discretion. Plaintiffs' invocation of *Union of Concerned Scientists* is also off-point. *See* Ans. Br. 46. There, the Court found material that the defendants had "pointed us to nary a case that would suggest" that "the make-up of agency advisory committees is an area traditionally left to agency discretion." *Union of Concerned Scientists*, 954 F.3d at 18. Here, in contrast, *Lincoln* and similar cases illustrate that agencies' choices in distributing funding from a lump-sum appropriation fall within the heartland of such discretion. *See* Br. 31-32.

### 2. The district court lacked authority to order reinstatement of personnel.

The district court also lacked the authority to order the reinstatement of personnel at the three defendant agencies for four reasons: plaintiffs (all States) lack standing to challenge personnel decisions, the Civil Service Reform Act (CSRA)

precludes district-court jurisdiction over plaintiffs' personnel-related claims, reinstatement is not an available remedy outside the CSRA, and personnel decisions are committed to agency discretion by law. Br. 34-43. Plaintiffs have offered no reason to reach a contrary conclusion on any point.

**a.** The government's opening brief explains that plaintiffs lack standing to challenge the termination of personnel because plaintiffs are not themselves injured in any concrete, non-speculative way by that termination. Br. 35-36. Plaintiffs respond in general terms that they have standing because they have been deprived of funding and access to agency programs. Ans. Br. 20-21. Even if that is true (for some subset of the grants and programs plaintiffs described in their papers *en masse*, A36-37), plaintiffs have not drawn the requisite connection between the agencies' internal staffing decisions and their alleged injuries.[5]

**b.** The government has also explained that the CSRA's establishment of a detailed remedial scheme for federal employee personnel actions deprives the district court of jurisdiction to hear their personnel-related claims. Br. 36-39. That

---

[5] Plaintiffs' statement (at 35) that "Defendants do not dispute that the mass terminations, if allowed to stand, would make it impossible for the agencies to carry out their statutorily mandated functions" is inaccurate. The government has consistently asserted that plaintiffs' fears of future injury are speculative. *E.g.*, Defs.' Opp'n to Pls.' Mot. for an Emergency Temporary Restraining Order 9 ("Plaintiffs are twenty-one different states, challenging the conduct of four different agencies, as to an unspecified number of grant, employment, and programmatic terminations, some alleged to have occurred, and some which may—or may not—occur in the future." (footnote omitted)), 20 (similar).

conclusion follows straightforwardly from *Elgin v. Department of Treasury*, 567 U.S. 1 (2012), and *United States v. Fausto*, 484 U.S. 439 (1988), in which the Supreme Court held that "[t]he CSRA 'established a comprehensive system for reviewing personnel action taken against federal employees.'" *Elgin*, 567 U.S. at 5 (quoting *Fausto*, 484 U.S. at 455).

Plaintiffs' invitation to reapply the *Thunder Basin* factors, Ans. Br. 30-32, fails to account for the fact that the Supreme Court already applied *Thunder Basin* in *Elgin*, and reaffirmed *Fausto*'s holding that the CSRA establishes the exclusive procedure to challenge federal personnel terminations as improper. *Elgin*, 567 U.S. at 10-15. Hence, courts have upheld the CSRA's exclusivity against "collateral, systemwide challenge[s]," explaining that "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005). Employees may raise arguments with broader consequences in CSRA proceedings, such as that a reduction-in-force exceeds an agency's authority or prevents an agency from carrying out its statutory functions. *Cf. Elgin*, 567 U.S. at 12 (rejecting "an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes" because "[t]he availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and adverse employment action at issue"). But that does not turn their employment claims into something else. And it makes no difference that plaintiffs did not explicitly "ask the court to review the propriety of personnel actions," Ans. Br. 33, or sue on employees' behalf, *id.* 33-34—the import of the

17

remedy plaintiffs sought and received was an impermissible circumvention of the carefully crafted set of remedies the CSRA sets out. *See Elgin*, 567 U.S. at 11, 22.

Plaintiffs cite *Axon Enterprise, Inc. v. Federal Trade Commission*, 598 U.S. 175 (2023), for the proposition that the issues raised in this case are not the issues the relevant administrative bodies customarily handle. Ans. Br. 30-32. But *Axon* cuts the other way. There, the challenges were "to the structure or very existence of an agency"—*i.e.*, that "an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Axon*, 598 U.S. at 189. *Axon* explicitly distinguished the challenges there from *Elgin* and a "specific substantive decision" an agency makes, like "firing an employee." *Id.* And *Axon* reaffirmed that a challenge to a termination is "precisely the type of personnel action [that is] regularly adjudicated by the MSPB." *Id.* at 187 (quotation omitted).

Plaintiffs overstate the adverse consequences of accepting the government's preclusion argument. Doing so would not "foreclos[e] all meaningful judicial review over all claims about agency action that involve personnel decisions." Ans. Br. 31; *see* Ans. Br. 32 (citing *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018)). To the contrary, those individuals to whom Congress has afforded employment rights and remedies— the employees—remain able to raise those claims in the proper forum. And routes to judicial relief for the harms plaintiffs have alleged remain open to them: for contract terminations or delays, plaintiffs may sue in the Court of Federal Claims; for "agency action unlawfully withheld or unreasonably delayed," plaintiffs may raise a claim under

5 U.S.C. § 706(1).  Plaintiffs' unsupported fears that staffing constraints might one day lead to an agency's inability to deliver legally mandated funds or services do not warrant dispensing with the CSRA's "comprehensive" system.  *Elgin*, 567 U.S. at 5 (quotation omitted).

    **c.**  Plaintiffs unsuccessfully attempt to distinguish the Supreme Court's decision in *Sampson v. Murray*, 415 U.S. 61 (1974).  Plaintiffs do not dispute the principle expressed in *Sampson* that courts generally decline to enforce employment contracts, but contend that it has no application here.  Ans. Br. 62-63.  But just because plaintiffs have sought "to vindicate … employment … relationship[s]" *en masse* rather than one-by-one, Ans. Br. 63, that does not render inapplicable *Sampson*'s caution against interfering with the need to afford the government "the widest latitude in the dispatch of its own internal affairs" or to respect the "the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee."  *Sampson*, 415 U.S. at 83 (quotation omitted).  At a minimum, such relief requires a heightened showing in this context, *see* Br. 40-41, a showing plaintiffs have not made.

    **d.**  Plaintiffs' insistence that agency staffing decisions are not committed to agency discretion by law, Ans. Br. 44-46, cannot be squared with on-point case law or the relevant statutes, *see* Br. 41-43.  Even *Union of Concerned Scientists*, which plaintiffs cite (at 46), implicitly recognized that staffing decisions are generally a discretionary matter.  954 F.3d at 18 n.5.  And the reason the Court departed from that

presumption in that case is because the agency in question had an explicit "directive" prohibiting grantees from sitting on advisory committees. *Id.* at 13. Furthermore, *Union of Concerned Scientists* involved an agency's advisory committees, *id.* at 13-15, the membership of which does not directly implicate executive discretion to enforce the law, a matter within the heartland of Executive discretion. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). More to the point, the statutes empowering the three agency heads to employ and manage staff exude discretion to those individuals. *See* Br. 42-43. Those statutes establish no judicially enforceable standards to guide the exercise of that discretion, a point to which plaintiffs have no response.

## II.     The Preliminary Injunction Is Vastly Overbroad.

The import of the Supreme Court's case law, most recently in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), could scarcely be clearer: fidelity to the traditional equitable principles that govern federal courts' grants of injunctive relief requires courts to tailor that relief to any irreparable injury shown by the parties. *Id.* at 843-44; Br. 43 (citing cases). Plaintiffs apparently agree. Ans. Br. 58 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 14 (1st Cir. 2000)). But as the government explained, the district court did not do so here. Having accepted that plaintiffs had shown some (indeterminate) amount of harm, the district court ordered defendants to unwind all steps taken in furtherance of Executive Order 14,238, whether those steps affected plaintiffs, non-parties, or no one at all. In doing so, it went well beyond granting relief to plaintiffs and by extension the bounds of its own authority.

As an initial matter, plaintiffs are wrong to suggest that the government invited, or else acquiesced in, the overbreadth of the injunction. Ans. Br. 58, 60. That the district court had already (and erroneously) found likely success on plaintiffs' broad theories before inviting the parties to propose injunctive language constrained the degree to which the government could insist on appropriate tailoring. Even so, among the other concerns it raised, the government explicitly brought to the court's attention that an order to unwind compliance with Executive Order 14,238 would "make[] 'equitable relief against non-parties' an issue." Defs.' Resp. to Pls.' Proposed Order 2-3, Dkt. No. 59. So it is simply incorrect to say that "[t]he district court 'accepted all the Defendants' suggestions for ensuring that the injunction was narrowly drafted.'" Ans. Br. 60 (quoting A1116).

Furthermore, the district court bore the responsibility of "select[ing] a fitting remedy for the legal violations it has identified." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam). Here, that would have meant analyzing the undifferentiated mass of evidence plaintiffs offered, *see* Br. 44-45, to determine which harms were to the plaintiffs themselves and which were irreparable, and tailoring the relief afforded accordingly. Plaintiffs' apparent suggestion that it does not matter whether they sought to vindicate a personal, irreparable harm or a reparable injury to a non-party, Ans. Br. 63-64, cannot be reconciled with precedent from the Supreme Court and this Court, which erects a high bar for irreparable injury precisely because injunctive relief is "extraordinary." *Starbucks Co. v. McKinney*, 602 U.S. 339, 345 (2024)

21

(quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)); *see Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

Nor is the injunction's (conceded) provision of relief to non-parties a necessary condition of affording complete relief to plaintiffs in this case. Ans. Br. 61-62. So even if broader relief is "sometimes" acceptable, Ans. Br. 61 (citing *CASA*, 606 U.S. at 851), it is only when such breadth is "incidental[]," *CASA*, 606 U.S. at 851, that such relief does not exceed a district court's equitable powers. Here, there was no need to enter such broad relief to remedy the harms plaintiffs identified. For example, if the district court believed plaintiffs to be harmed (or at imminent risk of suffering harm) by terminations of specific grants and losses of programming—and putting side the numerous other obstacles to such relief, *supra* pp. 10-20—it might have ordered the government to preserve funding and access to specific programs for plaintiffs alone, leaving it to the agencies to manage compliance. Instead, the district court accepted plaintiffs' invitation to bar all efforts to comply with the Executive Order, effectively installing itself as a monitor of a huge swath of ongoing agency operations. To the extent plaintiffs intimate that non-party benefits might nevertheless be a plus of a broader injunction, *see* Ans. Br. 61, that assertion flies in the face of *CASA*.

## III.   The Remaining Preliminary Injunction Factors Favor Vacatur.

For the reasons given in the government's opening brief, the harms plaintiffs have alleged are not the sort of "irreparable" injury sufficient to justify injunctive

relief. Plaintiffs respond by insisting that "program closures, project delays, and job losses" satisfy the irreparable harm requirement. Ans. Br. 53. But the standard is not whether plaintiffs are certain to continue along "unscathed," Ans. Br. 56, it is whether the harm is truly "irreparable." And in any event, the cited harms, even if substantiated, pale in comparison to the damage the injunction inflicts on the public fisc and on government operations. *See* Br. 46-47; Exhs. to Mot. for Stay Pending Appeal, Dkt. Nos. 63-1, 63-2, 63-3 (detailing harms to the government).

Plaintiffs speculate that the government might be able to recover grant monies disbursed and expended, but that supposition is untenable in the wake of recent Supreme Court decisions and the fact that plaintiffs have not committed to repay disbursed funds if their suit fails. *APHA II*, 145 S. Ct. at 2659 (granting stay of preliminary injunction requiring disbursement of grant monies because, as here, "[t]he plaintiffs do not state that they will repay grant money if the Government ultimately prevails"); *Department of Educ.*, 604 U.S. at 651. As to the forced reinstatement of terminated personnel, the Supreme Court has also recently provided guidance to direct the court's exercise of its equitable discretion. *McMahon*, 145 S. Ct. at 2643 (staying a preliminary injunction preventing the Department of Education from implementing a reduction-in-force and requiring reinstatement of terminated employees); *see Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Although the *McMahon* order itself is brief and arose from the stay stage, *see* Ans. Br. 57, the lower-court proceedings teed up similar questions, highlighting the propriety of heeding the

Supreme Court's cue regarding the equities here.  Here, for example, as in *McMahon*, the government has pointed to the speculative connection between agency staffing and the asserted injuries.  Br. 35-36; Stay Appl. at 10, 15-18, *McMahon*, 145 S. Ct. 2643 (No. 24A103).  Even were it not so, the unrefuted facts the government introduced in this case evince that compelling federal agencies to rehire personnel who are disgruntled with their prior treatment—and in certain instances, who are even assisting in litigation against the government—comes at a real cost to agency management.  Decl. of Keith E. Sonderling 2-3, Dkt. No. 63-1; Decl. of Kelly Mitchell 5-6, Dkt. No. 63-2; Decl. of Gregory Goldstein 2-4, Dkt. No. 63-3.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

SARA MIRON BLOOM
*Acting United States Attorney*

MELISSA N. PATTERSON
SIMON G. JEROME
*Attorneys, Appellate Staff*
*Civil Division, Room 7209*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*

*(202) 514-1673*

September 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,202 words, according to the count of Microsoft Word.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Simon G. Jerome*
Simon G. Jerome

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Simon G. Jerome*

Simon G. Jerome